1

2  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------------x
   In the Matter of
4
   WORLDCOM, INC., et al                    Case No.
5                                           02-13533
              Debtor.
6
7  ------------------------------------x
8
                        June 17, 2003
9                       10:00 a.m.
10                      United States Custom House
                        One Bowling Green
11                      New York, New York
12
   B E F O R E:
13
           HON. ARTHUR J. GONZALEZ, U.S. BANKRUPTCY JUDGE
14
15 Hearing Re: Fee applications - Squire, Sanders &
   Dempsey, LLP, as co-counsel for the Debtors; Akin Gump
16 Strauss Hauer & Feld, LLP, as counsel to the Official
   Committee of Unsecured Creditors; Pricewaterhouse-
17 Coopers, LLP, as special advisors to the Debtors;
   Kelley Drye & Warren, LLP, as special counsel for the
18 Official Committee of Unsecured Creditors; Wilmer
   Cutler & Pickering, Piper Rudnick, LLP, Lawler Metzger
19 & Milkman, LLC, Smith Pachter McWhorter & Allen, PLC,
   Weil, Gotshal & Manges, LLP, Lazard Freres & Co., LLC,
20 Scully Scott Murphy & Presser, PC, Jenner & Block,
   LLC, KPMG, LLP, Patton Boggs, LLP - adjourned to a
21 date to be determined; (03-2366) MCI WorldCom
   Communications, Inc., Pacific Bell Telephone Company,
22 Pre-Trial Conference - adjourned to 6/26; (03-2366)
   MCI WorldCom Communications, Inc., Pacific Bell
23 Telephone Company, Motion by defendant to dismiss
   complaint - adjourned to 6/26; (02-2366) MCI WorldCom
24 Communications, Inc., Pacific Bell Telephone Company,
   Motion filed by the plaintiff for summary judgment -
25 adjourned to 6/26; Motion of Southwestern Bell

2

2   agreements, known as the managed value plans have
lapsed by their own terms or, in the alternative,
3   relief from the automatic stay to allow for
termination of the agreements or, in the alternative,
4   for an order compelling the Debtors to assume or
reject the agreements - adjourned to 7/01; Motion by
5   Verestar, Inc. for relief from stay and authorizing
setoffs, compelling payment of post-petition
6   obligations and requiring Debtor to assure or reject
executory contract.  Objection filed by Debtor -
7   adjourned to 7/29; Motion filed by Staton Holding,
Inc. for relief from the automatic stay to pursue
8   administrative relief - adjourned to 7/01; Motion by
Spectrasite Communications, Inc. to compel Debtors to
9   assume or reject leases and for immediate payment of
post-petition amounts related thereto - adjourned to
10  7/01; Motion by Mississippi Power Company to compel
Debtor to assume or reject that certain agreement for
11  the provision of Fiber Optic Facilities and Services
dated August 12, 1991 and compel timely performance
12  obligations under unexpired lease of personal
property.  Objections filed - adjourned to 7/15;
13  Motion by Howard Katz, Wanda Cheryl Katz, Richard B.
Schwartz, Charles Brewer and Harriet Brewer for relief
14  from the automatic stay.  Objections filed - adjourned
to 7/15; (03-2032) WorldCom, Inc, Max V. Laughlin, et
15  al.  Motion by defendants Adrian Warren, et al, for
findings of fact.  Motion by defendants Adrian Warren,
16  et al, to quash service, vacate orders and dismiss
defendants.  Motion by defendants Adrian Warren, et
17  al, to amend judgment.  Omnibus reply filed by the
plaintiffs to all of the above motions - Adjourned to
18  7/01; (03-2175) Linear Electric Company, WorldCom,
Inc. and WorldCom Purchasing, LLC, Pre-Trial
19  Conference - adjourned to 7/15; Motion filed by
Caroline Covington for relief from the automatic stay
20  - adjourned to 7/15; Motion filed by Dr. Yanina
Shapiro for leave to file a proof of claim beyond
21  deadline - Motion to be decided on the submissions;
Motion filed by Mercantile Partners, LP, for allowance
22  of late-filed proof of claim - adjourned to 7/08;
Motion filed by the Debtors for authorization (i) to
23  transfer assets between the Debtors, and (ii) to
reject an executory contract.  Objection of the City
24  of New York filed.  Objection of AT&T Corp. filed -
adjourned to 7/08; Hearing re: Motion of the Debtors
25  to enforce the automatic stay against actions of

3

2    filed - adjourned to 7/01; Motion by plaintiff
     Snavely, Zinmeister and NYLB, Inc. for relief from
3    stay.  Objections by Debtors filed.  Joinder to the
     Debtor's objection filed by the Official Committee of
4    Unsecured Creditors - adjourned to 7/01; (02-3511)
     Focal Communications Corporation, WorldCom, Inc., et
5    al - Pre-Trial Conference - adjourned to 7/01;
     (03-2105) WorldCom, Inc., ABN Amro Bank, N.V., et al,
6    Motion filed by the plaintiff for extension of
     temporary injunction.  Defendants' opposition filed;
7    Motion by Debtors for approval of settlement with
     Valor Telecommunications Enterprises, LLC, and
8    Longacre Master Fund, Ltd.; Motion filed by the
     Debtors for an order authorizing the assumption of an
9    unexpired, amended lease of nonresidential real
     property located in Jackson, Mississippi; OCS RE:
10   Motion filed by the Debtors for entry of an order (A)
     establishing procedures for Debtors' proposed auction
11   of Pentagon City and related property, (B) approving
     "break-up fee" arrangement with proposed purchase, (C)
12   establishing date and time for sale hearing, and (D)
     approving form and manner of notices; Motion filed by
13   the Debtors for approval of rejection of 113
     individual service orders; Motion filed by the Debtors
14   for approval of rejection of 86 individual service
     orders; Motion by Wilmer, Cutler & Pickering to
15   authorize retention as special counsel to the special
     investigative committee and motion for relief from
16   certain terms of such order; Objection filed by the
     Debtors to proofs of claim of Teldar Communications
17   Network, Inc., Claim Nos. 24004 and 24005.  Response
     filed by Teldar Communications Network, Inc.;
18   Objections filed by the Debtor to proofs of claim
     filed by Oracle Corporation relating to software
19   license dispute.  Reply by Oracle Corporation filed;
     Motion filed by National Message Center, Inc. for
20   relief from the automatic stay.  Objection by Debtors
     filed.  Joinder of the Official Committee of Unsecured
21   Creditors to Debtors' objection; Motion filed by
     HSG/ATN, Inc. for allowance and payment of
22   administrative expense.  Objection by Debtors filed.
     Joinder to the Debtors' objection filed by the
23   Official Committee of Unsecured Creditors.
24
     Reported by:   SABRINA SALAS, CSR
25

4

2    A P P E A R A N C E S:

3

4    WILMER, CUTLER & PICKERING
             Attorneys for Special Committee
             350 Park Avenue
5            New York, New York   10022
6    BY:    WILLIAM J. PERLSTEIN, ESQ.

7

8    ENGELMAN BERGER, P.C.
             Attorneys for HSG
9            One Columbus Plaza, Suite 1050
             3636 North Central Avenue
10           Phoenix, Arizona   65012
11   BY:    DAVID WILLIAM ENGELMAN, ESQ.

12

13   WEIL, GOTSHAL & MANGES, LLP
             Attorneys for Debtors
14           1501 K. Street, N.W., Suite 100
             Washington, D.C.   20005

15

16   BY:    ADAM P. STROCHAK, ESQ.
                  - and -
             KRISTIN KING, ESQ.

17

18

19   AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
             Attorneys for Official Committee
             of Unsecured Creditors
20           590 Madison Avenue
             New York, New York   10022

21

22   BY:    SHUBA SATYAPRASAD, ESQ.
                  -and-
             IRA DIZENGOFF, ESQ.

23

24

25

5

2    A P P E A R A N C E S:   (Continued)

3

            McCARTER & ENGLISH, LLP
4                Attorneys for Valor
                 Telecommunications
5                Mellon Bank Center
                 P. O. Box 111
6                Wilmington, Delaware  19690
7        BY:    WILLIAM F. TAYLOR, ESQ.

8

9        WEIL, GOTSHAL & MANGES, LLP
                 Attorneys for Debtors
10               767 Fifth Avenue
                 New York, New York  10153-0119

11

         BY:    CHRISTOPHER J. MARCUS, ESQ.

12

13

            KELLEY DRYE & WARREN, LLP
14               Attorneys for Creditors'
                 Committee
15               101 Park Avenue
                 New York, New York  10178

16

         BY:    MARK R. SOMERSTEIN, ESQ.

17

18

            RICHARD L. KORAL, ESQ.
19               Attorney for HSG
                 60 East 42nd Street, Suite 2320
20               New York, New York  10165

21

22

23

24

25

6

2    A P P E A R A N C E S   (Continued):

3

   TELEPHONE APPEARANCES:

4

          KEVIN LAURILLIARD, ESQ.,

5

          BRUCE WHITE, ESQ.,

6              Patton Boggs

7    GERRIL PRONSKE, ESQ.,

8    MARC R. STANLEY, ESQ.,

9    JEFFREY W. NEMORE, ESQ.,

              Kramer, Levin, LLP

10

          JAMES HEIDELBACH, ESQ.,

11             Gerhardt & Smith, LLP

12    DARRYL LADDIN, ESQ.,

              Arnall, Golden & Gregory, LLP

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          WORLDCOM, INC., ET AL

2          P R O C E E D I N G S

3          MR. PEREZ:  Good morning, Your

4   Honor.  Let me just flip directly to the resolved

5   matters.

6          The first two matters, Your Honor,

7   are stipulations to be entered, one in connection

8   with WorldCom versus ABN Amro, and the other one

9   in connection with Valor Communications.  They're

10  on Page 14 of the docket.  Mr. Strochak is going

11  to present those, but before I do that, Your

12  Honor, I wanted to introduce to the Court Paul

13  Eskildsen who is the new acting general counsel at

14  WorldCom.

15          THE COURT:  How are you doing?

16          MR. ESKILDSEN:  Good morning.

17          MR. PEREZ:  He had never been here

18  before so he wanted to understand what we were

19  doing and be introduced to the Court, but I will

20  let Mr. Strochak take these first two.

21          THE COURT:  All right.  Thank you.

22          MR. STROCHAK:  Good morning.  Adam

23  Strochak, Weil, Gotshal & Manges, for the Debtor.

24          The first matter is the Debtor's

25  motion for extension of the temporary injunction

8

WORLDCOM, INC., ET AL

1

2    issued in the adversary proceeding, WorldCom, Inc.

3    versus ABN Amro Bank, Adversary 03-2015.  You will

4    recall, Your Honor, this matter initially came

5    before the Court on our motion for preliminary

6    injunction.

7            The Court granted that motion in

8    March and entered a preliminary injunction

9    enjoining prosecution of claims against Ms. Mayer,

10   Susan Mayer, the Debtor's former senior

11   vice-president and treasurer through June 15th,

12   and the preliminary injunction order left open an

13   opportunity for the Debtor to move to extend that

14   injunction beyond June 15th on ten day's notice.

15           We did file a motion to extend the

16   injunction, I believe it was filed on June 7th.

17   And I am pleased to report that after extensive

18   discussions with counsel for the bank defendants

19   in that case, that we have reached agreement for a

20   short continuation of the injunction for an

21   additional 30 days.

22           The reason for the continuation --

23   I know that the Court is probably aware that

24   Ms. Mayer's employment status with the Debtors has

25   changed since last week, but the reason for the

9

1                  WORLDCOM, INC., ET AL

2    extension is that the Debtors had been in

3    settlement negotiations with the banks to resolve

4    the banks' claims against both the Debtors and

5    Ms. Mayer, and those -- those negotiations have

6    proceeded satisfactorily to the point that we have

7    a tentative agreement that is still subject to

8    committee approval and, of course the Court's

9    approval by this Court.  We felt it was

10   appropriate to extend the injunction with respect

11   to the claims against Ms. Mayer for an additional

12   30 days to let that process take its full course.

13               I believe Mr. Heidelbach, counsel

14   for the banks, was going to participate by

15   telephone today.  I do have a stipulation to

16   present.  Mr. Heidelbach has agreed to the form of

17   stipulation.  And if there are no questions, I can

18   present a copy for the Court.

19               THE COURT:  Anyone else wish to be

20   heard?

21               MR. DIZENGOFF:  Thank you, Your

22   Honor.  Ira Dizengoff, Akin, Gump, for the

23   Committee.

24               The Committee is examining the

25   proposed terms of the settlement with the banks.

10

1              WORLDCOM, INC., ET AL

2    I think that 30-day window for this injunction

3    will give us sufficient time to finish our

4    diligence.  These are very complicated issues.

5    It's a very complicated lawsuit.  The banks

6    brought -- excuse me -- in connection with

7    constructive trust and most intermediate balance.

8    We are doing that.  We think in due course we will

9    come to a recommendation for the Committee and it

10   will be before the Court, but the injunction makes

11   sense, Your Honor.

12              THE COURT:  All right.  Anyone

13   else?

14              MR. HEIDELBACH:  This is James

15   Heidelbach.  I am participating by phone and I

16   represent the 20 banks that are the defendants in

17   the adversary proceeding.  And I think

18   Mr. Strochak has -- has represented the banks'

19   position correctly.

20              Our sole impetus for entering into

21   this extension is the ongoing settlement

22   discussion.  Other than that, we don't think there

23   would be any reason for the injunction to

24   continue.

25              THE COURT:  All right.  Thank you.

1                    WORLDCOM, INC., ET AL

2    Anyone else?

3                    (No response.)

4                    THE COURT:  No further comment

5    being heard, based on the pleadings as filed and

6    representations made on the record and no

7    opposition having been interposed, I will grant

8    the request as modified.  You may hand up the

9    order.

10                    Go ahead.

11                    MR. STROCHAK:  The next matter,

12   Your Honor, is the Debtor's motion pursuant to

13   Bankruptcy Rule 9019 for approval of a settlement

14   with Valor Telecommunications Enterprises, LLC and

15   Longacre Master Fund, Ltd., Docket No. 5644.

16                    We provided notice of this motion

17   in accordance with the Court's case management

18   order.  We have not received any objections to it.

19                    The Committee did raise some

20   informal questions and potential objections to the

21   motion and we spent a lot of time working with the

22   Committee and its counsel to address their

23   concerns about it.  I believe all those concerns

24   have been addressed and the agreement we have

25   reached is that based on a representation on the

12

1          WORLDCOM, INC., ET AL

2    record by counsel for Valor regarding the nature

3    of the relationship between Valor and Longacre,

4    that the Committee is satisfied and has no

5    objection to this motion.

6              In short, I will turn the podium

7    over to counsel in a second, but in terms of a

8    short summary, the agreement provides for the

9    fixing of Valor's claim in this matter.  Valor had

10   to assert a claim in the amount of approximately

11   $4.8 million and it had a claim to a right of

12   setoff with respect to approximately $1.7 million

13   or so.  All of this is recounted in the motion

14   itself in terms of the specific numbers involved.

15             We have agreed to fix the amount of

16   the setoff and allow the setoff, and the result of

17   that is it will fix the amount of Valor's claim

18   which has subsequently been sold to Longacre, at

19   my recollection, was approximately $3.6 million --

20   excuse me -- 3.1 -- $3.128 million will be the net

21   amount of the claim.

22             In addition, the agreement is a

23   compromise of other issues related to rejection of

24   certain circuits.  Valor took certain positions

25   with respect to the priority that any termination

13

1      WORLDCOM, INC., ET AL

2  fees would get with respect to circuits that were

3  rejected.  And we have been able to resolve that

4  dispute with an agreement that provides that any

5  termination fees due under FCC fall under tariffs

6  with respect to termination of services under

7  these circuits will be paid as a prepetition

8  unsecured claim.

9            So we believe that's a favorable

10  resolution for the Debtors and represents a fair

11  compromise under the standards of Bankruptcy Rule

12  9019.

13            So with that, I ask Mr. Taylor,

14  counsel for Valor, to make the representation that

15  we previously discussed.  And then I do have an

16  order to hand up if the Court has no further

17  questions.

18            THE COURT:  All right.  Anyone else

19  wish to be heard?

20            MR. TAYLOR:  I'm already here.  I

21  will use this one.

22            All right.  Bill Taylor with

23  McCarter & English in Wilmington, Delaware.  I

24  have been asked by the Debtors to address a

25  concern the Committee had that Valor might have an

14

1              WORLDCOM, INC., ET AL

2    ongoing financial interest with Longacre.

3                  Basically the way this worked was

4    in February, Valor sold Longacre its gross claim

5    and then Valor essentially repurchased or paid

6    back a portion of the claim that was the setoff.

7    So the parties have evened up their financial

8    dealings.  There are no further financial dealings

9    and I don't know what else to say.

10                 I believe they should address what

11   the Committee was concerned about.

12                 THE COURT:  The Committee?

13                 MR. DIZENGOFF:  Thank you, Your

14   Honor.

15                 The only concern we have is where

16   the money was actually going via the setoff back

17   into Longacre's hands, but I think you represented

18   that's not the case.  Their economics are done

19   between Valor and Longacre.  With that

20   representation, we have no objection to the

21   settlement.

22                 MR. TAYLOR:  Yes, that is correct.

23                 THE COURT:  All right.  Anyone else

24   wish to be heard?

25                 (No response.)

15

1              WORLDCOM, INC., ET AL

2              THE COURT:  No further comment

3    being heard, based on the representations made on

4    the record and no opposition having been

5    interposed, I will grant the motion.  You may hand

6    up the order.

7              All right.  Go ahead.

8              MR. STROCHAK:  I believe Mr. Perez

9    has the next matter, Your Honor.

10             MR. PEREZ:  Your Honor, the next

11   matter is the Debtor's motion pursuant to 365 of

12   the Bankruptcy Code to assume a lease of unexpired

13   real property in Jackson, Mississippi, Docket No.

14   6062.

15             I don't believe there have been any

16   objections to this.  This is a relatively routine

17   assumption of a real property lease.

18             THE COURT:  All right.  Does anyone

19   else wish to be heard?

20             (No response.)

21             THE COURT:  No further comment

22   being heard, based on the pleadings as filed and

23   no opposition having been interposed, I will grant

24   the motion.  You may hand up the order.

25             MR. PEREZ:  Your Honor, the next

16

1                    WORLDCOM, INC., ET AL

2    motion is the motion for authority to sell,

3    auction, the Pentagon City real estate property.

4                    As the Court is aware, this has

5    been a subject of motions in the past.  It's a

6    two-story building, Pentagon City.  There is

7    subject to a pending lease with the TSA, the new

8    Division of Homeland Security that does the

9    security at the airports.  The proposed purchase

10   price is a little in excess of $133 million.  And

11   there's some additional consideration.

12                    The break-up fee is 1.95 percent of

13   the purchase price.  We're proposing to have an

14   auction on July 23rd, Your Honor, and the sale

15   hearing would be July 29th.

16                    We did receive comments from both

17   the United States Attorney's Office in their

18   capacity as counsel for the lessee, the TSA, as

19   well as comments from the Committee.  I believe

20   that we've addressed all of the comments that have

21   been raised.  And I don't believe that there's any

22   continuing either objection or concern with the

23   proposed form of order authorizing the bid

24   procedures and the payment of the break-up fee.

25                    THE COURT:  All right.  Anyone else

17

```
 1                    WORLDCOM, INC., ET AL
 2   wish to be heard?
 3                    MR. SOMERSTEIN:  Just -- Mark
 4   Somerstein, Kelley, Drye & Warren, for the
 5   Creditors' Committee.  We note for the record our
 6   concerns were addressed in the notice and in the
 7   sale -- the proposed form of bidding procedures
 8   order.
 9                    Thank you.
10                    THE COURT:  All right.  Anyone
11   else?
12                    (No response.)
13                    THE COURT:  Based on the pleadings
14   as filed and the representations made on the
15   record, I will grant the request.
16                    You may hand up the order.
17                    MR. PEREZ:  Your Honor, Mr. Marcus
18   is going to handle the circuit rejections.
19                    MR. MARCUS:  Your Honor,
20   Christopher Marcus, Weil, Gotshal & Manges, on
21   behalf of the Debtors.
22                    The next two motions on the docket,
23   motions to reject circuits, are on the agenda
24   because we had planned to go forward with them.
25   Last evening we received a call from -- we
```

18

1          WORLDCOM, INC., ET AL

2  received a call from counsel for Verizon.  Verizon

3  had several concerns about some of the specific

4  circuits on the motion to reject 113 service

5  orders and so we've agreed to adjourn that motion

6  until next week's hearing.

7          With respect to the motion seeking

8  rejection of 86 individual service orders, there

9  was another concern raised by Verizon regarding

10  the provision surrounding filing of proofs of

11  claim.  We've agreed with Verizon that we will

12  work together to just tweak the language, and then

13  if it's okay with Your Honor, we will submit an

14  order to the Court, an agreed upon order to the

15  Court as soon as we've completed that language.

16          THE COURT:  All right.  What

17  adjourn date -- what other date does Verizon have

18  matters on that it was seeking these to be

19  adjourned to or --

20          MR. MARCUS:  Just until next

21  Tuesday, Your Honor.

22          THE COURT:  All right.  Because

23  there was an issue -- there's an issue that will

24  become clearer later today about matters that are

25  going to need to be adjourned, but originally

19

WORLDCOM, INC., ET AL

1
2    there shouldn't have been anything on the 22nd.
3    There are a number of matters that are on the 22nd
4    and there's going to have to be -- no, the 24th,
5    the 24th is going to have to be utilized, but it's
6    probably not going to be able to be utilized for
7    WorldCom unless it's an emergency.
8              MR. MARCUS:  That's not a problem.
9    We can push it.
10             THE COURT:  To July 1st?
11             MR. MARCUS:  That would be fine.
12             THE COURT:  So 7/1 at 10:00 o'clock
13   for both the 113 individual service orders and the
14   86 individual service orders.
15             MR. MARCUS:  That would be fine,
16   Your Honor.  Thank you.
17             THE COURT:  All right.  Thank you.
18             MR. PEREZ:  Your Honor, we have
19   been aware that the 24th was not available and I
20   believe that in the last couple of months we made
21   sure that nothing got set there.  I think some of
22   the things may have gotten set there originally
23   without people realizing it.
24             THE COURT:  I think that and -- I
25   think that's right.  I don't know if I made a

20

1          WORLDCOM, INC., ET AL

2    mistake and we adjourned something to that date as

3    well, but --

4               MR. PEREZ:  No, we -- the Court did

5    grant us one setting on the 26th on something, but

6    other than that -- Your Honor, the next matter is

7    the motion of Wilmer, Cutler, Docket No. 6441.  I

8    believe Mr. Perlstein is here, counsel for the US

9    Trustee.

10              MR. PERLSTEIN:  Good morning, Your

11   Honor.  William Perlstein, Wilmer, Cutler,

12   Pickering.

13              This is a request for a limited

14   modification to the existing retention order to

15   allow Wilmer, Cutler to represent additional

16   RBOCs.  The reason the operating company is

17   adverse to the Debtors in FCC and other regulatory

18   proceedings, the existing orders allows such

19   representations of Verizon, Qwest and one small

20   matter for SBC.  The new order would expand the

21   authority to allow the general representation of

22   SBC and BellSouth in such regulatory proceedings.

23              We believe that the US Trustee and

24   the Debtors are agreeable to this.

25              THE COURT:  The US Trustee's

21

1                    WORLDCOM, INC., ET AL

2    Office?

3                    MR. ZIPES:  Good morning, Your

4    Honor.  Greg Zipes from the US Trustee's Office.

5                    The US Trustee does consent to the

6    limited relief requested today.  This would not be

7    a granting of the motion in full.  There needs to

8    be further discussion between Wilmer, Cutler and

9    the US Trustee's Office on that.

10                   But what's being approved today,

11   subject to the Court's approval, of course, is

12   that Wilmer, Cutler would be permitted to

13   retain -- to represent the other RBOCs, as they're

14   called here, on matters that aren't before this

15   Court, and that appropriate loan off procedures

16   will continue to be in place on the part of

17   Wilmer, Cutler, such that the attorneys involved

18   with the investigation by the Special Committee,

19   those that have reviewed the numerous E-mails of

20   WorldCom and the documents of WorldCom, would not

21   be involved with any of these matters relating to

22   the other RBOCs.  And the order would make clear

23   that that's the relief being granted today.

24                   And there is a proposed order.  I

25   don't know this Court has actually seen the final

22

1    WORLDCOM, INC., ET AL

2    draft of the order, but there has been language

3    worked out between the US Trustee's Office and

4    Wilmer, Cutler that provides for that limited

5    relief.

6                 THE COURT:  All right.  The

7    Committee?

8                 MR. DIZENGOFF:  Your Honor, we've

9    had lots of discussions with the Wilmer, Cutler

10   firm about their application.  We have not seen

11   the revised form of order.  As a conceptual matter

12   we agreed previously they could represent Verizon

13   in regulatory matters and Qwest in regulatory

14   matters.  And I understand this Court continues

15   that sort of status quo with respect to certain

16   other RBOCs.

17                 There were other aspects of the

18   order we did have concern about and that would be

19   subject to further discussion between the

20   Committee and the Wilmer, Cutler firm, but my

21   understanding from the representations of

22   Mr. Perez who I spoke to yesterday, those are not

23   going further today and we'll have further

24   discourse about that.

25                 MR. PERLSTEIN:  That is correct,

23

                    WORLDCOM, INC., ET AL

1

2    but I have a form of order that I can hand up.  It

3    is limited solely to the other RBOCs, which is SBC

4    and BellSouth, and solely to regulatory

5    proceedings, principally, the FCC and State

6    proceedings, not inside this Court, and limited to

7    the same sort of proceedings that we have

8    continued to represent Verizon, Qwest on

9    throughout this case, but that they would not be

10   representing any further clients in the bankruptcy

11   case.

12                    THE COURT:  All right.  Anyone

13   else?

14                    (No response.)

15                    THE COURT:  No further comment

16   being heard, based upon the pleadings filed and

17   the statements made on the record, I'll grant the

18   request as modified and after -- has the Committee

19   now had an opportunity to review it?

20                    MR. DIZENGOFF:  This is fine.  This

21   form of order is fine.

22                    THE COURT:  You may hand up the

23   order.

24                    MR. PERLSTEIN:  Thank you, Your

25   Honor.

24

WORLDCOM, INC., ET AL

1

2      MR. PEREZ:  The next matter is a

3  matter that's going to be submitted on submission

4  so it's just noted in there but -- and that

5  concludes the uncontested matters.  So now we --

6      THE COURT:  Before we go, let's

7  just for the record, the matter you are referring

8  to is the motion filed by Dr. Yanina Shapiro for

9  leave to file proof of claim beyond the deadline.

10      MR. PEREZ:  Correct.

11      THE COURT:  She has consented to or

12  requested this resolution on the submissions and

13  the Debtor has requested to -- has consented to

14  that?

15      MR. PEREZ:  Yes, we have filed a

16  response with a proposed form of order that should

17  have to get to ECF to this party.

18      THE COURT:  All right.  Thank you.

19      MR. PEREZ:  Your Honor, I believe

20  that is all of the uncontested matters.  The one

21  thing that we did not mention was the continuation

22  of the fee applications to July 15th.

23      THE COURT:  All right.  They will

24  be adjourned to 7/15 at 10:00 o'clock, and there

25  will be at some point a further notification as to

25

```
 1              WORLDCOM, INC., ET AL
 2    whether all these fee applications will be ready
 3    to go forward at that time.
 4              MR. SOMERSTEIN:  Mark Somerstein.
 5    I certainly have no objection to the adjournment
 6    of Kelley Drye's fee application, but I think
 7    there is one matter I should put on the record and
 8    perhaps even by putting on the record, the issue
 9    may get resolved.
10              For whatever reason,
11    notwithstanding the good efforts of Mr. Perez and
12    Ms. Goldstein, Kelley, Drye has not been paid in
13    the case at all.  There is an administrative order
14    requiring the Debtors to pay 80 percent of fees
15    and expenses; however, the Debtors appear with
16    respect to Kelley, Drye not to have complied with
17    that order.
18              We haven't raised it with the Court
19    thus far.  We certainly would anticipate we won't
20    need to raise it with the Court, but I think
21    simply by putting it on the record today, we may
22    be able to resolve the issue now that it's known
23    to the Court.
24              Thank you.
25              THE COURT:  Mr. Perez?
```

26

1                    WORLDCOM, INC., ET AL

2                    MR. PEREZ:  Your Honor, I was aware

3    that this was an issue.  I, frankly, thought the

4    issue had been resolved weeks or months ago.  I

5    was surprised when Mr. Somerstein told me right

6    before the hearing that he was going to put this

7    on the record without, you know, trying to contact

8    me again to make sure -- to see what I could do

9    about it.

10                    Obviously, the Debtor has paid tens

11   of millions of dollars in fees.  This is an

12   oversight, not anything intentional.  I just wish

13   it had been handled in a different fashion.  I

14   have made probably three or four inquiries,

15   requests, et cetera, not only on behalf of Kelley,

16   Drye, but other law firms to ensure payment, and

17   it's unfortunate it had to be brought up in this

18   respect and we'll try to take care of it.

19                    THE COURT:  All right.  The next

20   matter?

21                    MR. PEREZ:  Teldar.  I believe

22   Mr. Strochak is going to be handling the rest of

23   the contested matters.

24                    MR. STROCHAK:  The next two matters

25   are claims objections that are listed as contested

WORLDCOM, INC., ET AL

1
2  because they are still active objections, but
3  they're on the calendar solely for scheduling
4  purposes.
5          The first is the Debtors' objection
6  to the proofs of claim of Teldar Communications
7  Network, Claim Nos. 24004 and 24005, and the
8  objection is docketed at Docket No. 5097.
9          We have been able to work out an
10 appropriate scheduling order with counsel for
11 Teldar.  I don't know if they're participating by
12 telephone or in the courtroom today.
13         This is a matter that's handled
14 primarily by Jenner & Block, but since it was just
15 presentment of an agreed order in order to save
16 the costs, I just offered to present the order.
17         I have a scheduling order to
18 present, Your Honor, that will essentially get the
19 claims through the discovery process by about
20 April of next year.  I believe Teldar has filed a
21 motion for relief from the automatic stay seeking
22 leave to liquidate this claim in the original
23 court that has a separate schedule as set forth in
24 accordance with the case management order; so,
25 obviously, the agreed scheduling order is subject

28

1                    WORLDCOM, INC., ET AL

2    to revision, depending on the outcome of the

3    motion to lift the automatic stay.

4                    But if the Court has no questions,

5    I can present an agreed scheduling order in this

6    claim.

7                    THE COURT:  You may have said this

8    in your presentation, but what is the adjourned

9    date, then, for a hearing for this or what date

10   were you looking for if you haven't put that in

11   the schedule?

12                   MR. STROCHAK:  We have -- the next

13   date is a pretrial conference scheduled for

14   April 5, 2004.  I am hoping that that's a Tuesday.

15                   THE COURT:  Well, we have plenty of

16   time to adjust it.

17                   Is that for both matters?

18                   MR. STROCHAK:  That's for the

19   Teldar matter.  The next matter is separate.

20                   THE COURT:  All right.  Go ahead.

21                   MR. STROCHAK:  I can present the

22   order, unless Your Honor has further questions.

23                   THE COURT:  You may hand up the

24   order.

25                   Go ahead.

1          WORLDCOM, INC., ET AL

2          MR. STROCHAK:  The next matter is

3  the Debtors' objection to proofs of claim filed by

4  Oracle Corporation related to a software license

5  dispute.  That's Docket No. 5101.

6          Just as with the previous matter,

7  this is one that's been handled primarily by

8  Jenner & Block.  They do have an agreed scheduling

9  order again to present.

10         The scheduling order really

11 addresses scheduling on a potential motion to lift

12 the automatic stay and establishes a schedule for

13 that.  I believe the control date for this one

14 would be August 19th, 2003 and, again, if I can

15 just ask the Court's indulgence, I hope that's a

16 Tuesday.  I just don't have my calendar

17 immediately before me.

18         THE COURT:  All right.

19         MR. STROCHAK:  So that would be the

20 hearing date for the motion.

21         THE COURT:  You didn't say 8/19?

22         MR. STROCHAK:  I did, yes.

23         THE COURT:  That will not be

24 available, I am sure.  So it's going to have to

25 be -- the following week begins the scheduling

30

1                    WORLDCOM, INC., ET AL

2    confirmation hearing.

3                    MR. STROCHAK:  That's right.  Yes.

4                    THE COURT:  Why don't you consult

5    with Oracle and see if we can work out a date

6    either before or after -- after the 19th, but not

7    that week?

8                    MR. STROCHAK:  We'll do that.  The

9    way the order is set up now, it's an on or before

10   date.  Why don't we go back and --

11                   THE COURT:  We'll have to go back

12   to the 5th.

13                   MR. STROCHAK:  I was going to

14   suggest why don't I do this?  Rather than end up

15   with dates that can't work, why don't I take this

16   one back and work out a schedule that will fit the

17   Court's August schedule in light of whatever

18   vacation plans the Court has and the confirmation

19   hearing, and then we will submit a scheduling

20   order for entry by the Court.

21                   THE COURT:  All right.

22                   All right.  The next matter, then,

23   is a motion filed by National Center, Inc.

24                   MR. STROCHAK:  That is correct,

25   Your Honor.

31

1                    WORLDCOM, INC., ET AL

2                    MR. SMITH:  This is Harlan Smith

3    representing National Message Center.

4                    THE COURT:  All right.  Go ahead.

5                    MR. SMITH:  I am here with Mr. Lee

6    Parks who is the litigation attorney in the case

7    in the United States District Court in the

8    Northern District of Georgia and also Mr. Morgan

9    Cooper as principal of National Center, Inc.

10                   We are requesting the Court to

11   allow us to proceed to liquidate to trying the

12   trial in the United States District Court.  We

13   want to point out to the Court that there's a

14   breach of contract.

15                   THE COURT:  I am going to have to

16   take a five-minute break.  I will return in a

17   couple of minutes and continue.

18                   (Short recess taken.)

19                   THE COURT:  All right.  Counsel for

20   National Message Center, you may continue and

21   speak a little louder.

22                   MR. SMITH:  As I say, I represent

23   National Message Center, Inc.  I am here with the

24   litigation attorney in the case pending in the

25   United States District Court in the Northern

32

1                    WORLDCOM, INC., ET AL

2    District of Georgia.  And also with Mr. Cooper who

3    is the principal -- one of the principals of

4    National Center, Inc.

5                    Now the case in the US District

6    Court was filed in September of 2001 sometime

7    before the filing of WorldCom Chapter 11, and the

8    case involved is a rather complex breach of

9    contract failure to provide services resulting in

10   National Message Service, Inc. incurring

11   substantial lawsuits and went out of business.

12                   We didn't expect it would probably

13   be 10 to 15 witnesses required.  All we're really

14   asking the Court to do is allow us to proceed to

15   make a determination or liquidate that particular

16   claim.  And they're in the process of -- discovery

17   documents have been furnished to WorldCom's

18   counsel and I think WorldCom is short on

19   furnishing information back to my client, but I

20   can let Mr. Parks speak to that issue.

21                   Basically, and we waited this --

22   this point of filing the motion because obviously

23   we recognize the Court would not entertain a

24   motion in the early stages of WorldCom's

25   Chapter 11; however, almost 12 months have gone

1                   WORLDCOM, INC., ET AL

2    by, disclosure statement and plan has been

3    presented, and ultimately a resolution process

4    will be evolving.

5                   And we believe it would be in the

6    best interest of the creditors, as well as Debtor,

7    and would represent judicial economy to let us

8    proceed in the District Court and let us proceed

9    with the matter in the liquidated amount of the

10   plan.

11                  And that's my preliminary remarks

12   in the case.

13                  THE COURT:  All right.  Thank you.

14                  All right.  Mr. Strochak?

15                  MR. STROCHAK:  Thank you, Your

16   Honor.

17                  The fundamental problem we have

18   here is really a question of numbers, Your Honor.

19   As the Court knows, as we represented in the past,

20   the Debtors had somewhere in the neighborhood of

21   2500 prepetition lawsuits pending at the time they

22   went into Chapter 11 last July.  While it may be

23   that with respect to any individual claim or any

24   one of these individual lawsuits that the effect

25   of lifting the stay to allow liquidation of that

WORLDCOM, INC., ET AL

1
2 one lawsuit in another forum might not have an
3 adverse effect standing alone on the conduct of
4 these Chapter 11 cases and the Debtors' ability to
5 manage them effectively and emerge effectively
6 from Chapter 11, it is a problem of aggregate
7 numbers.  If we do this for every lawsuit, we are
8 going to -- going to end up spending an enormous
9 amount of time, money and energy in fighting off
10 these claims in District Courts, in State Courts
11 around the country in all the various
12 jurisdictions where the Debtors do business and
13 have lawsuits pending.
14                So, fundamentally, the problem for
15 us is that if you do it for this case, there's no
16 real reason why you wouldn't do it for any other
17 case and we end up with a waterfall effect where
18 every claim will end up being liquidated in the
19 home court at great prejudice to the Debtors and
20 their creditors.
21                This case, in particular, does not
22 present any compelling circumstances whatsoever to
23 lift the automatic stay.  It's a lawsuit that's
24 pending in Georgia.  I believe the lawsuit has not
25 progressed substantially.  It is nowhere near

WORLDCOM, INC., ET AL

ready for trial.  Discovery has really just
commenced in the action.  It is a relatively
ordinary commercial dispute between the Debtors
and one of their former customers.  There are just
simply no circumstances that suggest under Sonnax
or any practical analysis of the matter that
litigating this one to liquidation in the home
court, so to speak, is of substantial benefit such
that it would not compromise the efficiencies
gained through centralized claims resolution in
the Bankruptcy Court.

I don't have much to add other than
that, other than what's already in our papers.  I
think for the reasons -- the same reasons that the
Court has denied numerous motions to lift the stay
throughout the course of these proceedings, that
there is nothing about this particular action that
warrants relief from the stay.  The appropriate
thing is to maintain the stay in place, to
adjudicate the claim in this Court without
prejudice to renewal of the motion at a later time
should it become clear for some reason that's not
clear at this juncture, that efficiency compels
litigating this claim in the home court.

36

1                    WORLDCOM, INC., ET AL

2                    So it would be our desire, Your

3    Honor, that the motion be denied without prejudice

4    to renewal at some later date, should some change

5    in circumstances become clear.

6                    THE COURT:  The Committee?

7                    MS. SATYAPRASAD:  Shuba Satyaprasad

8    from Akin, Gump on behalf of the Official

9    Committee of Unsecured Creditors.

10                    Your Honor, it is the Committee's

11   position that the Movant has failed to demonstrate

12   that cause for relief from the stay exists and

13   that the Movant's claim can be expeditiously

14   handled in the claims resolution process.

15                    Further, the Committee believes

16   that for the benefit of creditors, the Debtors'

17   focus at this stage of their cases should be on

18   the reorganization efforts.  And for these reasons

19   and those stated by the Debtors, the Committee

20   joins the Debtors' objection.

21                    THE COURT:  All right.  Counsel for

22   National Message Center, do you have anything to

23   add?

24                    MR. SMITH:  Yes, Your Honor.

25   Again, the point that's made by counsel concerning

37

WORLDCOM, INC., ET AL

1
2  the 2500 prepetition lawsuits, they have got to be
3  resolved in some state, form or fashion and,
4  obviously, your court, if it's going to hear 2500
5  claims of that nature, it would seem to me that
6  that would create an impossible task.

7        And all we're asking for is to let
8  this Court and the District Court in Georgia ensue
9  pending resolving that issue which is somewhat of
10  a liquidated claim actually, is it seems to me to
11  be a service of the Court in the interest of
12  judicial economy so the other courts can solve the
13  issue rather than have a log jam.

14        I don't know how you can handle
15  2500 lawsuits by one court.  And I don't see it.
16  The arguments of the motion should be denied, they
17  seem to me without merit.

18        THE COURT:  All right.  I will take
19  it under advisement and issue an order as soon as
20  I can.

21        MR. SMITH:  Thank you, Your Honor.
22        THE COURT:  Thank you.

23        All right.  The next matter is the
24  motion by HSG/ATN, Inc.

25        MR. STROCHAK:  That is correct.  My

38

1          WORLDCOM, INC., ET AL

2     colleagues, Mr. Marcus and Ms. King, are going to

3     handle this matter.  And I believe counsel for HSG

4     is here.  I think it's his motion.

5              THE COURT:  What I think we should

6     do first is -- I'm going to take a five-minute

7     break to make sure that counsel for everyone

8     that's going to be here or sought to be heard on

9     this matter has given their appearances to the

10    court reporter.

11              To the extent that there are

12    documents to be submitted that there are no

13    evidentiary issues to be raised, they can be all

14    handed up and exchanged.

15              To the extent there are evidentiary

16    issues, just to focus on what they may be and I

17    will address them probably before I hear argument

18    and just take these few minutes to try to organize

19    ourselves so we can efficiently do this hearing.

20              I know I was advised there are

21    witnesses to be called.  I need to end this

22    hearing by 1:00 o'clock, so we're going to have to

23    do everything we can to get it done by

24    1:00 o'clock and enable you to have all your

25    rights and the record as full as both sides really

39

1              WORLDCOM, INC., ET AL

2     want it.  So I will return.

3                  {Short recess taken.}

4              THE COURT:  I will hear from the

5     Movant.

6              MR. KORAL:  Richard Koral.  I am

7     local counsel.  I would move for the admission of

8     David Engelman, attorney admitted to practice in

9     the State of Arizona and the Federal District

10    Court in Arizona.  He is counsel for HSG and would

11    be conducting the substantive matter of this

12    hearing.

13             THE COURT:  All right.  I will

14    grant the motion.

15             MR. KORAL:  Thank you, Judge.

16             MR. ENGELMAN:  Thank you, Your

17    Honor.

18             THE COURT:  Pull it forward.

19             MR. ENGELMAN:  David Engelman of

20    Engelman, Berger, Phoenix, Arizona, on behalf of

21    HSG/ATN, Inc.

22             This is our motion for payment of

23    an administrative expense claim.  It's a contested

24    matter and I don't know how the Court would

25    prefer, if you would like oral argument first

40

1                    WORLDCOM, INC., ET AL

2     before moving into evidence, but we are ready to

3     call my first witness, if you prefer to do that.

4                    THE COURT:   I think we should start

5     with the witnesses because in the event I do run

6     out of time, and I apologize that I haven't

7     started on time to give you a lot of time, I think

8     I would like to, at least, get the witnesses'

9     testimony in the record and then we can address

10    the issue of argument.

11                   MR. ENGELMAN:   Very good.   Thank

12    you.

13                   Before we do that, can we just -- a

14    housekeeping matter, move for the admission of the

15    exhibits that we have agreed to?   I think

16    everything has been agreed to.   We have marked as

17    Movant's Exhibit A, Your Honor, an agreed

18    statement of facts and a separate set of exhibits

19    attached to it.   I believe it's in.

20                   And what we have done is marked

21    this as Movant's Exhibit A, and you will see they

22    are tabbed numbers 1 through 19, so we have marked

23    those exhibits Movants Exhibit A1, A2, et cetera,

24    all the way through 19.   We would move to offer

25    this into evidence.

41

1                    WORLDCOM, INC., ET AL

2                    THE COURT:  Any objection?

3                    MR. STROCHAK:  No, objection, Your

4    Honor.

5                    THE COURT:  All right.  It's

6    admitted as Movant's Exhibit A.

7                    (Movant's Exhibit A1-19 received.)

8                    MR. ENGELMAN:  Finally, the other

9    exhibit from the Movant has been marked as

10   Movant's Exhibit B that I have in my hand.  And I

11   would like to offer into evidence.  I don't

12   believe there's any objection and I will approach

13   the bench with it.

14                   THE COURT:  Any objection?

15                   MR. STROCHAK:  No objection.  Is

16   this the call log?

17                   MR. ENGELMAN:  Yes.

18                   MR. MARCUS:  No objection.

19                   (Movant's Exhibit B received.)

20                   MR. ENGELMAN:  I would like to call

21   Mr. George Bein to --

22                   THE COURT:  Take that microphone

23   around and you may have to get close to it to pick

24   up what you are saying.

25                   MR. ENGELMAN:  May I use the

42

```
 1                    WORLDCOM, INC., ET AL

 2  podium?

 3                    THE COURT:  Yes.  Watch your step

 4  going through there.

 5  G E O R G E    B E I N, having

 6              been duly sworn by a Notary Public of the

 7              State of New York, (Sabrina Salas),

 8              according to law, was examined and

 9              testified as follows:

10                    DIRECT EXAMINATION

11  BY MR. ENGELMAN:

12              Q.    Mr. Bein, good morning.  State your

13  name for the Court.

14              A.    My name is George Bein.

15              Q.    Where do you currently reside?

16              A.    I reside in Puerto Rico.

17              Q.    And what's your relationship to the

18  Movant, HSG/ATN, Inc.?

19              A.    I am the president of the company.

20              Q.    Is that a corporation?

21              A.    Yes, it is a regular corporation.

22              Q.    And under what laws of what state?

23              A.    HSG/ATN was incorporated and is

24  incorporated under the laws of Puerto Rico.

25              Q.    Will you please tell the Court your
```

43

                    WORLDCOM, INC., ET AL

1

2    title?

3         A.    Yes.  I am the president of HSG.

4         Q.    And when was HSG formed?

5         A.    HSG was incorporated in Puerto Rico

6    approximately five years ago.

7         Q.    And have your duties been as the

8    president of HSG since it was formed five years

9    ago?

10        A.    My overall duties have really been

11   overall general management of the company on a

12   daily basis.

13        Q.    Will you please describe for the

14   Court what HSG does for business purposes?

15        A.    HSG is in the business of doing

16   marketing for telecommunications services.

17        Q.    And it's done that exclusively

18   since its formation five years ago?

19        A.    Yes, it has.

20        Q.    Does it conduct any other type of

21   business?

22        A.    No, not at all.

23        Q.    So when you say that you market for

24   a telecom -- in the telecom business, can you

25   describe a little bit of how that's processed?

44

1              WORLDCOM, INC., ET AL

2        A.      How we do our marketing?

3        Q.      Yeah, how you do your marketing,

4    just generally.

5        A.      Generally speaking, we have

6    advertisements in national publications.  We

7    market through affinity groups like the Good Sam's

8    Club and Coast to Coast Resorts and we also have a

9    dealer network.

10       Q.      Now, have -- has HSG conducted any

11   business with WorldCom in the past?

12       A.      Very definitely.  We have been

13   associated with WorldCom for the last ten years,

14   the last six of which have been on an exclusive

15   basis.

16       Q.      And were there written contracts

17   entered into between HSG and WorldCom?

18       A.      Yes.

19       Q.      And when I say "WorldCom," I also

20   may mean its predecessor, is that correct?

21       A.      Correct.

22              MR. ENGELMAN:  Your Honor, may I

23   show the witness our exhibit book?

24              THE COURT:  Go ahead.

25   BY MR. ENGELMAN:

45

1              WORLDCOM, INC., ET AL

2         Q.    Mr. Bein, would you please take a

3    look at what's been marked as Movant's Exhibit A

4    and, in particular, Exhibits A1 through 7?

5         A.    Okay.

6         Q.    Can you -- are those the agreements

7    that HSG and WorldCom or its predecessor have

8    entered into over the course of the years?

9         A.    Yes, it is.

10        Q.    And, generally speaking, I don't

11   want to get into the detail, but generally, what

12   services are HSG providing to WorldCom by nature

13   of these agreements?

14        A.    We provide marketing.  Our

15   intention is to enroll customers for long distance

16   services, toll free numbers, calling cards and

17   Internet service.

18        Q.    And what benefit does, in your

19   belief, does WorldCom receive from your services

20   by these contracts?

21        A.    WorldCom benefits by billing the

22   customers for the services and receiving the

23   monthly revenue from the customers.

24        Q.    And what type of services was

25   WorldCom providing pursuant to these agreements to

46

1                    WORLDCOM, INC., ET AL

2       the customers?

3              A.    WorldCom was providing the network

4       services for the -- carrying the actual long

5       distance traffic.

6              Q.    What were the payment terms under

7       the terms of these -- let me back up.

8                    First of all, Exhibit -- Movant's

9       Exhibit A1 is the original agreement, correct?

10             A.    That's correct.

11             Q.    And then Exhibits A2, Movant's

12      Exhibit A2 through A7 are subsequent amendments to

13      the original agreement?

14             A.    Yes, sir, that's correct.

15             Q.    And Exhibit A -- Movant's A7 is the

16      last signed agreement between HSG and WorldCom, is

17      that correct?

18             A.    That is correct.

19             Q.    What were the payment terms from

20      WorldCom to HSG pursuant to the terms of these

21      exhibits, A1 through 7?

22             A.    Based upon the monthly billing of

23      all the customers who had been -- who were

24      contributing to the monthly revenue, the terms

25      were that our company would receive a commission

47

WORLDCOM, INC., ET AL

2  that was deemed earned and to be paid 45 days at

3  the end of the billing month.

4        Q.    And how was that commission rate

5  determined according to the contract?

6        A.    It was determined on a

7  product-by-product basis; so some products paid a

8  little bit higher commission, some products paid a

9  little lower commission.

10        Q.    Well, in the course of fulfilling

11  the contracts, did HSG do anything besides market

12  for new customers?

13        A.    Yes, we provided customer service

14  centers to be the front-end for customer service

15  for these customers.

16        Q.    And what does customer service

17  consist of?

18        A.    Well, customer service consists of

19  a lot of different things.  Customers would call

20  us for a variety of reasons, including ads and

21  changes to their services, changing toll-free

22  numbers, changing the ring to numbers on a

23  toll-free call.  They might call with complaints:

24  My long distance isn't working, my calling card

25  isn't working, or my toll-free number isn't

48

1                    WORLDCOM, INC., ET AL

2     working.

3                    Or it might be something as simple

4     as:  What is my rate when I make calls within my

5     particular state or what is the rate when I call

6     from the US to Germany or what if I use my calling

7     card?  I'm travelling in Switzerland and I want to

8     call back a relative in this country, what are my

9     rates?

10                    So we provided that to the

11    customers, as well as taking simple things as

12    changes of addresses.

13             Q.    How did customers know to call HSG

14    with these customer service issues?

15             A.    Well, they knew for a lot of

16    reasons.  It was our whole idea to have the

17    customer identify with us as their service

18    provider, so our marketing was all under our names

19    and trademarks and logos.

20                    When the customer -- when we were

21    successful in enrolling a customer with WorldCom,

22    they received a welcome letter that had our name

23    and logo and it was signed by the then president

24    of the company, Jeffrey Bein.  His signature was

25    the only signature on it.

49

1          WORLDCOM, INC., ET AL

2               The welcome letter also contained

3      our service mark names for our products like

4      UltraCall and UltraNet and UltraCard.  Those were

5      our service mark names.  So we wanted the customer

6      to identify with us.

7               In addition, for every customer

8      receiving a calling card, we designed the calling

9      card and on the front of the card was our customer

10     service center phone number with the instructions

11     to call us for additional cards or other services.

12          Q.    At the time the bankruptcy case was

13     filed by WorldCom on July 21st, 2002, I gather

14     there were customers that WorldCom, for the

15     service, that were enrolled by HSG, is that

16     correct?

17          A.    Oh, a lot of customers.

18          Q.    Is it okay for us to understand

19     that when I use the term "customers," unless I

20     explain otherwise, I will be referring to those

21     customers that were enrolled by -- for the

22     WorldCom service prepetition by HSG, is that okay?

23          A.    That's correct, because we were --

24     had an exclusive agreement with them.

25          Q.    Well, what does that mean?  You

50

1              WORLDCOM, INC., ET AL

2    have an exclusive agreement?

3          A.    Well, let me -- probably for the

4    last four to six years, probably close to six

5    years of our association with them in our

6    exclusive exclusivity arrangement, we were not

7    permitted to offer the services of any other

8    vendor except for WorldCom.

9          Q.    And if you -- if one were to look

10   at Exhibits A1 through 7, which is the -- which

11   are the executed agreements between HSG and

12   WorldCom, those are all related to this exclusive

13   arrangement?

14         A.    Yes, sir.

15         Q.    All right.  Did that arrangement

16   eventually terminate?

17         A.    Yes, it did.

18         Q.    And the contract -- the last sixth

19   amendment was terminated, is that correct?

20         A.    That's correct.

21         Q.    Was that termination initiated by

22   HSG?

23         A.    It was.

24         Q.    And if I refer you to Exhibit,

25   Movant's Exhibit A9, is that a true and correct

51

1                    WORLDCOM, INC., ET AL

2    copy of a letter from Jeffrey Bein to WorldCom?

3            A.    Yes, it is.

4            Q.    And that's initiating the

5    termination, is that correct?

6            A.    Correct.

7            Q.    And, to your knowledge, was that

8    termination letter sent pursuant to the contracts

9    with WorldCom?

10           A.    Yes, it was.  Yes, it was.

11           Q.    Who is Jeffrey Bein?

12           A.    Jeffrey Bein is my son who was then

13   president of the company.

14           Q.    As of June 28th, 2002, what was

15   your title with the company?

16           A.    I was vice-president.

17           Q.    And as vice-president of the

18   company at that time, were you aware -- you were

19   aware that your son was sending this letter?

20           A.    Absolutely.

21           Q.    And it was sent with your

22   authorization?

23           A.    Absolutely.

24           Q.    Why were you -- why was HSG

25   terminating this contract with WorldCom?

52

1          WORLDCOM, INC., ET AL

2          A.     There was only one purpose in mind

3    and that was to become a nonexclusive agent.  We

4    wanted to be released from that and that's why we

5    sent it.

6          Q.     You wanted to be released from the

7    exclusivity?

8          A.     The exclusivity, not to -- we

9    wanted to continue to do business with WorldCom

10   but on a nonexclusive basis.

11         Q.     And were you having any

12   conversations, you personally, with any

13   representative of WorldCom at or around June 28th,

14   '02 in this regard?

15         A.     Absolutely.  As a matter of fact,

16   there was another amendment that was offered to us

17   to make us nonexclusive even prior to sending this

18   letter out.

19         Q.     And is that what's been termed the

20   seventh amendment which is Movant's Exhibit 8?

21         A.     Yes.  That was the seventh

22   amendment that basically kept all the terms and

23   conditions of the previous contracts and

24   amendments but made us a nonexclusive agent.

25         Q.     And was that agreement prepared by

53

1                    WORLDCOM, INC., ET AL
2    WorldCom, to your knowledge?
3            A.      It was definitely prepared by
4    WorldCom.
5            Q.      And was it signed by HSG?
6            A.      Yes, sir.
7            Q.      To your knowledge, has WorldCom
8    ever signed it?
9            A.      No, we submitted it to them and
10   have not heard from them since.
11           Q.      Approximately when did HSG submit
12   this seventh amendment to WorldCom?
13           A.      Oh, the seventh amendment?
14           Q.      Yes.
15           A.      I am not sure if the exact date was
16   probably sometime mid-July.
17           Q.      And after it was submitted, was
18   there any further conversations or communications
19   with representatives of WorldCom --
20           A.      Yes, I was.
21           Q.      Let me finish my question.
22           A.      Sorry, sir.
23           Q.      After this was submitted, the
24   seventh amendment was submitted to WorldCom for
25   its approval, were there any further

54

1                  WORLDCOM, INC., ET AL

2   communications between you and representatives of

3   WorldCom regarding continuing your -- HSG's

4   relationship with WorldCom?

5           A.    Yes, there were several

6   conversations, primarily with my direct WorldCom

7   representative by the name of Brent Lako

8   (phonetic.)

9           Q.    The termination letter of

10  June 28th, 2002 was accepted by WorldCom, was it

11  not?

12          A.    Yes, it was.

13          Q.    And I would refer you to

14  Exhibit A10.  Is that the letter from WorldCom

15  that acknowledges acceptance?

16          A.    That's correct.

17          Q.    And did you receive this letter?

18          A.    I did receive this letter.

19          Q.    And did you read this letter?

20          A.    I sure did.

21          Q.    And did you, at the time you

22  received this letter, intend to abide by the terms

23  and conditions that were contained in this letter?

24          A.    We absolutely did, yes.

25          Q.    So this agreement is terminated,

WORLDCOM, INC., ET AL

1
2  the termination of the agreement is accepted by

3  WorldCom.  Was there ever any formal agreement

4  entered into thereafter by WorldCom and HSG?

5          A.      No, there was not.

6          Q.      Has HSG been paid any commissions

7  for customer usage after the bankruptcy case was

8  filed?

9          A.      Yes, we did receive some

10  commissions after the filing date.

11          Q.      For what periods and in how much --

12  how much, if you recall?

13          A.      For the last week in July, say,

14  from the filing date through the end of July, it

15  was a very, very small amount, I think on the

16  order of 10, $15,000.  For the billing month of

17  August we received approximately $200,000.  And

18  for the billing month of September, our commission

19  check was $225,000.

20          Q.      Did HSG attempt to procure any new

21  customers for WorldCom after the bankruptcy case

22  was filed?

23          A.      After the case was filed and after

24  I was told that we would not receive commissions

25  for new customers, we did not attempt to procure

56

WORLDCOM, INC., ET AL

1

2  new customers for WorldCom; however, we continued

3  to service, of course, the current ones.

4          Q.    Were you ever told by a

5  representative of WorldCom after the bankruptcy

6  was filed that you would continue to receive your

7  residual commissions or the commissions for

8  services generated by the existing customers you

9  procured after the bankruptcy was filed?

10          A.    Very definitely, several times in

11  several different formats.

12          Q.    And -- anything orally?  Did you

13  have any conversations with representatives of

14  WorldCom?

15          A.    Yes, I did.

16          Q.    Would you tell us with whom those

17  conversations, each conversation was and the

18  approximate date?

19          A.    I spoke with Brent Lako several

20  times in the month of August and he assured me

21  that if we abided by the terms of our -- or the

22  surviving terms of our agreement, we would

23  continue to get paid our commissions.  He very

24  definitely used the exact terms, "Your only hole

25  in this thing is going to be the prepetition two

57

1                 WORLDCOM, INC., ET AL
2    months and three weeks."
3          Q.    So in that conversation, were you
4    asked to not solicit the customers away from
5    WorldCom?
6          A.    Oh, yes, that was part of the deal,
7    yes.
8          Q.    And was that part of the
9    termination letter you received from Kirk Gibson
10   on behalf of WorldCom?
11         A.    Kirk Reynolds, yes.
12         Q.    Kirk Reynolds.  Sorry, Kirk Gibson
13   I think is the baseball player.  Sorry about that.
14         A.    His message clearly was don't
15   solicit the customers and you'll get your ongoing
16   residual commissions.
17         Q.    And did you adhere to that?
18         A.    Absolutely.
19         Q.    Did you ever deviate from that
20   request to not solicit?
21         A.    We deviated, perhaps, two times;
22   one was an isolated incident and one was a formal
23   decision that we had to -- that our business
24   really needed to do something to survive.
25         Q.    The isolated incident, let's talk

1                    WORLDCOM, INC., ET AL

2    about that for a second.

3                    Before I do that, though, let me

4    point out to you Exhibit No. A11, if I may.

5            A.    Yes, sir.

6            Q.    And can you describe -- that's a

7    memorandum from WorldCom, is that correct?

8            A.    Yes, it is.

9            Q.    And did HSG receive this

10   memorandum?

11           A.    We did, yes.

12           Q.    And Exhibit 12, do you see that,

13   A12?

14           A.    Yes.

15           Q.    And, to your knowledge, was that a

16   letter that was posted on the Internet by

17   WorldCom?

18           A.    Yes.

19           Q.    And did you view this by looking on

20   the Internet?

21           A.    Well, I did, but in addition to

22   that, we received this letter, I believe, also in

23   the mail.

24           Q.    So this letter --

25           A.    Sorry, not the first page but the

59

1                    WORLDCOM, INC., ET AL

2    actual letter itself we received in the mail.

3              Q.    So let's be clear.  We're looking

4    at Exhibit A12 which consists of three pages?

5              A.    Correct.  That is all definitely on

6    the Internet, but in addition to -- rather than

7    the first page, the letter that starts with "Dear

8    Agent Partner," is something we received also in

9    the mail.

10             Q.    Understood.

11                   So you received -- HSG receives

12   this August 5th letter and it also receives the

13   August 6th letter from Mr. Reynolds?

14             A.    Correct.

15             Q.    How did you, in your mind, construe

16   those two letters together?

17             A.    To me, they were absolutely

18   perfectly clear.  They're saying follow -- abide

19   by the terms of your contract or the surviving

20   terms -- which essentially means don't solicit the

21   customers -- and you will get your ongoing earned

22   commissions.

23                   It's not even an interpretation.

24   It says that.

25             Q.    All right.  And then we talked

60

1                    WORLDCOM, INC., ET AL

2    about that you abided by or HSG abided by that

3    request except for two situations?

4              A.    Correct.

5              Q.    And one of them you indicated.

6                    Just so we're clear for the record,

7    when we talk about solicit, we're talking about

8    right now soliciting the Customers, using a

9    capitalized "C" for Customers, as those Customers

10   procured or enrolled by HSG for WorldCom

11   prepetition, is that correct?

12             A.    That's correct, yes.

13             Q.    So when we talk about solicitation

14   for these following questions, do you understand

15   the meaning, going out and trying to take away

16   those Customers with a capitalized "C" and

17   using -- from WorldCom's business?

18             A.    That's exactly what I understand,

19   yes.

20             Q.    And there are two instances, is

21   that correct?

22             A.    Correct.

23             Q.    And let me show to you Exhibit A15.

24   Take a look at that, please.

25             A.    Yes.