UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------x

In Re:

WORLDCOM, INC., <u>et al.</u>,

        Debtors.

Chapter 11 Case No.
02-13533 (AJG)

(Jointly Administered)

------------------------x

Before: The Honorable Arthur J. Gonzales,
      United States Bankruptcy Judge

Taken on July 1, 2003 at 11:00 a.m. at the United

States Bankruptcy Court, One Bowling Green,

Manhattan, New York.

2

A P P E A R A N C E S

WEIL, GOTSHAL & MANGES, LLP
BY: CHRISTOPHER J. MARCUS, ESQ.
    767 Fifth Avenue
    New York, New York 10153-0119
Attorney for the Debtor

WEIL, GOTSHAL & MANGES, LLP
BY: KRISTIN G. KING, ESQ.
    1501 K Street, N.W.
    Washington, D.C.  20005
Attorney for the Debtor

DAVID ENGELMAN, ESQ.
60 East 42nd Street
New York, New York 10165
Appearing on behalf of HSG/ATN, Inc.

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
BY: KENNETH A. DAVIS
    590 Madison Avenue
    New York, New York   10022-2524

ADAM P. STROCHAK, ESQ.
BY: ADAM P. STROCHAK
    1501 K Street, N.W.
    Suite 100
    Washington, D.C.  20005
Attorney for the Debtor

I N D E X

| WITNESS | DIRECT | CROSS | REDIR | RECROSS |
|---------|--------|-------|-------|---------|
| RAY AHERN | 4 | 60 | 82 | |

WORLDCOM, INC.

1           THE COURT:   My recollection being

2       that the last hearing the witness was

3       either -- we were going to call the

4       next witness or the witness was about to

5       be cross examined, so, please proceed.

6           MR. ENGELMAN:   I'm David Engelman,

7       appearing on behalf of the Trustee, Mr.

8       Bein, who testified.  I think we've just

9       completed with him and I think we're

10      getting ready for the Debtor's

11      examination.

12          THE COURT:  Will the witness then

13      take the stand, please?

14          MS. KING:   Kristin King for the

15      Debtor, we have some additional exhibits

16      that we wanted to put forward in order

17      to give them to opposing Counsel.

18          MR. STROCHAK:   Your Honor, Adam

19      Strochak.  If I can just clarify to the

20      Court, I think we concluded last time,

21      the Movement had rested his case.  We

22      had already cross examined their

23      witness.  The gentleman who just took

24      the stand, Mr. Ray Ahern, was the

25      Debtor's witness, I mean.  I just wanted

WORLDCOM, INC.

4

1          to make sure you understood that so

2          there's no confusion.

3               THE COURT:   With respect to these

4          Exhibits, you've shown them to opposing

5          and are there any objections, Mr.

6          Engelman?

7               MR. ENGELMAN:   No objection,

8          Your Honor.

9               THE COURT:   They are identified

10         as Debtor's Exhibits, numbers, as

11         amended, A through I.

12              MS. KING:   It'll be A through I,

13         Your Honor.

14              THE COURT:  So admitted.  If not,

15         we can turn back to the witness, please.

16              THE WITNESS:   Just to clarify,

17         I've not been sworn in as yet.

18    R A Y   A H E R N, having been first duly sworn

19    according to law, testified as follows:

20    DIRECT EXAMINATION

21    BY MS. KING:

22              THE COURT:   You may commence the

23         examination.

24      Q.   Good morning.

25      A.   Good morning, Ms. King.

5

WORLDCOM, INC.

1      Q.    Would you mind stating your name again

2  for the record, please?

3      A.    My name is Ray Ahern.

4      Q.    What is your relation to Worldcom?

5      A.    I'm an employee, have been there 18

6  years.

7      Q.    In what capacity do you currently serve

8  at Worldcom?

9      A.    I'm the Director for Business Operations

10  in the Art Channel Department.

11      Q.    Now, what actually do you do for the

12  Channel Division or what do you perform vis-a-vis

13  represent agreements or agents or what?

14      A.    Well, primarily, a function of the

15  Channels Department is the management and

16  procurement of bringing on new avenues of

17  distribution of our products through non-employees

18  such as companies or individuals and so as to

19  evaluate to re-sellers.

20      Q.    Generally, are you familiar with the

21  representation agreements that Worldcom has

22  entered with representative agents?

23      A.    Very much so, part of my function as

24  Operations Director -- I work with our legal

25  department on building these contracts in terms of

6

WORLDCOM, INC.

1    what has become the standard agreements that are

2    out there today, the boiler plate.

3        Q.    Now, what is the role of agents for

4    Worldcom?

5        A.    Agents are another avenue for marketing

6    and distributing our products out into the

7    marketplace.  Essentially, the easiest way to

8    perhaps look at it is to state that they are an

9    extension of the sales force, they augment the

10   "MCI/WORLDCOM" sales force by really broadening

11   the footprint of our representations out in the

12   market.

13       Q.    And are you familiar with the HSG/ATN

14   movement?

15       A.    I am.

16       Q.    And in what way are you familiar with

17   them?

18       A.    I know that prior to the 1998 merger

19   between MCI and Worldcom, "ATN" was already an

20   agent with Worldcom for, I guess, going back from

21   this point at least the last ten years or so.

22       Q.    And at what point in time in your

23   capacity as Director of the Channel Division did

24   you become familiar with "ATN"?

25       A.    After the merger, when I became part of

7

WORLDCOM, INC.

1    the agent program or Channels Department within

2    Worldcom, I became familiar with "ATN" through

3    amendments that were done to the latest agreement

4    that "ATN" had executed with Worldcom back in

5    August of 1998.

6        Q.    Now, I'd like to draw your attention to

7    the Movement's Exhibits.  Do you have the Exhibit

8    Book in front of you?

9        A.    I do.

10       Q.    Specifically, turn to Exhibit No. 1.

11   And with your knowledge and understanding, that is

12   the representation agreement you've heard between

13   "HSG" and "ATN", as I'll refer to as "ATN" and

14   Worldcom?

15       A.    Yes, it is.

16       Q.    And what specifically, in a general way,

17   obviously, based upon your knowledge of these

18   agreements and the amendments thereto, does the

19   representation agreement require "ATN" to do on

20   behalf of Worldcom?

21       A.    Really, the function of the agreement is

22   both disagreement and our agreement in general

23   that we continue to have with agents or evaluated

24   with the re-sellers today.  It permits them to be

25   an authorized representative to the public to

WORLDCOM, INC.                                          8

1  businesses and to sell our products, that is to

2  say, Worldcom products.

3      Q.    And with that role -- strike that.  Was

4  that role limited in any way by terms of the

5  agreement or in terms of what that really meant in

6  terms of carrying those products?

7      A.    The agreement is very specific to what

8  the representative is allowed to do and what they

9  cannot do and so it's defined for them as to what

10 we warrant their role to be which is strictly to

11 go out and procure new customers for MCI Worldcom

12 and, you know, for that they receive compensation.

13     Q.    I would like to draw your attention to

14 Sections 11.1 and 12.1 of the representation

15 agreement.

16     A.    Yes.

17     Q.    Would you please read the first two

18 lines of that provision, please?

19     A.    Certainly.  "Representative understands

20 that representative is an independent contractor

21 and not an employee of Worldcom under this

22 agreement and that Worldcom is interested only in

23 the orders for services that representative

24 obtains".

25     Q.    And what, in your opinion, is the import

9

WORLDCOM, INC.

1  of that particular provision?

2      A.    Well, I think it's making it very clear

3  both in here and in the very front of the

4  agreement that what we're looking for is to --

5  we're looking for representatives to procure new

6  customers and new orders for customers under the

7  agreement, limited to the services that the

8  agreement allows the representative to represent

9  themselves as being an agent or representative of

10  MCI Worldcom.

11      Q.    Pursuant to this agreement, what were

12  those services that "ATN" was marketing?

13      A.    Well, all of our contracts that I'm

14  familiar with including this one listed in Exhibit

15  A, are enlisting the products that the

16  representative is authorized to sell.

17      Q.    Turning your attention to Exhibit A now,

18  the services listed there, the Ultra call, one

19  plus the Ultra call, toll free and the Ultra card.

20  Were those Worldcom services that were being sold

21  by "ATN"?

22      A.    Yes, those are the services that under

23  the initial agreement that the representative was

24  authorized to sell.  These are the "TTI" National

25  Services and just for your own understanding,

WORLDCOM, INC.

1  "TTI" is or was a wholly owned subsidiary of

2  Worldcom and the different brand names that are on

3  our platform owned by MCI Worldcom.

4      Q.   Although Worldcom is listed in the

5  agreement, the services that were actually sold

6  were the "TTI" services?

7      A.   Yes, the marketing, that and the

8  independent user or customer would see or would

9  have a brand name of "TTI" National.

10     Q.   I'd like to turn your attention or have

11  you turn your attention to 8.1 of the

12  representation agreement.  Are you generally

13  familiar with this provision in this agreement?

14     A.   Very familiar with it, yes.

15     Q.   Can you tell me generally what this

16  provision requires?

17     A.   This provision is in all our agreements

18  and is stated in all of our agreements and is that

19  the company or the covenant shall be guaranteed

20  between MCI and the representative, those

21  customers that the representative has procured for

22  "MCI" or now "MCI" customers and we will continue

23  to pay or we will pay the representative a

24  commission as outlined in the contract for those

25  customers, but in the event that the agreement

WORLDCOM, INC.

1  should terminate under certain terms and

2  conditions that are listed, the agent or

3  representative will not contact those customers

4  for the purpose of eliciting them to a competitive

5  service.

6      Q.   Okay.   And can you describe what vehicle

7  is that, is that 8.1 provision?  That's to say,

8  8.1, the non-solicitation provision?  Would that

9  be a standard provision that you would include in

10  all of your representation agreements?

11      A.   Yes.  If you've got an agreement, a

12  department or from one of our general managers,

13  you would see that provision in the contract.

14      Q.   So, it's not unique to the "ATN"?

15      A.   No, this is a very standard, I mean and

16  it's -- in all of them and each in 8.3 portion of

17  that, that illustrate what we call a "USE" action

18  and what course of action Worldcom would take

19  which is the 8.2 if it were breached.

20      Q.   And what specifically was that action

21  under 8.3?

22      A.   That we would provide notice to the

23  representative of the breach of 8.1 and within

24  five days cease paying all commissions occurring

25  from that point forward.

12

WORLDCOM, INC.

1    Q.   Then turn your attention to Exhibit A,

2 we've already covered, but B, specifically what

3 provisions do these relate with regard to

4 commission?

5    A.   Exhibit B outlines, you know, how the

6 fact that a representative will be paid commission

7 for the order submitted and accepted as a stall by

8 Worldcom and just generally outlines, you know,

9 what we will be paying or what we pay or what we

10 do pay and what the payments would be and how

11 exactly the payments would be made to the

12 representative, that is the terms.

13    Q.   Now, drawing your attention specifically

14 to Exhibit No. D?

15    A.   Yes.

16    Q.   Would you describe generally what this

17 Exhibit requires?  This Exhibit B?

18    A.   Yes, this is -- it's termed Exhibit D,

19 service levels and it has in here some kind of

20 backup service level agreement between Worldcom

21 and the representative for how the customer

22 service center would perform on any period.

23    Q.   Now, a standard or a standard provision

24 that you include in most representation

25 agreements?

13

WORLDCOM, INC.

1      A.    In some of the agreements that I have

2  been involved in since going back to early 1999

3  with Worldcom, I've never seen or recall ever

4  having in our agreements anything that is related

5  to service lines and this I would have to say is

6  pretty unique and was done at the request of the

7  "ATN" representative.

8      Q.    Those are related exclusively to the

9  customer service that would be provided by "TTI",

10  is that correct?

11      A.    That's right.    "TTI" or Worldcom

12  customer service center.

13      Q.    Now, turning your attention to the

14  subsequent numbered Exhibit in the Exhibit book

15  submitted by you with each of the amendments to

16  the representation agreement.

17      A.    I've read them and I have through the

18  years, I've seen them in various books and at

19  times.

20      Q.    Now, do each of the amendments included

21  in the Exhibit book represent your understanding

22  of the amendments that were entered between agents

23  and "ATN" and the representatives?

24      A.    Yes.

25      Q.    That is to say, with relation to the

14

WORLDCOM, INC.

1  representation agreement, how your customers are

2  notified to call Worldcom with customer service

3  requests or the "TTI", I should say?

4      A.    Well, in any event, there is a number of

5  ways that a customer is made aware of our customer

6  service center.  They receive a welcome letter

7  that will have the 800 number in several areas on

8  it and the letter itself which bears the same 800

9  numbers provided on the monthly invoice, to

10  customer, that the customer would see the 800

11  number again, which is placed on the back of the

12  calling card, if the customer was to have a

13  calling card.  And we also have a public web site

14  that customers would access to which would tell

15  them how to get in touch with our customer service

16  center.  We have Republic web site which customers

17  could access and all, for example, would provide

18  the same 800 number that I just described to you.

19      Q.    Drawing your attention to Debtor's

20  Exhibit No. A, would you tell me what copies of

21  documents these are?

22      A.    These were copies sent to me out of our

23  calling card performing area and they are some

24  examples of how you would call a custom calling

25  card customer and the custom being that the front

15

WORLDCOM, INC.

1  of the card has a unique offer that has been done

2  to it, not just say, your standard "TTI" type of

3  offer.

4       Q.    Turning to page four of Exhibit No. A,

5  it does respond for the front of the card that

6  would have been issued to customers, is that

7  correct?

8       A.    These are examples of actual cards that

9  -- at various times I would assume that our

10  calling  or our performance center, provided

11  custom calling cards that were related to "ATN".

12       Q.    Were these cards issued pursuant to an

13  agreement with "ATN"?

14       A.    Calling cards are a product of the

15  Exhibit A that "ATN" would sell, yes.

16       Q.    Would all customers that had been

17  originally solicited by "ATN", that became

18  Worldcom customers, would they have received these

19  cards?

20       A.    Again, if the customer through the "ATN"

21  wanted a calling card, which a calling card is a

22  major component, "ATN" could provide, whether it's

23  one of the custom cards or our standard "TTI"

24  brand name calling card and that cost them.

25       Q.    Can you tell me what number is listed

16

WORLDCOM, INC.

1    for customer service on these cards, please?

2        A.    Customer service is in "TTI" National

3    "MCI" Worldcom, if you will, 800 number, directing

4    those calls to our San Antonio calling center.

5        Q.    And how would an individual who will

6    have received the card know to call that number?

7        A.    It's on the back of the card.

8        Q.    And the information related to a number

9    at the top of the card under the designation

10   "ATN", the top would be a number there, that of an

11   "ATN" number, is that correct?

12       A.    Yes, it is.  I believe so.

13       Q.    And what was the purpose of putting the

14   number on the front of that card as opposed to the

15   customer service number on the back?

16       A.    Well, I would assume "ATN" requested

17   that the 800 number be on it and to direct the

18   person that called to that number if they were

19   looking for additional cards or wanted other

20   services so that they could contact "ATN" for

21   those services, and go to us -- and, of course,

22   customer service, on the other hand, would have

23   been directed with regard to the back of the car

24   for customer service, would call the 800 number.

25       Q.    Is that 800 umber, is that for your San

WORLDCOM, INC.

1  Antonio customer center?

2      A.    San Antonio is where the customer

3  service center for "TTI" is located.  I mean, MCI

4  Worldcom has a number of customer service sites

5  throughout the country for, you know, different

6  divisions, the consumer division and the business

7  division that I'm in, so we have a lot more than

8  San Antonio.  But the "TTI" customers were

9  specifically directed to San Antonio.

10      Q.    Who's responsible for issuing these

11  cards to your customers, the Worldcom customers?

12      A.    These come up all from our fulfillment

13  center.

14      Q.    "TTI"?

15      A.    "TTI". I mean, the art work itself gets

16  sent out to a company that does it and does the

17  logos and everything that is on the card and that

18  is coordinated through our operation.

19      Q.    And I'd like to try and draw your

20  attention to Debtor's Exhibit B.  Please, are you

21  familiar with Debtor's Exhibit B?

22      A.    Yes, I am.

23      Q.    Please tell me what it is.

24      A.    It's a copy of an invoice that would go

25  to the "TTI" customer.

WORLDCOM, INC.

1    Q.    And can you tell me what number is

2    listed on the number of customer service on this

3    invoice?

4    A.    That is the number to our San Antonio

5    customer service location, the same one that would

6    appear in the welcome letters and the web site and

7    the calling card.

8    Q.    And there's a paragraph that specifies

9    information related to "ATN". Are you familiar

10    with that paragraph?

11    A.    Yes, I am.

12    Q.    Can you tell me why that paragraph was

13    included in this invoice?

14    A.    That is what we call a "bill message"

15    and it's used to put some sort of message out

16    there on the invoice for customers and you have a

17    bill message that wishes customers happy holiday

18    or happy July 4th or, you know, it could be a

19    number of messages but here it is, a message on

20    behalf of "ATN" on the invoice saying that we

21    really appreciate your business and it means -- I

22    mean, it's kind of like, almost like an ad, if you

23    wanted to become a dealer or an agent or some sort

24    of thing like that with "ATN". And you would call

25    their 800 number.

WORLDCOM, INC.                                    19

1    Q.    So the 800 listing is related to an

2    interest in becoming a dealer?

3    A.    That's correct.

4    Q.    And this is a message that was included

5    to your knowledge, consistent with the type of

6    invoices that have been sent out prior to July as

7    well?

8    A.    They certainly are, yes.

9    Q.    And all those ones prior to July -- or

10   prior to this July, involves Worldcom's customer

11   service number as regards the 800 number listed?

12   A.    Our customer service number whether it's

13   for customers that were brought to us by "ATN" or

14   any other agent or customer calling, would be

15   there or anybody else would have the same invoice

16   plus the 800 number or the same number.

17   Q.    All right, let's turn your attention to

18   Debtor's Exhibit No. C.  Can you tell me what that

19   document is, please?

20   A.    This is another sample of a "ATN"

21   National customer invoice, only a month after the

22   other Exhibit that Ms. King directed me to.

23   Q.    What is the date of this particular

24   invoice?

25   A.    August the 22, 2002.

20

WORLDCOM, INC.

1     Q.   And it would have been a Worldcom

2  Chapter 11 filing center?  Is that right?

3     A.   Yes.

4     Q.   And in relationship to this particular

5  invoice, the information related to "ATN" has been

6  removed".  Can you tell why that was?

7     A.   The bill message was removed because by

8  the time this invoice was generated, the agreement

9  between "ATN" and Worldcom had been terminated.

10    Q.   And what was the purpose then related to

11  the termination that the information was removed?

12    A.   Well, the bill message -- I mean,

13  there's no sense in having "ATN" put a bill

14  message on there.  They were no longer an active

15  agent authorized to sell our products and

16  services.

17    Q.   Now, I'd like to approach the witness,

18  please.

19          THE COURT:  All right.

20    Q.   Are you generally familiar with the

21  pleadings in this case, Mr. Ahern?

22    A.   I have reviewed them at various times,

23  yes.

24    Q.   Have you specifically reviewed the

25  supplemental declaration of Jeff Bein?

WORLDCOM, INC.

1      A.   I have read it.

2      Q.   Now, I would like to draw your attention

3  specifically to Paragraph 8 of that supplemental

4  declaration.  Now, would you mind reviewing that

5  and reading the first three sentences, please.

6      A.   Yes.  "Debtor acted consistently with

7  our ongoing relationship as well.  For example,

8  after Debtor filed Chapter 11, Debtor continued to

9  include messages from "HSG" in bills to customers.

10  These messages instructed customers to call "HSG"

11  with any service issues.  Customers retained their

12  "HSG" proprietary calling card with "HSG" phone

13  number.  Debtor never provided its own proprietary

14  replacement".

15      Q.   Now,, related specifically to the first

16  three sentences of that paragraph, sir, is it your

17  understanding that that is a correct statement?

18      A.   It's incorrect.

19      Q.   Based on -- Worldcom exactly, I mean,

20  the August invoice was the first invoice that --

21  or the invoices that came out after the

22  termination of the agreement at "ATN"'s request.

23      Q.   Now,, I'd like to draw your attention to

24  Debtor's Exhibit No. B.  Can you tell me, please.

25  -- excuse me one second.

WORLDCOM, INC.

22

1    A.    I don't see Exhibit B.

2          MS. KING:    May I approach the

3          witness, Your Honor?

4          THE COURT:    Go ahead.

5    Q.    Can you tell me what this is, please?

6    A.    This is an example of a welcome letter

7    that would go to new customers.

8    Q.    Who would be responsible for sending out

9    that welcome letter?

10   A.    The mailing of the letter would come

11   from "TTI" Worldcom.

12         [end of tape 1, side A]

13   DIRECT EXAMINATION

14   BY MS. KING:

15   Q.    Can you tell me what logo the letters

16   bear?

17   A.    In the upper left hand corner, it's the

18   logo on the "TTI International, Inc." and in the

19   upper right hand corner it's the logo of Telecom

20   work "ATN".

21   Q.    Who signed the letter?

22   A.    It's signed jointly on the left hand

23   side by George Hampton, who's Vice President

24   within Worldcom and the signature or the signatory

25   on the right is Jeffrey Bein, who is the President

23

WORLDCOM, INC.

1    listed or as President of "ATN".

2        Q.    And would you tell me which number the

3    recipient of the letter is directed to call for

4    customer service issues?

5        A.    The same number that is on the calling

6    cards, for "TTI" -- their web site in San Antonio,

7    customer service center that "TTI" operates.

8        Q.    And to your knowledge, is the

9    information that is included in this welcome

10    letter consistent with the welcome letters that

11    would be sent out throughout the representation

12    agreement between "ATN" and "TTI"?

13        A.    Yes, I think the only difference that

14    you might see if you were to look at the letters

15    would have been a reference to the type of product

16    that the customer got.  So, if you look at the

17    second paragraph, where it says "save with long

18    distance program", I see a reference on the first

19    line to a 4.9 cent per minute rate.  A customer

20    under another product might have a different rate,

21    so, depending upon what that customer got, other

22    than that, I see no difference in what the letter

23    has.

24        Q.    Now, with regard to the "TTI" web site,

25    sir, how would a customer access that web site?

24

WORLDCOM, INC.

1 What would it have directed them to call?  Would

2 it be the customer service or call "TTI" and

3 Worldcom?

4      A.    If you go on the net and if you would go

5 to "TTI National.com", you know, through the

6 description, you get to find out how to contact us

7 and you would drop to a section that would have

8 "Customer Service description" and you would see

9 the 800 number there.

10     Q.    Now, what services does "TTI" customer

11 service center provide to the "TTI" Worldcom

12 customers originally solicited by "ATN"?

13     A.    The same services.  Mainly, that all of

14 our customer service centers throughout the

15 country provide -- it's really a full service

16 center in terms of addressing customer billing

17 issues, technical problems, requests to add new

18 services, delete some.  Really, responding to

19 whatever inquiry the customer might have in either

20 -- which can be addressed directly by the

21 representative answering the phone or perhaps

22 being routed to the appropriate area for handling.

23     Q.    What are the hours of operation and

24 stopping of this customer service center?

25     A.    The same.  That is the same as the San

25

WORLDCOM, INC.

1  Antonio center is stopped, well, our customer

2  service center down there has about 85 people.

3  It's staffed with representatives about 45 or 50

4  who answer the phones and it's only for billing

5  inquiries and other issues from 7:00 a.m. central

6  to 9:00 p.m. central.  And then after 9:00 p.m.

7  central, you call that number and you will be

8  directed to another toll free number and that is

9  staffed 24 hours a day, seven days a week, 365

10 days a year for technical issues, non-billing

11 inquiries, so if a customer, for example, called

12 and had a problem with their phone service or had

13 a problem with their calling card, you know, in

14 the middle of the night, they could reach somebody

15 at that Internet number.

16     Q.   Now, what interaction, if any, did -- or

17 "ATN" for its employees have with "TTI" customers

18 at the service center?

19     A.   I would imagine that any customer that

20 would say, contact "TTI", because at the "TTI"

21 they market under these services or set them up

22 for the "TTI" service and had an issue, "TTI"

23 could -- oh, I'm sorry, "ATN" could direct them

24 over to our customer service center for resolution

25 or whatever, you know, again depending upon how it

26

WORLDCOM, INC.

1  would be routed to us with the billing system,

2  etc.

3      Q.    I'm sorry, could "ATN" resolve any

4  customer service issues raised by a "TTI"

5  customer?

6      A.    There is no -- a technical issue, where

7  if there's a billing issue, since we -- it's our

8  network and our billing system, we generate the

9  bills.  You really would have to work through the

10  "TTI" Worldcom to resolve it.  The best you could

11  do would be to act as a go-between to help to try

12  to facilitate the type of issue or issues brought

13  to us for resolution.

14      Q.    Now, I'd like to draw your attention to

15  Debtor's Exhibit No. E, please.  Can you tell me

16  with relationship to the chart marked "HSG" plea

17  and post petition, commission, I mean, second page

18  on the chart, "HSG", plea and post petition

19  commission.  Can you tell me what that chart

20  represents, please?

21      A.    This is a breakdown of the commissions

22  that would have been earned for the month at the

23  left hand side and it's divided into those

24  commissions that were earned in the pre-petition

25  period, prior to the bankruptcy filing.  And then

27

WORLDCOM, INC.

1   further down it's listed those commissions earned

2   in the post-petition period of time.

3        Q.   Okay.  And the chart marked "HSG 2002"

4   and "2003" revenue, would you tell me what that

5   requests, please?

6        A.   This also is a breakdown that shows from

7   January 2002 through April 2003, the

8   commissionable revenue that should have been to

9   customers that were brought to "TTI" through "ATN"

10  and the amount of commission that would have been

11  earned as a result of the commissionable revenue,

12  that those customers generated for the months that

13  are listed on the left hand side.

14       Q.   So, for the month of July, when it says

15  in the chart, month, for instance maybe January,

16  '02 and revenue quote, 1 point or one million six

17  hundred and twelve or $1,612,910.6 and then the

18  commission, $2,069,314.44.  Is that the revenue

19  that was generated during the month of January?

20       A.   That's correct.

21       Q.   And when was the commission related to

22  that revenue generated in January?  When would

23  that have been paid?

24       A.   Our contract, including "ATN"'s

25  agreement, calls for commissions to be paid on or

28

WORLDCOM, INC.

1  about 45 days after the billing month that is

2  listed.  So, for January 2002, revenue month

3  commissions would have been paid on or about March

4  15th of that year.

5      Q.   And looking at this chart, can you tell

6  me what post petition commission would have been

7  paid or what to "ATN"?

8      A.   The post petition commissions if you

9  want to just go back on the first page of the

10 Exhibit, it might be easier, shows where July post

11 listed, that would be from the filing period going

12 forward.  So, from like, I think, July 21st of

13 2002 through July 31st, that period of time, that

14 customers generated commissionable revenue and

15 it's listed here as having $28,345.19 commission

16 figured to it.

17     Q.   And that payment would have been made

18 when?

19     A.   I believe that would have been made

20 around September 15th time frame.

21     Q.   Okay.  And the next commission that

22 would have been paid?

23     A.   The next commission would have been

24 based upon bonus commissionable revenue and that

25 would have been paid in a 45 day time after the

29

WORLDCOM, INC.

1   month of August so that would have been right

2   around the 15th of October, 2002.

3        Q.    The chart specifically says that a

4   commission for the August post-petition period

5   would have amounted to just over $199,000 in the

6   sections noted and that particular payment amount

7   was $185,658.59.  Could you tell me what the

8   difference was and what that was for?

9        A.    All right. The actual check that was

10  sent for ATN was for the figures in the comment

11  section, it was $185,658.90.  The discrepancy of

12  $15,764.80 is listed right above that entry and

13  the explanation is that in the August 3rd, 4th and

14  5th time frame, those invoices had not originally

15  been calculated and needed to be extracted out so

16  pre-petition -- for the pre-petition amount that

17  was entered for those customers who were invoiced

18  on those dates.  So, you will see that $13,764.85

19  listed up above in the pre-petition section to

20  show that that was part of what the actual claim

21  amount that we have stated to the Court was pre-

22  petition for this particular representative.  So

23  it wasn't adjusted, just didn't come out of pre-

24  petition payment because they're not allowed to do

25  that.

WORLDCOM, INC.

1    Q.    For the month of August going over to

2    the revenue generated, the commission check would

3    have been sent on or about what time frame?

4    A.    The August commission would have been

5    around the 15th of October.

6    Q.    And the next commission payment on this

7    chart would be September, 2002?

8    A.    That would have been September, 2002,

9    commissionable revenue generated in that calender

10   month.

11   Q.    And what was the amount of that payment,

12   was that commission check?

13   A.    The check was in the amount of

14   $221,207.24.

15   Q.    And around what time would a check have

16   been sent?

17   A.    Approximately 45 days after the calendar

18   month of September ended, so right around the 15th

19   of November, it would have been the time that

20   check would have been sent.

21   Q.    Now, turning to the second page of that

22   graph, can you tell me what the total post

23   commission paid to "ATN" was?

24   A.    $435,211.33.

25   Q.    Now, going back from there to the

31

WORLDCOM, INC.

1   representation, can you tell -- me and turning to

2   Movant Exhibit No. 8, can you tell me the

3   circumstances that led to the drafting to the

4   seventh amendment to the representation agreement?

5       A.   Well, we received a letter from "ATN"

6   that was dated June 28, 2002, and the letter was

7   addressed to George Hampton, sent care of my name

8   at my work address and the letter, in effect, was

9   a notification by "ATN" to Worldcom. That "ATN"

10  intended to terminate the representation agreement

11  and by their right to do -- that is, by giving us

12  30 days notice, if we would not agree to remove an

13  exclusivity clause within the representation

14  agreement.

15      Q.   Turning forward, I'll pick up in a

16  minute where we left off.  But turning to Exhibit

17  No. 9, we're moving to Exhibit No. 9, please.

18      A.   Yes.

19      Q.   Is the letter included or is a copy of

20  the letter that you received from Mr. Bein

21  included?

22      A.   That letter I received in my office

23  somewhere right around a day or two after the date

24  on the 28th.

25      Q.   And what did it specify with regard to

32

WORLDCOM, INC.

1  the time line for termination of the agreement?

2      A.    It provided that there be -- or that

3  "ATN" was giving Worldcom 30 day notice of

4  termination of the representation agreement.

5      Q.    And it was at that point or sometime

6  subsequent to your [inaudible] at that point and

7  in receipt of this letter that a seventh amendment

8  was brought into for "ATN"?

9      A.    Yes.   I mean, in the letter, the request

10 was to remove that exclusivity in the agreement

11 and after receiving a letter, we had discussions

12 internally as to whether or not to agree to remove

13 the exclusivity portion from the agreement.   And

14 based upon the fact that, you know, we placed a

15 value on having an exclusive relationship with

16 "ATN".   But after receiving the letter and

17 determining what we wanted to do, the decision was

18 made to go ahead and draft -- and work with our

19 legal department to draft an amendment to that

20 stipulation reflected in the removal of the

21 section of the agreement that made for "ATN"

22 exclusive representative to Worldcom.

23     Q.    And when was the seventh amendment

24 forwarded to "ATN" to your knowledge?

25     A.    I received it from our legal department

33

WORLDCOM, INC.

1    on July the 10th and after reviewing it and

2    speaking with our attorney then it was forwarded

3    over the e-mail to Brent Lacho, who is the Sales

4    Director in Los Angeles who had sales

5    responsibility for the "ATN" account, instructed

6    Brent -- Mr. Lacho, that is, that the seventh

7    amendment was enclosed and protected and could be

8    forwarded however he saw fit to use it.

9        Q.    Subsequent to your sending your seventh

10   amendment to "ATN", did you become aware of any

11   activity by "ATN" that would have led you to not

12   want to let you use the seventh amendment?

13       A.    Yes.    The seventh amendment was sent

14   over about a week or so later and we entered the

15   bankruptcy filing and right at the end of July --

16   and right about the end of July, I should say, the

17   first day of August or a couple of days later, I

18   received a phone call from Brent Lacho and I

19   received both a phone call and then later e-mail

20   correspondence, informing me that he had received

21   notice from our customer service center in San

22   Antonio and they overheard something on the line.

23               MR. ENGELMAN:    I'm objecting to

24           the question.

25               MS. KING:    It's not being offered

WORLDCOM, INC.

1          for the truth of the matter.  It's being

2          offered to indicate the state of mind of

3          the Debtor that would have led them to

4          want to terminate the agreement with

5          "ATN".

6               THE COURT:  Any response to that

7          from anyone?

8               MR. ENGELMAN:    It may be a state

9          of mind of perhaps Mr. Lacho, but he is

10         not here.  I don't believe that the

11         state of mind of this witness or the

12         fact of him giving an example of -- him

13         trying to give information of what

14         somebody else may have said is

15         pertinent.

16              MS. KING:  Finish what you're

17         saying.

18              MR. ENGELMAN:  What I said was

19         I mean, this is not what this

20         gentleman's statement is what he is

21         testifying.  I mean, it's [inaudible]

22         perhaps the state of mind of Mr. Lacho

23         who was mentioned here but it's not this

24         gentleman's state of mind and I think

25         it's therefore -- I mean, it doesn't fit

WORLDCOM, INC.

1        with any exception to hearsay and it's

2        clearly trying to introduce evidence by

3        what somebody else said because I can't

4        cross examine that person.

5            THE COURT:  I think it's true and

6        who made the decision on this at

7        Worldcom as to not to enter into the

8        seventh amendment.

9            THE WITNESS:  That was a decision,

10       Your Honor, that we were told after we

11       received notification.

12           THE COURT:  By who?

13           THE WITNESS:  Our Vice President

14       in the Channels area and also in consult

15       with our legal department.

16           THE COURT:  Well, let me hear

17       from Debtor's Counsel in response to

18       the objection.

19           MS. KING:  Mr. Ahern was very

20       involved with the decision to accept the

21       discontinuation of the "ATN" agreement

22       and the relation that he wanted to

23       testify to is directly related to the

24       reason why Worldcom decided to initiate

25       the acceptance of the termination and

WORLDCOM, INC.

1              therefore, critical to the mind set of

2              the Debtor in terms of the acceptance of

3              the termination.

4                    THE COURT:  I understand -- when I

5              asked the witness before we took a break

6              and I will ask it again.  How does the

7              witness know that anyone at Worldcom

8              believed what "ATN" what he just alleged

9              that they were doing?

10                   THE WITNESS:  I told that by our

11             Sales Director who handled the "ATN" who

12             had a conversation with somebody in our

13             customer service area and with Mr.

14             George Bein as well.

15                   THE COURT:  Well, what involvement

16             did you have with the decision made at

17             Worldcom not to renew?  I'm not sure

18             that accepting the termination is the

19             correct phrase, but involved with the

20             decision that ultimately led to the

21             acceptance of the termination?

22                   THE WITNESS:  Yes, I understand

23             what you're saying, Judge, completely.

24             In my direct capacity, I worked on all

25             of our contract matters and interfaced

WORLDCOM, INC.

1          with our legal department so in this

2          particular instance in reviewing both

3          the termination notice from "ATN" and

4          the seventh amendment that was, in

5          effect, removing the exclusivity, all

6          those were processes that I was involved

7          in and had a lot of input to both, the

8          business decision behind it and also in

9          consult with our legal department.  So

10         when the information that was presented

11         to me by Mr. Lacho was told, we

12         discussed it with our legal department

13         and determined that -- that at that time

14         that there were or that there appeared

15         to be a breach of Section 8-1 and that

16         rather than going forward with the

17         amendment to removing exclusivity, we

18         decided at that point the best course of

19         action was to simply agree that the

20         termination or the 30 day notice that

21         "ATN" provided to us had indeed lapsed

22         and that we were in agreement that the

23         representation agreement had been

24         terminated.

25              THE COURT:  Then I'll overrule the

WORLDCOM, INC.

1           objection and accept it as not for the

2           truth of the matter but as to the state

3           of mind at Worldcom in making its

4           decision with respect to the termination

5           letter sent by "ATN".

6      Q.    Just to clarify, after or on about July

7    the 15th, after you had sent the seventh amendment

8    of the agreement to "ATN" -- on or about July the

9    15th, what information became available to you

10   that indicated that you were going to eventually

11   -- going to accept the termination of the

12   agreement?

13     A.    The trigger to this was that right after

14   on or about July the 31st, Mr. Lacho called me and

15   said that there was an apparent solicitation by

16   "ATN" to one of the "TTI" customers and he wanted

17   to know, you know, what I thought about that.  I

18   reviewed the contract and I told him that in my

19   opinion, it was a clear violation of 8.1 and I

20   sought the opinion of our legal department

21   [inaudible] and we informed Mr. Lacho and he sent

22   us some information to our legal department and we

23   had discussions on it and just determined that

24   rather than go forward with any other amendments

25   to the agreement or agreeing to rescind the

39
WORLDCOM, INC.

1  agreement, that the best course would be to

2  acknowledge that the 30 day notice had indeed

3  lapsed effective July 28th and that we considered

4  the agreement to have been terminated.  And what I

5  asked our legal department to do was to draft a

6  letter and send it out from the legal department,

7  so that it had one of our Associate Counsels on

8  the letter that indicated the agreement of

9  termination of July 28th but also could point out

10  to "ATN" the obligations under Section 8.1 of the

11  agreement and for them to be able to continue to

12  receive, you know, commissions.  In effect, not to

13  breach that section of the contract.

14      Q.   And with regard to that provision,

15  attached indeed to Exhibit No. 10, now, is that

16  letter with that MCI Worldcom letterhead, the

17  letter to which you refer; is that the one

18  involved?

19      A.   Yes, that is the letter that our lawyer,

20  the MCI lawyer, directed at direction and sent out

21  to "ATN".

22      Q.   And the third paragraph that begins with

23  the reference to 8.1.  Is that the paragraph that

24  was included at your request?

25      A.   That's right, it's really meant to be a

40

WORLDCOM, INC.

1   strong reminder of the applications that we wanted

2   to hold the representative to.

3       Q.    And that provision was included and you

4   based it upon your understanding that that Section

5   8.1 had been violated?

6       A.    That's right.  We learned indeed there

7   was clear solicitation of our customers.

8       Q.    By "ATN"?

9       A.    Yes.

10      Q.    Subsequent to sending the August 6th

11  letter engaging in a notice of termination, when

12  was the termination have essentially been

13  effective on the agreement?

14      A.    [inaudible] after the notification date

15  on the letter from "ATN", which would have made

16  the effective termination date -- July the 28,

17  2003.

18      Q.    And [inaudible] letter specifically

19  specifies that, is that correct?

20      A.    Yes.  I'm acknowledging that agreement

21  is now effective as of that July 28th date.

22      Q.    Subsequent to sending this letter,

23  specifically to "ATN", did "TTI" have any further

24  discussions with "ATN" relating to any other

25  agreements or amendments or otherwise?

WORLDCOM, INC.                                    41

1       A.    There were communications on the part of

2  the sales channel with "ATN" and I believe Mr.

3  Bein specifically.

4       Q.    Can you tell me what those

5  communications were at all?

6       A.    It was a couple of short e-mails between

7  Mr. Bein and Mr. Lacho as to whether or not there

8  was -- whether there was any likelihood in trying

9  to solve the relationship or continuing with the

10  relationship under the agreement that had been

11  terminated, or whether we would rescind that

12  notice and trying to pick up where we left off.

13  But by removing exclusivity that was a sales

14  consideration, that wasn't [inaudible] the

15  operations for legal conversation.

16      Q.    So, it wasn't a conversation that you

17  yourself had been involved in, in any manner?

18      A.    No.  Nor would I object, I believe,

19  because I knew in my opinion the August 6th

20  letter, that the legal department sent out,

21  clearly stated that the agreement had been

22  terminated and we already sent the notice and

23  weren't going to continue to forget about it.

24      Q.    Just to back up for a second, did

25  Worldcom ever execute the seventh amendment to the

WORLDCOM, INC.                                    42

1   agreement at all?

2       A.   No.  "ATN" sent the agreement after the

3   August letter was sent and the agreement -- that

4   is the amendment, a signed amendment, from "ATN"

5   came to me but it was never executed.

6       Q.   Now, turning our attention and moving on

7   to Exhibit No. 11.  Can you tell me what that

8   document is?

9       A.   This is a memorandum that was sent out

10  by our department, our Cost Development Department

11  to agents and partners, if you will, companies or

12  individuals who might receive commissions from us

13  explaining a little bit about, you know, what is

14  going on as a result of the bankruptcy.  And it

15  points to our web site that has an inflow about a

16  disk where some people could click on and key into

17  an access with that information between July 22nd

18  and early in August.  You know, it was pretty

19  hectic with regard to the company and trying to

20  get information to the appropriate people who had

21  questions about how is the bankruptcy impacting

22  and what is going to occur.

23      Q.   About how many agents would have

24  received this mass communication from Worldcom?

25      A.   I think the way we decided to do it was

WORLDCOM, INC.

1  to -- because we had, you know, agreements and

2  well over one thousand agreements out there, many

3  of whom were not really actively selling anything

4  that we thought that, you know, the most important

5  people that should be made aware of this were

6  anybody who had recently received a commission

7  check from the company.

8          [end of tape 1, side b]

9  DIRECT EXAMINATION

10  BY MS. KING:

11      A.   Those would have been agents who are

12  either under Worldcom's representation agreements

13  or "TTI" representation agreements or had both

14  types of agreements.

15      Q.   And the date of the letter is August 2,

16  2002?

17      A.   Yes, it is.

18      Q.   And so would this letter have been sent

19  out in the mass mailing prior to the August the

20  6th notice of termination sent to "ATN"?

21      A.   Yes, I think the letter -- because we

22  had already had that correspondence, that we were

23  trying to get to the different agents and I think

24  what we were trying to do at that point, as I

25  said, was get it to those agents who had recently

WORLDCOM, INC.

44

1    received commissions, but I know I had

2    conversations with our External Commissions

3    Department, that they had all the most recent

4    addresses and contact names of the agents so I

5    think we just had those folks, you know, pulling

6    the addresses and sending out these letters and it

7    probably would have went to maybe -- in the

8    neighborhood of maybe 350, 360 agents.

9        Q.    I'm returning your attention to Exhibit

10   -- Movant's Exhibit No. 12.  Can you tell me what

11   the -- or what each of these papers -- oh, I'm

12   sorry, the first page which looks to be some sort

13   of front page and the second two pages which look

14   to be a letter and what specifically these

15   documents are, please?

16       A.    Well, agent priority, a name -- as I

17   said agent priority, which is a name given to the

18   web site that is accessible to agents that we have

19   under contract.  So, you know, it's a means or

20   method of our agents getting notification on

21   products and they submit orders on line and it's a

22   quick way to get information out to those who are

23   in our program.  So what we did was we began -- we

24   were working with people who handled the

25   administration of this web site and we had them

WORLDCOM, INC.

1  post out the bankruptcy filing Chapter 11 web

2  site, sending a letter to agents regarding

3  information that they should read and which

4  directed them to the location where to go.

5      Q.   And after the termination of the

6  agreement, the order or the August 6th letter that

7  was sent by Worldcom to "ATN", would Worldcom have

8  expected "ATN" to continue to access an agent web

9  site hosted by Worldcom?

10     A.   I don't know if I want to put anything

11  to chance, whether I would have expected them to

12  do it.  I think the way to insure not doing it

13  would have been to just disable the IB access, the

14  system.  And other than that, if that idea is

15  active, chances are that somebody will go and read

16  it.

17     Q.   But the web site was really focusing on

18  active agents, agents who were still actively

19  involved?

20     A.   Well, it's an agent web site and

21  specifically, if you're "ATN", your agreement is

22  terminated and you're not an agent anymore.  So it

23  was not meant for them but you know again, if you

24  had the key to the door.

25     Q.   Now, turning your attention to Exhibit

WORLDCOM, INC.

46

1    No. 15. Movant's No. 15, let me back up for a

2    second, subsequent to your August 6th letter and

3    your understanding that in late July there had

4    been violation of the non-solicitation provisions

5    of 8.1, did you become aware of any further

6    solicitation effort by "ATN" directed at "TTI"

7    customers?

8        A.    Yes.

9        Q.    How did you become aware of such

10   solicitation efforts?

11       A.    Well, I received a faxed copy of a

12   letter that was sent by "ATN" to a "TTI" customer

13   encouraging them to move away from "TTI" and

14   receive the services of another company that "ATN"

15   had aligned themselves to.

16       Q.    When did you receive this letter

17   approximately?

18       A.    That was at the end of October.  A copy

19   of the letter that I received was at the end of

20   October of 2002.

21       Q.    Now, turning your attention to that

22   specific letter, please -- or Exhibit No. 15, when

23   you received this letter was it your belief or

24   understanding that that was the only September

25   solicitation that "ATN" had sent out?

WORLDCOM, INC.

47

1    A.    No, not a chance.

2    Q.    And why is that?

3    A.    I mean, you know, I would say back to

4  number one, the end of July and what transpired

5  then and now, the chances of me receiving more

6  than one letter that went out to a customer, I

7  mean, that is not the way I viewed it though.

8    Q.    This letter dated September 25th, is

9  that correct?

10    A.    That's right.

11    Q.    Of 2002?

12    A.    Yes.

13    Q.    And would "ATN" have had received a

14  commission check in September for -- or from

15  Worldcom?

16    A.    Yes, they would have.

17    Q.    On or about what date would that have

18  check been received?

19    A.    Again, around the 15th of the month

20  which was consistent with sent out checks.

21    Q.    That would have been for the July period

22  of time?

23    A.    That would have been July post-petition

24  revenue time.

25    Q.    What, if any, action did Worldcom take

WORLDCOM, INC.

48

1    upon learning of the direct solicitation in late

2    October?

3        A.    The date I got this letter, I got -- I

4    faxed it over to our legal department and -- down

5    in Washington and specifically to Mr. Reynolds who

6    authored the August 6th letter on my behalf.  Then

7    covered it with both him and my Vice President as

8    to, you know, what the letter entailed.

9        Q.    Now, in turning your attention to

10   Debtor's No. F?

11       A.    Yes.

12       Q.    Would you tell me, please, what this

13   letter is?

14       A.    Again, this is a June 28th letter which

15   I got around the 28th of August, which was faxed

16   to me, reviewed with Curt Reynolds and George

17   Hampton as well as actually several other senior

18   people in our legal department.  The result of the

19   decision was made that he would once again send a

20   letter or another letter to Mr. Bein, with my

21   name, which was Worldcom noting the 8.1 provision

22   in the agreement and the applications under that

23   with regards to customers as well as the

24   attachments to the letter that was sent showing

25   the September 25th letter that we received a faxed

49

WORLDCOM, INC.

1   copy of and a copy of the August 6th letter that

2   was sent by Mr. Reynolds.

3       Q.    Now, were you involved in the decision

4   to send this follow up letter to "ATN"?

5       A.    Very much so.

6       Q.    And were there any other alternatives

7   considered?

8       A.    Well, we had discussions as to whether

9   or not we would simply invoke what we thought was

10  our right under the agreement to cease paying

11  commissions for the solicitation as provided in

12  Section 8.3 of the agreement.

13      Q.    But it was determined to take this

14  course?

15      A.    Well, we opted to take this course --

16  at the time again, a lot of activities were

17  evolving around the bankruptcy and review of the

18  contracts that we had and coming closer to the

19  decisions on what to do with the contract.  So,

20  rather than separate this agent or, you know, out

21  run anybody else, we just did -- we figured out

22  the best course of action was once again sending a

23  strong reminder letting them know that we're aware

24  of the activities that are ongoing and, you know,

25  give us more time to evaluate and make a

50

WORLDCOM, INC.

1   determination as to what we wanted to do.

2       Q.    Did you have concerns about the impact

3   of the solicitation efforts on your customers?

4       A.    Yes, I mean, I wrote e-mails to, you

5   know, our legal department and to my Vice

6   President, my VP in our Legal Department, you

7   know, stating that the concerns that -- if one is

8   out there, the chances are good that there are

9   many, many more solicitations that might have gone

10  on so what is the impact of this going to do to

11  our customer base, our revenue stream.

12      Q.    Now, subsequent to sending out this

13  November 11th letter, did you become aware of any

14  further solicitation efforts by "ATN"?

15      A.    Yes, I was aware.

16      Q.    How did you become aware of those

17  efforts?

18      A.    Well, on the 4th of December I received

19  notice that there were copies of a mass mailing

20  that went out from "ATN" and it looked to be in

21  the November time frame encouraging customers to

22  now move to a new service provider and talking

23  about the debilitating effect of the bankruptcy

24  that it would have on "TTI", who was a service

25  provider and a customer service provider.  So,

WORLDCOM, INC.

51

1  yes, we were made aware of that, but our customer

2  service department had received copies of these

3  letters and were also assessing increased or an

4  increase in telephone traffic from customers

5  inquiring as to what is going on and their need to

6  move away from you or you guys no longer going to

7  be there and do we have to go to a new provider.

8      Q.    Was there a large increase in volume of

9  calls during that time frame to the customer

10  service center?

11      A.    To my understanding, in conversations I

12  had with the director of the customer service that

13  there was a marked increase in that type of call

14  that came in, a number.

15      Q.    Now, just to back up for a second.  Do

16  you know whether -- or how many calls on average

17  the customer information center would take a day?

18      A.    I'm not sure on the given day.  I don't

19  follow the customer service that closely or all

20  that closely, but as a result of this activity and

21  inquiries I had made, I would say that the average

22  is probably in the 47, 48,000 calls in a month.

23      Q.    Now, relating specifically to the "TTI"?

24      A.    Yes, this -- my conversation had to do

25  with San Antonio customer service center which is

WORLDCOM, INC.

1  the only one that I am referencing now.  So, yes,

2  related to the inquiries, yes.

3      Q.    Now, I'm returning your attention to

4  Movant No. 16, please, or 16 and 17, do these

5  represent the letters that were forwarded to you

6  in December by the customer service center?

7      A.    Yes, they do.

8      Q.    Now, and these were the solicitation

9  letters that you were made aware of?  Or the

10  solicitation letters that "ATN" had sent?

11     A.    Yes, they are.

12     Q.    Now, moving back to these solicitation

13  letters that you received in early December.  Do

14  you recall Mr. Bein at that time, that they began

15  sending them out on November the 15th and that was

16  Mr. Bein's testimony?

17     A.    Well, I became aware of these on the 4th

18  of December and yes, I do recall Mr. Bein's

19  testimony as to the thing that you just mentioned.

20     Q.    Now, on or about November the 15th, that

21  was when "ATN" would have received its commission

22  checks for September generated commissions?

23     A.    Yes.  I also would question the date of

24  November the 15th.  I would almost really think it

25  was earlier based upon -- in the Exhibit 16 that

53
WORLDCOM, INC.

1   at the bottom in small print it mentions that

2   Internet offer that expires November the 30th for

3   the Internet.  And that was an offer that would

4   have expired November the 30th.  If you're mailing

5   out something on the 13th or 15th of November, that

6   is not a lot of time for an offer to stand.  So, I

7   am almost thinking it predates November the 15th

8   time period.

9              THE COURT:  How much further do

10             you have on direct examination?

11             MS. KING:   Just about maybe ten

12             minutes at most, Your Honor.

13             THE COURT:  Go ahead.

14  DIRECT EXAMINATION

15  BY MS. KING:

16      Q.   Once you learned that the solicitation

17  efforts -- or of the solicitation efforts in the

18  November time frame, generally, what action did

19  you take then?

20      A.   Well, I called [inaudible] I mean, aside

21  from speaking directly with our Legal Department,

22  I got in contact with our outside counsel at Weil

23  and Gotshal, Mr. Marcus.

24      Q.   And in relationship to your conversation

25  specifically related to that, were any

54

WORLDCOM, INC.

1   communications sent to "ATN" related to that

2   effort?

3        A.   Yes.

4        Q.   Turning your attention to Movant Exhibit

5   No. 18, can you tell me what that is, please?

6        A.   This is a copy of a letter that Mr.

7   Marcus sent out to Mr. Bein, George Bein, relating

8   to the solicitation of our customers.

9        Q.   Were there any other activities that

10  Weil, Gotshal undertook with relation to the

11  solicitation effort?

12       A.   Well, by then, you know, it was clear

13  that, you know, the amount of customers that had

14  been contacted was only 20 or 50 or 100, by mass

15  mailing so the best way we felt -- the most

16  effective way that we could reach out and get back

17  to these customers and counter the letters and

18  edge or whatever that were provided to them was to

19  send a letter to a large or a very large

20  percentage of the customer base that we have under

21  the "ATN". So what we did is we prepared a

22  mailing that went to "TTI" business customers --

23  I'm sorry, "TTI" residential customers and then

24  there was also a separate letter that went to

25  business customers that was sent under the

55

WORLDCOM, INC.

1  representative, the "ATN" representative and he

2  sent it out with the idea of agents over -- making

3  commissions over $100,000 and this was a final

4  warning.

5      Q.   Do you know the approximate cost of

6  sending out those letters?

7      A.   Well, the hard cost -- what I mean, the

8  cost that directly hits budget that I'm

9  responsible for was in the neighborhood of

10  $35,000, which would have been for envelopes,

11  postage and paper so that gets -- I'm back to my

12  budget and there are -- there's a soft cost

13  involved with the number of -- or I should say,

14  with the dates that we had to coordinate to get

15  this done, so this was done throughout the

16  Christmas period as well.  So, it was, you know,

17  sort of short staffing for Christmas time and

18  which was done for the company.  And there was an

19  added work load in regard to the bankruptcy and

20  now this came into play.  So it was a lot to be

21  done, too.

22      Q.   Now, turning your attention very briefly

23  to Debtor's Exhibit G and H.  Are these accurate

24  copies of the letters that were sent out to the

25  customers that Worldcom had cultivated by "ATN"?

WORLDCOM, INC.

1      A.    These are accurate copies of the letters

2   we brought to our Legal Counsel and sent by the

3   Vice President of my unit and then sent out, I

4   mean.

5      Q.    And then briefly turning back to

6   Movant's Exhibit 18, in the letter from Mr. Marcus

7   that was sent out on December 23, 2002.  Is this

8   letter -- does it remind "ATN" of issues related

9   to non-solicitation?

10     A.    Yes, it did.

11     Q.    So the -- what did it say?

12     A.    It directed them, I believe what Mr.

13  Marcus put out there that they had been contacting

14  our customers and it was a violation of the

15  automatic stay resulting from the bankruptcy.

16     Q.    And subsequent to that communication

17  from Mr. Marcus, did you have cause to learn of

18  any further solicitation efforts?

19     A.    Efforts such as Worldcom -- the next

20  thing that we were made aware of was that "ATN"

21  had begun, I guess, a campaign in regard to trying

22  to get our agents or those people or companies

23  that might be subject to agents under our agents

24  who had been out and would represent our product

25  to customers and bring us customers.  So, my

57

WORLDCOM, INC.

1    understanding of that is -- as well was based upon

2    Mr. Bein's testimony a couple of weeks ago, that

3    there was about 1,500 solicitations made to our

4    agent base.

5        Q.    And turning your attention to Debtor's

6    Exhibit No. I.  Is this -- do you know, Mr. Ahern,

7    if this is an example of the solicitation effort

8    that you're talking about?

9        A.    Yes, that's correct.

10       Q.    What other name is mentioned in this

11   e-mail regarding the solicitation of customers of

12   yours?

13       A.    In the third paragraph, it mentions here

14   that if you're not one of the lucky ones to have

15   your contract accepted or I should say, perhaps,

16   if you are one of the lucky ones to have your

17   contract accepted and not rejected, so that is

18   great.  If not, you should be or you should

19   consider moving your customers to a vendor who

20   will pay you commissions.

21       Q.    What was your understanding of the

22   import of that in regard to customers?

23       A.    Well, it meant -- it's rather than doing

24   a mass mailing to the end user, it's now a way of

25   going to another source to try to move customers

WORLDCOM, INC.                                                              58

1  over to another provider.

2      Q.    And did you direct further actions to

3  "ATN" to stop these further efforts of

4  solicitations?

5      A.    This mailing message of which I received

6  a copy of, I bought it over to Weil, Gotshal,

7  where we have reference to Mr. Marcus and he then

8  sent another letter to "ATN".

9      Q.    Turning your attention to Movant's

10 Exhibit No. 19.  That is an accurate copy of the

11 letter sent by Mr. Marcus?

12     A.    Yes, it is.

13     Q.    And at what time did Worldcom determine

14 that it was going to reject the agreement with

15 "ATN"?

16     A.    Well, the contract rejection process was

17 something that was a "weak link process" from our

18 standpoint in terms of working both with our Legal

19 Department and other areas to first gather up all

20 agreements that we had because it probably had

21 started in the late September time frame that we

22 began to put together lists and categories.  And

23 those contracts that you know were, obviously,

24 going to be rejected, because they had long since

25 been dormant and just no sense in having them

59

WORLDCOM, INC.

1  around.  And there were other contracts that

2  probably had value to the estate.  So, probably,

3  the measure that we took, yes, probably there

4  would have been others that would have been

5  questionable that we would want to consider.  So,

6  from that September period of time to the late

7  November, early December times, there was movement

8  and discussion of which agents do we want to know

9  this first and I will classify it as being

10  contracted we would want to submit to the Court

11  for further -- for rejection.

12       Q.    And at the time that "ATN" would have

13  been notified of the rejection, were there other

14  agents who had been paid monthly commission checks

15  which have been passed upon and there were others

16  where contracts were rejected by Worldcom.  So,

17  some were rejected by Worldcom?

18       A.    Yes.

19       Q.    Approximately how many others?

20       A.    I would say in the neighborhood of about

21  280 to 300 would be the number.

22       Q.    Now, was "ATN" notified in the same

23  manner -- the same as these other agents were?

24       A.    Yes.  I want to make one thing clear.

25  That is, every agent communications that we made

60

WORLDCOM, INC.

1   from my department and from -- in support of our

2   department, we kept those communications

3   consistent and the same.

4       Q.   And finally, just to clarify, were any

5   of the customers that were procured by any of

6   these agents and did Worldcom view these customers

7   as its customers?

8       A.   Yes.  In fact, that they are and the

9   fact that they still are, I mean.

10      Q.   In terms of the activities that Mr. Bein

11  testified that "ATN" undertook operating a small,

12  very small service center, would there have been

13  any statement or any indication by Worldcom to

14  "ATN" that those activities should have been

15  discontinued after the termination of the

16  agreement?

17      A.   There would have been no reason, none at

18  all, we would not want to do that.  I mean, if I

19  could just consult with Counsel for one moment,

20  please?

21              MS. KING:   No further questions,

22          Your Honor.

23              THE COURT:  All right.  Thank you.

24          We'll take a lunch recess and we'll

25          begin cross examination after lunch.

61

WORLDCOM, INC.

1              MR. ENGELMAN:    We'll pick it up

2         after?

3              THE COURT:    We're going to take a

4         break until 2:15 and we'll pick this

5         matter \up at 2:15 and I have a matter

6         initially for about ten minutes, so I

7         will ask the Court Reporter to return at

8         or near 2:00.

9              [LUNCH RECESS]

10   CROSS EXAMINATION

11   BY MR. ENGELMAN:

12        Q.   My name is David Engelman.

13        A.   Good afternoon, Mr. Engelman.

14        Q.   I'm going to ask you a few questions, if

15   I may, please.  Now, you indicated that in your

16   role as the Director of Business Operations for

17   the Channel Division, that you're familiar with

18   all the issues.  Is that correct?

19        A.   I'm familiar with all the standing type

20   agreements that we have and a great deal of

21   contact myself, individual contact.

22        Q.   Now, you indicated today your

23   familiarity with "ATN"?  Is that correct?

24        A.   That's correct.

25        Q.   Now, I've used "ATN" as "HSG", so if you

WORLDCOM, INC.

1    hear me use "HSG", you'll understand that would

2    also mean "ATN"?

3        A.    No problem.

4        Q.    Now, it's important for your company to

5    have customers continue to utilize Worldcom's

6    services; is that correct?

7        A.    Absolutely.

8        Q.    And that is what generated the income

9    for the company?

10        A.    Yes.

11        Q.    And isn't it true that there is certain

12    types of a customer with follow up services

13    typical and necessary when companies sign up for

14    Worldcom?

15        A.    To a degree, a short period.

16        Q.    Customers may call up and ask for some

17    kind of question or to have maybe a change of

18    address or things of that nature?  Isn't that

19    true?

20        A.    That's correct.  Throughout all customer

21    service department, yes.

22        Q.    Now, what specific knowledge do you

23    have, that is, Ray Ahern, have about the follow up

24    customer services that Worldcom provides?

25        A.    As Worldcom, I know that when customer

63

WORLDCOM, INC.

1   service centers approximately 14 hours a day for

2   any type of standard type billing inquiry or

3   customer change of address or name and the likes,

4   as well as 7/24 technical section as well.

5                [end of Tape 2, Side A]

6   CROSS EXAMINATION

7   BY MR. ENGELMAN:

8        Q.   And isn't it true that very often

9   representation agents, "ATN" included, also would

10  receive calls from customers?

11       A.   Very probably because they set up

12  customers that may be who a customer would tend to

13  call perhaps.

14       Q.   Isn't it true also that it would be

15  important to Worldcom's business, that if a

16  customer were to call "ATN" or a similar type

17  agent that whatever services were being asked for

18  by the customer [inaudible] "ATN" would provide as

19  Worldcom?

20       A.   I think in that vein, I think it would

21  be important that Worldcom -- that for any

22  customer who would call and contact any of our

23  representatives, that the representative would

24  obviously take the call and direct it to our

25  customer service center or maybe the customer

64

WORLDCOM, INC.

1  would be looking for new services, that would be

2  even better, I mean.

3      Q.  Or if the customer was just looking to

4  ask a few questions that didn't need a change of

5  service or they didn't need Worldcom to intervene,

6  that the agent could also provide that

7  information?

8      A.  I mean, if the customer calls that is

9  great.  It's not a requirement of the agent but,

10  you know, if I'm somebody who has signed up a

11  customer and they call me and I can give them a

12  quick answer to it, fine.

13     Q.  Now, I believe you testified that "ATN"

14  had been doing business prior to Worldcom's merger

15  with Worldcom or its predecessor prior to its

16  merger in 1998, is that correct?

17     A.  Yes, that's correct.

18     Q.  And during that -- or during its

19  inception of "ATN" or inception of doing business

20  with Worldcom, or whatever, it's predecessor until

21  termination, it was involved in procuring

22  customers for Worldcom to provide services.  Would

23  that be correct?

24     A.  That's right.  The agreement that I have

25  and even in our most recent agreement, that was