65

WORLDCOM, INC.

1  terminated by "TTI, if you're a representative, it

2  would logically be assumed that you would be

3  procuring customers for Worldcom.

4      Q.    And if in the course of that -- if there

5  was an "ATN" calling card that was distributed to

6  customers, is that correct?

7      A.    Well, there was the customer calling

8  card, correct.

9      Q.    And do you have the Exhibit to find it

10  on?

11      A.    Yes, I do.

12      Q.    Now, you're ahead of me.  I have to get

13  my Exhibits.  I'll provide it now, Debtor's A, B,

14  C.  Do you have Debtor's Exhibits A in front of

15  you?

16      A.    Do I, Mr. Engelman?

17      Q.    Yes, do you?

18      A.    Yes.

19      Q.    Great.  Now, could you take a look at

20  Debtor's Exhibit No. A.  You testified earlier

21  today that these are examples of calling cards you

22  had.  Is that correct?

23      A.    That's correct. Customer cards or

24  customer calls that were associated with "ATN",

25  yes.

66

WORLDCOM, INC.

1    Q.   And so isn't it true that "ATN" and

2  Worldcom were -- or "TTI" would get together and

3  kind of work on jointly this type of card and then

4  send it out to various customers?

5    A.   Not the -- on the calling card side, but

6  just in terms of what the situation would be.  I'm

7  sure there would be information of what should be

8  on the face of the card and our performance area

9  would have jurisdiction with that and it would be

10  in the marketing department to be sure with the

11  rest of the logos as to what would be on these

12  cards and that would be their decision, yes.

13    Q.   Now, on the various "ATN" calling cards,

14  there's also a phone number to which "ATN" can

15  reach or can be reached, I should say, by the

16  customer.  Isn't that true?

17    A.   Yes.  By whoever has a card who could

18  call that number, that's right.

19    Q.   And take a look at the Debtor's Exhibit

20  No. B and tell me when you're through and ready.

21    A.   I'm ready.

22    Q.   Now, in the middle of the paragraph,

23  that was actually deleted the following month,

24  there is a web site that says, "ATN.Com".  Is

25  there not?

67

WORLDCOM, INC.

1    A.    It's listed in the message, yes.

2    Q.    And that is not Worldcom's web site is

3    it?

4    A.    Absolutely not.

5    Q.    Was there a methodology for agents to

6    communicate service calls that it might receive

7    from customers to Worldcom?

8    A.    I think there was a couple of ways.  I

9    mean, certainly, those could be gotten and

10   representatives could call or they could e-mail or

11   they could -- depending on whether there would be

12   an issue or an issuing service or some sort of

13   change in service.  I mean, they could upload

14   information, I think, in some sort of bulletin

15   board of [inaudible] some nature, so, sure, there

16   are two ways of communications, right.

17   Q.    Now, a representative agent of Worldcom

18   swimmer to "ATN" would need to have certain access

19   to Worldcom's upload to upload this information?

20   A.    I'm not familiar with the exact process,

21   but that would seem logical, so it would be some

22   sort of secure site that nobody could address, but

23   I'm not familiar exactly with the method of

24   uploading it and the uploading of the information.

25   Q.    Do you have any knowledge whether "ATN"

WORLDCOM, INC.                                    68

1   uploaded any information that it received from

2   customers that it had procured between July 21,

3   2002 and say December 15, 2002?

4        A.   I'm aware that there was limited amount

5   of uploadings that were done.  I was told, yes.

6        Q.   But you don't personally know that, that

7   was what you were told by somebody else, is that

8   correct?

9        A.   Sure, because of the various departments

10  that I would interface with, I mean, I'm not in

11  those departments and I would rely upon my daily

12  contact with people from those departments.

13       Q.   Isn't it true that this uploaded

14  information came from "ATN" to Worldcom after

15  August 6, 2002?

16       A.   I don't know the exact date ranges so.

17       Q.   You just don't know the dates?

18       A.   I don't know the dates but if it did, I

19  wouldn't argue with you on it.

20       Q.   Do you have or have you reviewed any

21  written communications from Worldcom or electronic

22  communications to Worldcom from Worldcom to "ATN"

23  after August the 6th, 2002 asking "ATN" to not

24  work with any of the customers in terms of follow

25  up services?

69

WORLDCOM, INC.

1    A.    I don't recall any correspondence

2  directly to "ATN" to do anything after August the

3  6th.

4    Q.    Has Worldcom closed off this

5  communication, their electronic communication

6  system between "ATN" and Worldcom that you

7  previously testified to?

8    A.    Of which, the bulletin board or --

9    Q.    The operating of information?

10    A.    I believe it has been taken down.  I

11  don't believe there's access to it anymore.

12    Q.    Now, was that done around the middle of

13  December, was it around in 2002?

14    A.    Yes.  I think around probably 12/15,

15  12/16, time frame, that sounds around right.

16    Q.    To the best of your knowledge, in fact,

17  didn't Worldcom send whatever information that

18  came from "ATN" regarding [inaudible] up until

19  this time in December that you just testified to?

20    A.    I do know it was sent back and

21  authenticated and I guess, there was a limited

22  amount of customer activity.  It was like a

23  handful of customer activity.  I don't know on a

24  daily basis what may have transpired but from my

25  perspective in the operations area and my

WORLDCOM, INC.

1  involvement in the contract, when they terminated

2  a contract there was no reason for "ATN" to

3  continue doing any of the obligations they had had

4  under the agreement.

5       Q.   But -- let's just withdraw the question.

6  Even after a contract was terminated effective

7  July 28th of -- following up the letter of August

8  6th?

9       A.   Mr. Reynolds' letter.

10       Q.   Mr. Reynolds' letter, that is?

11       A.   Yes.

12       Q.   Now, there was still some communication

13  between Mr. Lacho and Mr. Bein regarding renewing

14  their agreement?  Was there not?

15       A.   I think I saw two e-mails or two e-mail

16  messages that are contained in the Exhibit Book

17  that have a reference to perhaps resurrecting or

18  continuing the relationship, if that would be

19  Exhibit 13 and 14 to the Exhibits.

20       Q.   Movant's Exhibits?

21       A.   Yes.

22       Q.   Now, so from what I understand what

23  you're saying, in your mind August 6th -- this

24  unit was terminated but nevertheless Brent Lacho

25  is continuing to have some communications with

71

WORLDCOM, INC.

1   George Bein, regarding, as you described it,

2   resurrecting this agreement.  Is that correct?

3       A.   Yes, there was some salesmanship going

4   on there.

5       Q.   And Mr. Lacho is an employee of

6   Worldcom, is that correct?

7       A.   Yes, he is but we're not in the same

8   department or he's not in the same department that

9   I'm in.

10      Q.   And he was -- at the time these e-mails

11  were written by him.  Is that correct?

12      A.   Yes, sir.

13      Q.   As I understand for 8.1 of the agreement

14  between my client and your company that was a non-

15  solicitation of customer -- or it was a non-

16  solicitation of customers for [inaudible]?

17      A.   Yes, sir.

18      Q.   Now, is there anything that -- as you're

19  saying the Court will read it, but in your view,

20  is there anything in Paragraph No. 8.1 that

21  prohibits "ATN" or anyone from "ATN" from

22  soliciting representatives as opposed to

23  customers?

24      A.   Other agents or somebody else under a

25  like contract with my company you mean?

72

WORLDCOM, INC.

1       Q.    Yes.

2       A.    No, that is not spelled out in that

3   paragraph.

4       Q.    Is it spelled anywhere else in the

5   agreement or any of the amendments that are into

6   evidence?

7       A.    No.

8       Q.    Now, Paragraph No. 8.1 prohibits, under

9   certain circumstances, the following terms of the

10  agreement.   That is "ATN" from soliciting

11  customers; is that correct?

12      A.    That's correct.

13      Q.    And customers are defined here as "those

14  customers procurity for Worldcom services by

15  "ATN".  Is that correct?

16      A.    Yes, sir.

17      Q.    Now, I want to talk to you about your

18  termination of the agreement between your company

19  and my client.

20      A.    Okay.

21      Q.    It started off as you described with a

22  letter from Mr. Bein to Worldcom on June 28th.   Is

23  that correct?

24      A.    The letter was dated June 28th and was

25  received probably a day or two later by me.

73

WORLDCOM, INC.

1    Q.    And then the termination was ultimately

2    accepted by Mr. Reynolds' letter of August 6th but

3    effective July 28, 2002.  Is that correct?

4    A.    The August 6th letter was our

5    acknowledgment that we agreed to accept the

6    termination of the 30 day period having expired on

7    the 28th.

8    Q.    And you testified earlier in part, that

9    acceptance of that termination was due to an

10   understanding that "ATN" was in violation of the

11   phone solicitation provision of 8.1.  Is that

12   correct?

13   A.    That's correct.

14   Q.    Now, you do not have a written document

15   that would substantiate that non-solicitation by

16   my client as alleged.  Do you?

17   A.    A written document from who?

18   Q.    From -- I have an e-mail from Mr. Lacho

19   that was sent to me and to our legal department

20   stating a conversation that he had on July the

21   31st with your client and an acknowledgment by

22   your client that, yes, they had or were looking to

23   procure customers, in effect, violating 8.1?

24   A.    Yes.

25   Q.    Did Mr. Lacho show you any letters

74

WORLDCOM, INC.

1  written by "ATN" or its representative directed

2  towards customers to solicit their business from

3  Worldcom?

4      A.    The September 25th letter is the letter

5  that I got from Mr. Lacho which showed those

6  solicitations, yes.

7      Q.    But that wasn't the letter that you made

8  your -- based your decision upon to accept the

9  termination, was it?

10      A.    No.  But the answer to your question had

11  he provided -- but in that time frame of the

12  August the 6th letter, no.

13      Q.    Now, understood.  But going back to the

14  decision to accept the termination, you testified,

15  I believe, earlier today and in answer to Ms.

16  King's questions that sometime around the end of

17  July you were told, I think, by Mr. Lacho, that

18  "ATN" was soliciting customers.  Is that correct?

19      A.    Yes.  I think it was like actually the

20  first or second of August that I had that

21  conversation with Mr. Lacho.

22      Q.    Fair enough.  Now, my question is now,

23  did Mr. Lacho show you at that time any letters or

24  e-mails or any written communication from "ATN" to

25  any customer in which it solicited that sort of

75

WORLDCOM, INC.

1    business?

2         A.    Not at that time, no.

3         Q.    Has Mr. Lacho or anybody else ever

4    showed you any written communication or electronic

5    communication which substantiates the position

6    that there was solicitations by my client other

7    than the September 25th letter?

8         A.    Well, just so I want to be clear with

9    you.  On the time -- the September 25th and

10   subsequent to September the 25th, there was a lot

11   of correspondence and prior to September 25th

12   there was a -- let's call it July 31et phone call

13   to my estimation between your client and Mr.

14   Lacho.

15        Q.    All right.  Let me ask if I can ask it

16   in this fashion.  Have you ever seen any written

17   documentation or electronic documentation to

18   substantiate the July 31st phone call that "ATN"

19   was soliciting customers?

20        A.    No, sir.

21        Q.    Now, take a look, please, at Movant's

22   Exhibit 10, which is Mr. Reynolds' August 6th

23   letter.

24        A.    I have it.

25        Q.    And you've reviewed that, I gather,

76

WORLDCOM, INC.

1  pretty carefully before today's hearing?

2       A.   Yes.  Very much so, including I'm the

3  guy that put it together.

4       Q.   Now, did you review it before it went

5  out by Mr. Reynolds?

6       A.   Yes, he would have forwarded it to me,

7  that's correct.

8       Q.   Now, is there any mention in this letter

9  about a specific solicitation by "ATN"?

10      A.   No.

11      Q.   Okay.  Now, this letter says that the

12 contract we accept the termination and it points

13 out the requirements of Paragraph No. 8.1, that

14 survived the termination of the contract.  Is that

15 correct?

16      A.   Yes, it does.

17      Q.   Now, let's talk for a second about the

18 September 25th letter of my client, which is our

19 Exhibit or Movant's Exhibit No. 15.

20      A.   I have it.

21      Q.   But before I do that, let me show you

22 that and also look at Exhibit 16 and 17, please.

23      A.   I have those as well.

24      Q.   Exhibit 16 and 17, I believe, came to

25 your attention, I believe you testified, in the

77

WORLDCOM, INC.

1  early part of December, perhaps the first week of

2  December of 2002.  Is that correct?

3       A.    December 4th, to be exact.

4       Q.    Now, and other than the Exhibits 16 and

5  17, is it true that the only written document you

6  have ever seen which purports to be a solicitation

7  by "ATN" of customers as that term is defined in

8  the agreement that we had marked, is the September

9  25, 2002 letter?

10      A.    That is all that was brought to me, yes.

11      Q.    You don't have any personal knowledge of

12  any others, do you?

13      A.    Not that I'm aware of.

14      Q.    And the September 25, 2002 letter that

15  we've marked as Exhibit 15, Movant's Exhibit No.

16  15, did not trigger a lot of activity in your call

17  center such as you've described in response to

18  Exhibit 16 of 17.  Is that correct?

19      A.    I did not go back and locate any kind of

20  call fluctuations in that period of time.  I was

21  more concerned with the breach than the call

22  volume.

23      Q.    Now, Mr. Ahern, please take a look at

24  Debtor's Exhibit E, which is the schedule of

25  revenues and commissions.  I think we can do this

WORLDCOM, INC.

1   by memory.  I just want to clarify, the last post-

2   petition commission check paid by the Debtor to

3   "ATN" was covering the period for September of

4   2002.  Is that correct?

5        A.    That's for the services provided during

6   that month?

7        Q.    That's right.  That was for the invoices

8   for that September of 2002.

9        A.    That's correct.

10       Q.    And nothing was paid for November or for

11  October, November and December or beyond that, is

12  that correct?

13       A.    That's correct.

14       Q.    After the August 6th letter, excepting

15  the fact that the termination was September to my

16  client by Mr. Reynolds, there were more commission

17  checks issued by Worldcom to "ATN"?  Is that

18  correct?

19       A.    That's correct.

20       Q.    So, in spite of the violation that you

21  heard about, the decision was to continue to make

22  the payments, correct?

23       A.    Yes, after a lot of deliberation what we

24  decided would evolve to the course of action to

25  take rather than accept the termination under 8.1

WORLDCOM, INC.

1    or 8.3, that the acceptance of the "ATN" request

2    to terminate would be accepted and the reminder of

3    the obligations under 8.1 were pointed out.

4         Q.    And the reminder of 8.1 was?

5         A.    Don't take our customers.

6         Q.    Don't take the customer?

7         A.    Yes.

8         Q.    And these customers, which is, by the

9    way, did they sign written contracts with Worldcom

10   or for services, that is?

11        A.    I don't think all the customers are that

12   type.   I think they are more like month to month

13   type agreements.   A short term relationship, yes.

14        Q.    So, then now they pay their bills, these

15   customers and they could go to print service or

16   service down the road and their service would be

17   there?

18        A.    They could come, yes.

19        Q.    Now, so it's important that for

20   [inaudible] to keep this customer base that they

21   be provided service, I assume, is that right?

22        A.    It's important that they be provided

23   network service and customer service.

24        Q.    And this customer base and the income

25   that came from this customer or these customers

WORLDCOM, INC.

80

1  procured by "ATN", as well as customers procured

2  by any representative agent is an important part

3  of Worldcom's business, I would assume.  Is that

4  correct?

5      A.    I would like to think that, sure.  Any

6  generated customer is appreciated.  Any customers

7  that use our services, yes, or sales

8  representative is important, yes.

9      Q.    And isn't that one of the reasons that

10 Mr. Reynolds stated in his August 6th letter

11 accepting the termination that "ATN" should keep

12 its hands off these customers because they are

13 important to us?

14     A.    Yes.

15     Q.    And Mr. Marcus wrote letters or a couple

16 of letters to "ATN", one of them being Exhibit 18,

17 or Movant's Exhibit 18.  These are all dated

18 December 23, 2002, correct?

19     A.    That's correct.

20     Q.    And had Worldcom made a payment of

21 commissions to "ATN" during the month of December?

22     A.    No, we did not.

23     Q.    And the payment that would have been due

24 if one were to be paid in December, that would be

25 back to October services?  Is that correct?

WORLDCOM, INC.

1      A.    That would be for the month of October

2  paid in December, correct, right.

3      Q.    And that the commission would have been

4  paid around December the 15th if it were going to

5  be paid at all, is that correct?

6      A.    That's right.

7      Q.    And this letter came after the 5th of

8  December and after your company decided not to pay

9  any more commissions to "ATN", is that correct?

10      A.    That's right.  This letter was in

11  response to the mass mailing that I became aware

12  of on 12/4 and contacted Mr. Marcus and he

13  authored this letter.

14      Q.    And the point of this letter is "stop

15  soliciting our customers".  Is that correct?

16      A.    I can't speak for Counsel but I think

17  on the basis of the two points, one is, don't take

18  the customers and another was part of -- this was

19  the automatic stay that was in place as a result

20  of the bankruptcy.

21      Q.    And I will have you turn to Exhibit 19,

22  which is Mr. Marcus's February 3rd letter.  Have

23  you read this letter as well?

24      A.    Yes, sir.

25      Q.    And this is another letter from Mr.

WORLDCOM, INC.                                          82

1  Marcus to my client not to solicit the other

2  representative's agents, is that correct?

3       A.   Yes, it is.  But understanding that the

4  total of the message of this letter and of the

5  e-mail generally, from their client was

6  encouraging those representatives to move

7  customers away from Worldcom, going at it at a

8  different direction and having an effect.

9       Q.   And again, I think we talked about

10  earlier that there was no prohibition

11  contractually of my client about contacting

12  agents, is that correct?

13      A.    There is nothing specific in the

14  contract about going after agents, only the

15  customers of those agents.

16              MR. ENGELMAN:   May I have a brief

17          second, Your Honor, please?

18              THE COURT:   Go ahead.

19              MR. ENGELMAN:   That's all the

20          questions that I have, thank you.

21              THE COURT:   Any redirect

22          examination?

23              MS. KING:   Yes, Your Honor.

24              THE COURT:   You can go ahead, Ms.

25          King.

WORLDCOM, INC.                                         83

1    REDIRECT EXAMINATION

2    BY MS. KING:

3        Q.    Good afternoon, Mr. Ahern.

4        A.    Good afternoon, Ms. King.

5        Q.    With relation to the August 6th letter

6    sent out by Mr. Reynolds, was there a

7    consideration of sending a more specific letter

8    related to the specific solicitations that

9    Worldcom had learned about?

10       A.    Yes, there was.

11       Q.    And were there, in fact, drafts of such

12   letters?

13       A.    There were drafts circulated by our

14   Legal Department for my review and the review of

15   my Vice President.  I also believe certain other

16   people in the Legal Department as well and those

17   drafts were read by those people and we were, I

18   believe, in agreement with the strong language

19   that was in them.

20       Q.    And the strong language would have been

21   specifically related to the solicitation

22   activities in early August that you testified to?

23       A.    In that late July sort of thing where I

24   was made aware of it in early August, that's

25   correct.

WORLDCOM, INC.

84

1    Q.    And the Movant 14 letter that Mr.

2 Reynolds sent out after the September 25th

3 solicitation that you testified to, do you know if

4 that specifically referenced the September 25th

5 solicitation by "ATN"?

6    A.    It had an attachment to the letter from

7 "ATN" to that customer and a second attachment was

8 the August the 6th letter.

9    Q.    But the letter itself did not

10 specifically mention September the 25th in it?

11    A.    No, I don't believe so.  I can look

12 again but I don't believe it did, no.

13         {end of Tape 2, Side B}

14 REDIRECT EXAMINATION

15 BY MS. KING:

16    Q.    With regard to the customer service

17 activities which "ATN" might have undertaken post-

18 petition, in any way would Worldcom have used

19 those activities as a benefit to its post-

20 petition?

21    A.    No.

22    Q.    Why not?

23    A.    I mean, again, we have a well trained,

24 well staffed customer service center in San

25 Antonio to handle these calls and the fact is that

WORLDCOM, INC.

1    after our -- after the July 28th termination of

2    the agreement, there was no benefit being brought

3    to MCI and there were no new customers brought on

4    for utilizing the network and who came to us

5    through "ATN" at our customer service center

6    number and there were a variety of ways they could

7    get there.  So, you know, at the end of the day if

8    "ATN" basically upon their own decision wanted to

9    cease doing anything, you know, they could have

10   disconnected the number or have that number say,

11   "TTI", please be sure to dial 800".  So there's no

12   benefit.

13        Q.    And if, in fact, was there a concern

14   that given the solicitation effort by "ATN", that

15   customers contacting that customer service number

16   would have potentially been asked to switch away

17   from Worldcom?

18        A.    That's right.  I think it's safe to say

19   we viewed it more as a possible lead source for

20   them, for any new customer calling in who would

21   have been asked to move to another provider that

22   "ATN" was now associated with.

23        Q.    Do you have knowledge of any impact that

24   the solicitation by "ATN" in late July and in

25   September and in the November and December time

WORLDCOM, INC.                                                86

1  frame and subsequent to that on your customer

2  base?

3      A.   Well, I think that I would -- well, I

4  can answer it this way or in a couple of ways.

5  Yes, there was a decline somewhat in the base but

6  I think a bigger concern to us, quite honestly,

7  was those customers calling in who were receiving

8  solicitations who would then say, "hey, what is

9  going on?  Do I have to move or don't I have to

10  move"?  And quite often, the result was that we

11  got these customers to remain with us by -- at

12  lower rates than by cutting down on the business.

13      Q.   After the post-petition -- after July

14  the 21st, was it important for you to continue at

15  the customer service center to answer questions

16  that were generated to the customer service center

17  and provide quality customer service to that

18  customer calling in?

19      A.   As important post as pre and just maybe

20  a little bit more, given all that was going on

21  with the company and we had to hold on to every

22  customer that we had.

23      Q.   And would you have associated in any way

24  any activities undertaken by the service that was

25  provided by "ATN", post-petition, with maintaining

87

WORLDCOM, INC.

1    the generation of revenue from these customers

2    that were Worldcom customers?

3        A.    I'm sorry, would you just rephrase that,

4    please?

5        Q.    In relation to the post-petition alleged

6    services that "ATN" provided, would you have, in

7    any way, viewed those services as a basis to the

8    continued generation of revenue from your

9    customers?

10       A.    No, there was nothing there -- or there

11   was nothing being done by "ATN" that we could not

12   have done ourselves on a greater -- not even on a

13   greater scale.

14       Q.    Now, with relation to a decline in the

15   customer base that may have occurred post-petition

16   related to the solicitation activity of "ATN",

17   would the decline essentially be a normal decline

18   in customers?

19       A.    I mean, there is, you know, the ebb and

20   flow of customer base in the company, I mean,

21   there are customers, for whatever reason, who

22   believe -- it's whether, you know, what they view

23   as less costing services or some other reason

24   would have left.  So, there's always going to be

25   attrition of customers as well as the

WORLDCOM, INC.                                          88

1   replenishment or replenishing of that customer

2   base to maintain the revenue by offering services

3   to different customers.

4        Q.   But in terms of the numbers that you

5   might have attributed to attrition, were they

6   beyond the norm of what you would expect in

7   attrition?

8        A.   No, I don't think there's any indication

9   to go with that, no.

10             MS. KING:   I have no further

11             questions.   Thank you.

12             THE COURT:   Any further recross

13             examination, Mr. Engelman?

14             MR. ENGELMAN:   No, Your Honor.

15             THE COURT:   Any more witnesses to

16             put on with regard to the Debtor?

17             MS. KING:   No, nothing further

18             from the Debtor with regard to

19             witnesses.

20             THE COURT:   If the Movant has no

21             other witnesses, I will take a short

22             break to let you gather your thoughts

23             and I will entertain closing statements

24             from both sides.   Thank you very much.

25             [recess]

WORLDCOM, INC.

1    THE COURT:    You may proceed, Mr.

2    Engelman.

3    MR. ENGELMAN:    Your Honor, we're

4    here asking the Court to award "ATN" in

5    their administrative claim and we think

6    it's provided for under a 503B action.

7    This is not a case just where we earned

8    a commission pre-petition, pursuant to

9    pre-petition contract.    There is more to

10    it than that, Your Honor, otherwise we

11    wouldn't just be here if that were just

12    the issue of the typical salesman

13    entering into a contract with a Debtor

14    pre-petition and than post-petition.

15    Money comes due, that is not what this

16    is all about.

17    We think there are two things that

18    "ATN" has done that has provided

19    substantial benefits to the estate.

20    First and foremost, that until November

21    the 15th and thereafter -- until a month

22    thereafter, and then continuous from

23    December 15th, "ATN"/"HSG", did not

24    solicit customers in spite of what you

25    might have heard today.    We just did not

90

WORLDCOM, INC.

1          solicit customers.  This was a critical

2          important piece to the Debtor's estate,

3          as I will discuss shortly with regard to

4          interfering, I mean.  This effort was

5          not solicitation but solicitation was

6          induced by the Debtor.  The second point

7          that we think is important to the estate

8          was the follow up services that were

9          provided by "ATN" to the customer.  Your

10         Honor, the cases of Amalgamated

11         Insurance of good law, I'm not

12         suggesting that is not good law, Your

13         Honor.

14              I've read the decision rendered in

15         the Enron case with respect to

16         administrative expense and I won't sit

17         here and discuss the various elements of

18         it for the awarding of the

19         administrative expense claims because

20         you know it but there are two things

21         that have happened post-petition, as

22         I've just described.  What you really

23         have here is a Debtor who wanted my

24         client not to solicit but didn't want to

25         pay it.  He paid it for a little while

WORLDCOM, INC.

1    and then decided, along with others in

2    this case, along with other

3    representative agents when they filed

4    the motion to reject in December of last

5    year, that they didn't want to pay those

6    commissions either, for what we call

7    residual commissions. Your Honor, the

8    two elements that we have to prove and

9    we realize this is our burden is one,

10   that there was some inducement by the

11   Debtor in possession and then number

12   two, that we provided to the benefit of

13   the estate.

14        Now, let's talk about the

15   inducement first. We submit that it's

16   -- the inducement which exists in spite

17   of what Mr. Ahern has stated today and I

18   think the credible evidence and the

19   logic says that there was inducement and

20   how -- let's go back, first of all, to

21   what this contract says. The operative

22   provision, Your Honor, Paragraph No. 8.1

23   of the representation agreement which is

24   Movan't Exhibit No. 1, this says that,

25   "Worldcom will pay commissions in

92

WORLDCOM, INC.

1          accordance with this Exhibit and also

2          with Exhibit B, will continue to pay

3          this residual or these residual

4          commissions based upon services realized

5          by customers, procured by "ATN" and in

6          exchange for that, in mutuality, that is

7          to say for that, that my client will not

8          solicit customers.

9               Now, this is the one provision of

10         this commission agreement that survives

11         the termination, whether you want to

12         call it termination by the parties or

13         rejection.  The Court may be aware that

14         in this particular contract, which was

15         part of the rejection notion that was

16         filed in December.  The motion was filed

17         in December despite the termination and

18         this particular provision survives and

19         this provision has mutuality to the

20         commissions for non-solicitation

21         commissions.  Now, they go hand in hand

22         so when Mr. Reynolds writes this letter

23         of August the 6th in which I pointed out

24         it in cross examination, that actually

25         no reference to this purported

WORLDCOM, INC.

1          solicitation by "HSG" in July.

2              They don't have any written

3          evidence of that and Mr. Bein had denied

4          that ever occurred but we have Mr.

5          Reynolds, when he wrote this letter he

6          says, Section 8.1 survives termination

7          of the agreement for so long as "MCI"

8          has an obligation to pay "ATN" any post-

9          petition termination commissions.  I

10         don't know what else could be done

11         stronger than that statement, Your

12         Honor, to create the element of

13         inducement.

14             I think that says it in black and

15         white.  This is not the pre-petition

16         company saying that, this is the Debtor

17         or the Debtor in possession that it is

18         not this provision of this contract that

19         has survived the termination and we will

20         pay you and you need to honor this

21         provision.  That is what the contract

22         says and my client did that.  Now, we'll

23         get to the September 24th letter which

24         Mr. Bein testified was isolated

25         circumstances and I would refer to the

1     same thing on the other side, where they

2     make try to make hay of it, but there is

3     no evidence that this was anything other

4     than an isolated circumstance, Your

5     Honor, and I would submit there is no

6     written evidence, no electronic evidence

7     to indicate that this was anything other

8     than what Mr. Bein testified to and with

9     somebody that had a long standing

10    relationship.  So we have the inducement

11    by this letter and we also have

12    inducement by the letters that are

13    Exhibit 11, 12, those Worldcom letters

14    of August 2nd to its agents that Mr.

15    Bein testified they received in the mail

16    as well as the August -- Exhibit 13 or

17    Exhibit 12, which was the other notice

18    letter to all of the agents that Mr.

19    Bein testified to, that he also receive

20    along with the other evidence of

21    inducement, to conform to and to perform

22    the remaining terms of this contract.

23         Now, what other evidence of

24    inducement is there?  Parties are

25    continuing to talk about the seventh

WORLDCOM, INC.

95

1          amendment, right up at least through

2          August or a portion of August after the

3          case had been filed and more inducement.

4          These maintenance services that my

5          client testified were provided and I

6          asked Mr. Ahern specifically, Your

7          Honor, so you understand that

8          information procured by my clients and

9          that is post-petition calls from

10         customers we're directed to Worldcom,

11         and they were directed both orally by

12         phone and they were directed

13         electronically and this information was

14         received and nobody said to my client,

15         "we're not paying, so stop doing this".

16         You know, they received the benefit

17         so I think that is another example, Your

18         Honor, for establishing the inducement

19         element.  If not, what benefit was

20         conferred and what is this all about.

21         They want to continue to maintain this

22         customer base, Your Honor and these are

23         not long term customers in terms of a

24         contract and they are not signing for

25         six months and they're not signing on

WORLDCOM, INC.

1          for the year.  They are -- they come and

2          go each month and so it's particularly

3          important to try not to have these

4          customers solicited and also to provide

5          the best service that you can, because

6          it's a volatile market.

7              So, what "ATN" did was, it fielded

8          these ten thousand calls that came into

9          its call center and that is evidence

10         that is undisputed.  Now, whether this

11         is a variable call center at Worldcom,

12         begs the question.  The issue is these

13         calls were made and they were serviced

14         by information which was provided and

15         sent over to Worldcom but the benefit

16         was to preserve this customer base and

17         if you take a look at the Exhibits, you

18         will see the letter, and I think you

19         will find that that, the written numbers

20         bear that out, because it's a fairly

21         consistent renewal of numbers until

22         "HSG" to solicit customers that really

23         started in November, that had the effect

24         of starting in December and more

25         probably in January.  So, what I'm

WORLDCOM, INC.

1            talking about, Your Honor, is a

2            situation where my client at the

3            specific request of this Debtor honored

4            its agreements that survived the

5            termination and did not solicit until

6            the middle of November and did so at

7            that time because it had information

8            that it would not receive any more

9            payments which, in fact, came to bear,

10           along with all the other many

11           representation agents.

12               Now, how do we quantify this?  You

13           know, Your Honor, this is not easy, I

14           mean, it's to easy to quantify the

15           negative but we could, in evidence of

16           the effect of the one month solicitation

17           and how many customers it took from the

18           Debtor, so, I mean, in that, in and of

19           itself, that indicates the value of the

20           non-solicitation.  So, there is a very

21           direct benefit to the estate by not

22           soliciting.  So, how much money are we

23           looking for, Your Honor?  One of the

24           Exhibits that we put forth looks at what

25           the revenue is and it has to do with

WORLDCOM, INC.                                                98

1          what the commissions that were paid and

2          then the commissions that were unpaid

3          post-petition.  We think we're entitled

4          to all of the commissions that are due

5          post-petition, but because we believe

6          that it was in a Debtor's failure to

7          make payments as they came due, which

8          gave rise to my client having to solicit

9          because what the Debtor was looking to

10         do was to have my client not solicit

11         customers, but they would not pay them

12         any post-petition commissions.

13             They wanted their cake and they

14         wanted to eat it, too.  Now, so I don't

15         believe we were entitled to commissions

16         forever, based upon the commission

17         arrangement.  However, I think, what is

18         appropriate in this case is to award my

19         client the commissions that were due for

20         the month of October and the month of

21         November and the month of December.  And

22         I think that approximates around

23         $600,000.  The precise numbers are in

24         the record, at about $600,000 and that

25         is because now it's -- those months that

WORLDCOM, INC.                                                99

1        my client did not solicit were the

2        monies -- let me back up.   The

3        solicitations started actually in

4        November, but because the benefit and

5        because the effect of that didn't take

6        place until probably closer to January,

7        we believe that we're entitled to three

8        months commissions.

9            Now, that is where we provided

10       the benefit by not soliciting.   However,

11       if I can just go back for a minute,

12       we're certainly entitled, Your Honor, to

13       the month of October, because there was

14       no solicitation at all during that month

15       and we're entitled to at least half of

16       November, because there was no

17       solicitation prior to November.   We're

18       entitled to this money, Your Honor,

19       because we preserved the customer base

20       by not soliciting and by also providing

21       these maintenance services when the

22       customers called in.   So, for this

23       reasons, we would urge the Court to

24       grant our motions for administrative

25       leave and interest at the Movant's

WORLDCOM, INC.                                    100

1            request.

2                    THE COURT:    Okay.   Thank you very

3            much. Ms. King?

4                    MR. MARCUS:   Mr. Marcus,

5            Christopher Marcus from Weil, Gotshal,

6            on behalf of Worldcom.   Excuse me, Your

7            Honor, in its administrative cross

8            motion, "HSG" argued that

9            notwithstanding the fact that they

10           terminated the representation agreement

11           and had admitted to soliciting the

12           Debtor's customers in violation of that

13           agreement, that they're entitled to

14           continuing payments for commissions

15           based upon -- or entirely upon orders

16           pre-petition.

17                   This assertion is in direct

18           contradiction of the case law surrounded

19           by the Bankruptcy Code and certainly,

20           it's in direct contradiction of the

21           policy behind the Bankruptcy Code.   Both

22           parties here agree on the case law,

23           "Mamouth, Jartran, Amagalmated, Enron",

24           in order to demonstrate the entitlement

25           to administrative claim under Section

WORLDCOM, INC.

1       503.  And, of course, the burden is on

2       the Movant to demonstrate first that the

3       claim arises out of transaction between

4       the Claimant and the Debtor in

5       possession, and that the services

6       provided by the Claimant were actual

7       necessary benefits to the estate.

8           Now, again, in "<u>Denton and</u>

9       <u>Anderson Company</u>" vs. "<u>Induction Heating</u>

10      <u>Corporation</u>" and in "<u>Dynach-Cuits</u>" and

11      in "<u>Fagels Corporation</u>" all of which are

12      cited in the Debtor's objection to this

13      motion.  The facts are perfectly

14      identical to the instant fax, and in

15      each case a sales representative went

16      out and procured orders for the Debtor

17      in pre-petition or a pre-petition period

18      and the goods or services were provided

19      post-petition and the Debtor was paid

20      for the goods and services, post-

21      petition and at every case the Court

22      disagreed with the Movant's argument.

23          They relied on the same language in

24      Anderson and I'm quoting from <u>178F.2nd</u>,

25      <u>841</u>, <u>844</u>.  I see nothing in the

WORLDCOM, INC.

1          Appellant's contention that the

2          Appellant should have a preferred claim

3          because the Debtor's estate was in

4          riscuity [ph] from the debt to having

5          filled the order, paid the estate and

6          which was no more enriched then it would

7          have been if the Debtor both on the

8          filling of the arrangement in regard to

9          the goods, and sold them afterwards and

10         no one argued that the unpaid seller of

11         such goods would be entitled to more

12         than a general claim.

13              The case law here is more than

14         clear.  "HSG" attempts to circumvent

15         "Denton & Anderson" and cases that

16         follow by asserting that they did not,

17         with the pre-petition orders that were

18         procured but rather than call center

19         services and this fictitious compliance

20         with the nonsense that it entitles them

21         to an  administrative claim, which

22         happens to be the amount of the

23         commissions.  Now, in examining each of

24         their asserted benefits to the estate,

25         it's clear that neither one entitles

103

WORLDCOM, INC.

1           them to an "admin" under Section 503.

2               First with respect to the call

3           center services, which "HSG" has devoted

4           and the services which were provided

5           pursuant to the transaction with or were

6           induced by the Debtor in possession and

7           that the services were actual and

8           necessary benefits to the estate.  Now,

9           before I go any further, I think it's

10          important to note that there is nothing

11          in the contract that contemplates any

12          call center services.  No part of

13          "HSG"'s commission is based upon call

14          center services.  Section 11 of the

15          representation agreement provides that

16          and I'm quoting, that "Worldcom is

17          interested only in orders for services

18          that represented only in orders for

19          services by representative obtained".

20          Now, the definition of "services" were

21          on the agreement, is the "services" that

22          Worldcom provides for the customers.

23              Now, call center is something that

24          Worldcom allowed "HSG" to do prior to

25          "HSG"'s termination of the agreement but

WORLDCOM, INC.                                              104

1           to serve "HSG"'s interest, the call

2           center was not for Worldcom's benefit.

3           The call center was for "HSG"'s benefit.

4           If there are any customer service issues

5           that came in, they were all handled by

6           Worldcom customer service center, all

7           bills, invoices, calling cards, welcome

8           letters, they all directed customers to

9           Worldcom customer service center for

10          more service.

11              "HSG" is arguing they should be

12          paid for something that they weren't

13          even entitled to be paid for under the

14          contract.  Nevertheless, with respect to

15          inducement or the inducement problem

16          that "HSG" has raised, either in papers

17          or at the hearing to have induced or to

18          provide call services, in more ways, let

19          me just say first, these e-mails, which

20          in between Lacho and Bein, which are

21          Exhibit 1 and 14 and "HSG"s Exhibit

22          both, and second it's the August 2nd

23          memorandum and the August 5th letter --

24          I mean, these are Exhibits 11 and 12 and

25          third it's the welcome to include

105

WORLDCOM, INC.

1         messages in the Debtor's invoices from

2         "HSG" and that is Debtor's Exhibit B and

3         C.  And fourth, that customers retain to

4         be able to call with "HSG" phone number

5         on it as Debtor's Exhibit No. A.

6         Now, Your Honor, it's clear that

7         each one of these did not induce any

8         post-petition services by "HSG".  Let's

9         first look at the Bein, Lacho mails or

10        e-mails, between Lacho and Bein that

11        demonstrate nothing more than Worldcom

12        and "HSG" who were discussing the same

13        thing, that is "HSG"'s desire to remove

14        the exclusivity provision from the

15        agreement, no requests to provide

16        services or any commitment whatsoever

17        from Worldcom.  It defies logic that the

18        e-mail from Brent Lacho, that Worldcom

19        may or may not agree to the amendment.

20        The pre-petition contract which could be

21        read as inducement for "HSG" to provide

22        call center services that are not even

23        contemplated under the contract and that

24        "HSG" is not entitled to payment for the

25        August 2nd memorandum, August 5th letter,

WORLDCOM, INC.                                          106

1          Your Honor.  And these were taken from

2          the web site that the Debtor's maintain

3          for their agents.  That "HSG" had access

4          to after it terminated its contract and

5          no longer wanted to be an agent.  And

6          while "HSG" had received the August 5th

7          letter in the mail but on August 6th the

8          Debtor had not yet accepted "HSG"'s

9          termination and it's logic that any

10         generic mailing that went out -- that

11         "HSG" would be included in that mailing.

12              However, when I asked Mr. Bein if

13         he knew what the web site was maintained

14         for, his answer was, for agents.  Now,

15         it's just more than a business duplicity

16         to have said on one hand it had

17         terminated the contract and no longer

18         wanted to be an agent but on the other

19         hand, to have access to the web site and

20         read letters that were designed

21         specifically for agents, and argue these

22         were induced by those letters.  Even

23         more important, though, you know, is

24         that these letters did nothing more than

25         manifest an intent to pay for the

WORLDCOM, INC.

1        Bankruptcy Code and a very similar

2        argument was made by the "HSG" <u>Dyna</u>

3        <u>Circuits</u>, were the agents in <u>Dyna</u>

4        <u>Circuits</u> argued that the Debtor had

5        waived its right to claim that the sales

6        representative was not entitled to

7        administrative claim because the Debtor

8        sent him a letter stating in identical

9        fashion as the Debtor's letter, that

10       Dyna Circuits attorneys have advised

11       Dyna Circuit that the Bankruptcy Code

12       prohibited payment to the extent that

13       the commissions were earned for the

14       post-petition. And that the Debtor would

15       pay those commissions.

16         [end of Tape 3, Side A]

17         MR. MARCUS:   The Court disagreed

18       with the sales representatives argument

19       for several reasons.  One which was and

20       this is at 1.3, 74, the language of the

21       January 5th letter reflects no more than

22       an intent to enforce the provision of

23       the Bankruptcy Code as interpreted by

24       the Debtor's Counsel and they're doing

25       exactly what Worldcom did here.  Now,

108

WORLDCOM, INC.

1              the third assertive inducement is the

2              typed messages in the invoices, the

3              customer service numbers on the invoices

4              and it had always been Worldcom's

5              customer service number and I don't

6              think you have to see that the message

7              had nothing whatsoever to do with

8              customers where the call center -- in

9              effect, that the message was removed at

10             the time of the invoices and immediately

11             after Worldcom accepted "HSG"'s

12             termination of the contract.

13                  This argument was all but abandoned

14             by "HSG" at the hearing.  Your Honor,

15             Mr. Ahern testified that the only

16             language in the invoices pre-petition

17             was basically free advertisement for

18             "HSG" and "HSG" selected new sub-agents

19             and never had anything to do with

20             directing customers to call "HSG" for

21             customer service issues.  And more

22             importantly, though, the Debtor's

23             removed the "HSG"/"ATN" message as soon

24             as possible.  The very first invoice

25             that went out after commencement date

109

WORLDCOM, INC.

1             and finally, the calling card, the

2             fourth type of inducement, similar to

3             the invoices, to the welcome letters.

4             The calling card did not direct

5             customers to "HSG" but for customer

6             service issues, there's customer service

7             number which is Worldcom's number and

8             all the calling cards state the same

9             thing, that if you want additional

10            calling cards or other services, call

11            "HSG" but for customer service issues,

12            call Worldcom customer service number.

13                I think that it's clear that each

14            of these four types of inducement, claim

15            to be by "HSG", in fact, is nonexistent

16            with respect to the actual and necessary

17            beneficial portion.  The call that the

18            "HSG" log has introduced to me into

19            evidence is completely the relevant log.

20            Mr. Bein estimated that 90 percent of

21            the calls were from customers and "HSG"

22            has the burden of showing, in any

23            services that they provided, which the

24            Debtor would dispute, that they provided

25            any services, but that any services

WORLDCOM, INC.

1          provided, that they were actual and

2          "HSG" may potentially have provided some

3          advice for some service through customer

4          and that is insufficient to establish an

5          entitlement to an administrative claim.

6          Mr. Bein testified that he could not

7          determine what services were provided

8          and he could not determine whether the

9          calls were received from the Debtor's

10         customer as opposed to some other third

11         party.  In fact, Mr. Bein agreed that

12         somebody who went on the web site and

13         got the telephone number could have

14         called that number to purchase a cell

15         phone or obtain a telephone and I don't

16         think anybody would argue that.

17              But as to the benefit to Worldcom

18         in this case -- I mean, it doesn't

19         demonstrate "HSG" actually provided

20         anything to the customer.  In addition,

21         Your Honor, and I think most

22         importantly, I heard Mr. Ahern testify

23         at great length that the Debtor's

24         maintain their own call center.  And I

25         feel 47 to 48,000 calls a month from

WORLDCOM, INC.                                          111

1          hundreds of thousands of customers and

2          the call center operates 24 hours a day,

3          365 days a year.  It's uncontroverted

4          that any call services that "HSG"

5          provided were not necessary as Worldcom

6          had expected to continue to provide the

7          customer service through its own call

8          center.

9               In fact, it's illogical to assert

10          that the Debtor's would want "HSG" to

11          continue accepting calls when they

12          maintain their own call center and were

13          a fact away, that "HSG" was soliciting

14          their customers as Mr. Ahern testified.

15          This was another method for "HSG" to be

16          able to contact the customers which

17          Worldcom had wanted to have.  Your

18          Honor, I think it's clear that "HSG"

19          does not show any inducement with

20          respect to the call center services that

21          the call center services were actual and

22          they weren't anywhere necessary or that

23          there was benefit from these call center

24          services.

25               With respect to the non-

WORLDCOM, INC.                                             112

1          solicitation covenant, "HSG" also has

2          the burden of demonstrating that this

3          restrictive covenant was entered into by

4          "HSG" and the Debtor's in possession and

5          that not soliciting the Debtor's was

6          actual, necessary and provided a benefit

7          to the Debtor's estate.  Now, the non-

8          solicitation provision, first and

9          foremost, is not a transaction through

10         "HSG" and the Debtor in possession.

11         Because right out of the gate, Section

12         1.6 of the sixth amendment which is

13         entered into by Worldcom.  That is about

14         nine months before the filing of "HSG"'s

15         motion on page six.  And I referenced

16         just above the conclusion where "HSG"

17         actually states, it said, "this prong

18         because the restrictive covenant was

19         entered into between "HSG" and

20         Worldcom".

21             Worldcom and that doesn't say the

22         "prong".  In fact, that is a patent

23         admission and this is a pre-petition

24         contract -- a pre-petition agreement

25         between Worldcom and the pre-petition

WORLDCOM, INC.

1           Debtor and "HSG" is compliant with the

2           restrictive covenant which was actually

3           necessary for -- provided for any

4           benefit to the estate.  And again, "HSG"

5           has argued that they have provided the

6           Debtor with the services of not

7           soliciting the Debtor's customers.  That

8           was because 503 offers an administrative

9           complain to induce the parties to

10          transact business and to provide goods

11          and services to Debtor in possession.

12              So, "HSG" is arguing about not

13          soliciting and saying they are providing

14          a service to the Debtor.  Your Honor,

15          compliance with the restrictive covenant

16          is not a service.  Courts have examined

17          where compliance is a non-competition

18          service and most of -- what is the

19          contention of 541, 96, provides earnings

20          from services performed by an individual

21          Debtor after the commencement of the

22          case which are not property of the

23          estate, essentially where Trustee

24          administrating the estate that view the

25          Debtor and so the estate would not

WORLDCOM, INC.

1       gobble up that individual Debtor's

2       earnings.

3               Similar to the administrative

4       claim, but with regard to the individual

5       Debtor, in re: "Schneweiss 233BR28",

6       Bankruptcy Court of the Northern

7       District of New York, which held that

8       the phrases, "services performed" does

9       not include services not performed and

10      including from the 9th Circuit

11      Bankruptcy Appellate Panel and it states

12      at page 30 that, "despite the fact that

13      Debtor may not be [inaudible] to comply

14      with the phrase, not to compete, and

15      Counsel contents compliance must be

16      personal services, because it can be

17      performed only by him".

18              This argument sounds convincing

19      until one realizes that Johnson can

20      comply with the covenant in one day and

21      the term, "personal service" is a

22      covenant which -- the term "personal

23      services" does not encompass which can

24      be performed by the deed.  We conclude

25      that compliance with a petition

WORLDCOM, INC.

115

1           agreement is not, "services performed",

2           but were released from the performance

3           of service not just the performance of

4           service.

5               Second, the case law specifically

6           states that the benefits of the estate

7           cannot be potential or speculative.

8           "HSG"'s assertion here has to be that

9           they provided a benefit by not

10          soliciting because if they did solicit,

11          it could have taken away the customers.

12          With all due respect, I think Mr.

13          Engelman's opening argument got it wrong

14          with respect to the evidence.  The

15          evidence is, in fact, that as Mr. Ahern

16          stated, they left off a portion of the

17          customers of Worldcom, that is, their

18          customers, during a period during which

19          "HSG" was soliciting what Mr. Ahern

20          would consider normal and there is error

21          in there.

22              And he didn't see anything outside

23          of the norm there.  The presumption that

24          by not soliciting that they benefitted

25          the estate simply is flawed.  Now, I

WORLDCOM, INC.

1          think the most important point with

2          respect to this solicitation, Your

3          Honor, is even after the fact that this

4          is not a transaction of the Debtor in

5          possession, "HSG" was not providing

6          services that it's speculative and the

7          presumption question is that "HSG"

8          actually solicited the customers.  "HSG"

9          breached this provision and admitted in

10         their papers and Mr. Bein admitted in

11         his testimony, that is to say, Mr. Bein

12         admitted to soliciting or "HSG" was

13         still receiving commission payment.

14              "HSG" Exhibit 15, as Your Honor

15         heard from Mr. Ahern, on his testimony

16         on the solicitation, "HSG" has started

17         soliciting and had solicited again and

18         again which cost the Debtors thousands

19         of dollars and [inaudible] time and

20         effort, in counteracting that

21         solicitation.  "HSG" simply cannot be

22         entitled to payment of administrative

23         claim for complying with a non-

24         solicitation provision when they were

25         actively soliciting and in fact, costing

117

WORLDCOM, INC.

1          the Debtors thousands of dollars, to

2          counteract.  Again, Your Honor, I think

3          it's clear the non-solicitation

4          provision was a pre-petition agreement,

5          that every benefit under the restrictive

6          covenant was speculative at best and

7          what "HSG" -- that they didn't actually

8          comply with the non-solicitation

9          agreement.

10              The final are three priorities and

11         the priority afforded to creditors to

12         transact business with the Debtor in

13         possession.  "HSG" was transacting

14         business with Worldcom and, in fact,

15         "HSG" terminated the contract so they

16         would no longer have to transact

17         business with Worldcom.  As I stated,

18         the [inaudible] because of the

19         exclusivity provision, they wanted to,

20         in fact, and did begin transacting

21         business with a competitor of Worldcom,

22         Paranet Global.

23              I brought it upon on cross

24         examination and Mr. Bein admitted

25         sending letters to 14,000 other agents

WORLDCOM, INC.                                    118

1          announcing that and trying to get the

2          other agents to leave Worldcom and

3          Worldcom's customers with them.  On

4          redirect examination and in fact on

5          cross examination of Mr. Ahern, Mr.

6          Engelman continued to ask about the

7          representation commission agreement

8          which prohibited the solicitation of

9          other agents because if it were not

10         prohibited in the agreement, it was

11         somehow okay.

12              Your Honor, "HSG" is missing the

13         point.  What this demonstrates is that

14         "HSG" was doing everything it could to

15         smear Worldcom's reputation and to -- on

16         the estate, when they were soliciting

17         the customers, and they were soliciting

18         agents and they were telling Worldcom's

19         customers that Worldcom was bankrupt and

20         its service levels were declining and

21         that we're not even sure if Worldcom

22         will be around much longer.  And now

23         they turn around and they want to be

24         compensated for that.

25              That is not a benefit to the

WORLDCOM, INC.

1          estate.  Let me just break down the

2          provisions into three buckets.  I think

3          that Mr. Engelman started but I think I

4          can do it better.  The first bucket

5          begins on or about December 15th when

6          "HSG" claimed that it continued the call

7          center services and goes out into

8          perpetuity.  There is simply no basis

9          upon which to pay these amounts.

10              "HSG" has not even asserted that

11         it's endeavoring to provide any

12         services.  Payment, in fact, contradicts

13         the very nature of the Bankruptcy Code

14         and posts the discharge and I think that

15         Mr. Engelman had retreated from the

16         payment out in perpetuity and that he

17         came back to payment through November

18         15th.  Even in his closing argument that

19         is.  Now, the second bucket is, the

20         commissions for the months of October,

21         November and December or through

22         December the 15th and these are the

23         commissions aim to be paid post-

24         petition, prior to when "HSG" claimed

25         giving services and "HSG" is only

WORLDCOM, INC.

120

1    entitled to payment of these commissions

2    to the extent that they met their burden

3    of -- or that they demonstrated to the

4    estate some benefit and this has fallen

5    well short of that. Third bucket and

6    this is raised by a counterclaim in our

7    objections, the commissions that were

8    paid for the period of July 22nd through

9    July 31st and the month of August and

10   September.  Non-post petition commission

11   paid.  Based on the Bankruptcy Code and

12   the provides that Debtors may not pay

13   petitioner's claims except in the

14   Bankruptcy Code by order of the Court.

15        And there is no order allowing

16   these payments and because Debtor had

17   demonstrated that "HSG" was not

18   providing a benefit to the estate, which

19   is a burden that was actually on "HSG"

20   to show they had been -- and there is

21   nothing in the Bankruptcy Code that

22   authorizes the Debtors to pay the July,

23   August and September commissions and

24   therefore, payment of those commissions

25   must be awarded and returned to the

WORLDCOM, INC.                                    121

1           Debtor.

2               There was one motion, Your Honor,

3           very quickly, last point.  In Mr.

4           Ahern's cross examination of why the

5           letters didn't reference the

6           solicitations, and why did they continue

7           to pay after those solicitations were

8           made or occurred and, Your Honor, it was

9           a business judgment whether they acted

10          correctly in not terminating the

11          contract or taking some other avenue,

12          which is not an issue.  But what is at

13          issue is whether "HSG" has provided any

14          benefit to the estate and we wish to

15          submit that "HSG" has not done so.

16              If Your Honor has any questions,

17          that's fine.  Otherwise, I'm finished.

18              THE COURT:   No.  Does the

19          Committee wish to make a statement on

20          behalf of the Committee?

21              MR. DAVIS:   Just a short statement

22          on behalf of the Committee.  The

23          Committee does not have first hand

24          knowledge of the facts in this case, but

25          it does appear clear from the evidence

WORLDCOM, INC.

122

1          of the record, first that this motion

2          involved pre-petition transactions and

3          secondly there is no benefit to the

4          estate as a result of "ATN"'s actions,

5          post-petition.  Not only that from the

6          record before the Court it appears that

7          "HSG" also affirmatively violated

8          restrictive covenants and simply has not

9          provided any benefit to the estate

10         whatsoever.  That is under Paragraph 3

11         and beyond that, I think it's important

12         that -- or for the Committee to

13         emphasize that allowing "HSG"

14         administrative treatment in this case

15         would create a very dangerous precedent.

16         And in that event, will put

17         administrative claim, if they were

18         awarded, administrative protection here.

19         I think it's quite possible, if not

20         likely, that similar agents would claim

21         similar protection thus creating

22         increasing administrative claims to the

23         Debtor's estate.  Thank you, Your Honor.

24              THE COURT:   Anything further from

25         Movant's?

WORLDCOM, INC.

123

1    MR. ENGELMAN:  Just a couple of

2    comments, Your Honor.  I will be brief.

3    Your Honor, just two points that I would

4    just like to close with for you to

5    consider this.  One is the argument that

6    everything was entered into between pre-

7    petition Debtor and nothing post-

8    petition that there were administrative

9    services provided by my client and post-

10   petition there were no services.  Again,

11   I want to emphasize to the Court that

12   among other things, the August 6th

13   letter which is post-petition and it

14   does state that affirmatively it comes

15   from this Debtor that my client has the

16   obligation to restrain from soliciting

17   any customers.  Paragraph 3 talks about

18   preserving the estate and I don't know

19   what can be more in line with the

20   concept of preserving the estate than

21   keeping the customer -- and to help keep

22   the customer base for this particular

23   Debtor.

24       And that was something obviously

25   important to this Debtor or else they

124

WORLDCOM, INC.

1          wouldn't have put that in this letter of

2          accepting the termination.  And it

3          doesn't mention anything about prior

4          solicitation but simply advises that

5          particular provision.  So, I really, I

6          think we need to emphasize that.

7              The other thing that Mr. Marcus

8          talked about was that the post-petition

9          maintenance calls didn't provide any

10         benefit and I would liken this condition

11         to the insurance agent for New York Life

12         who procures customers for New York Life

13         and than has renewals on their insurance

14         policies come up and those policies

15         aren't going to be renewed and the

16         customers are not going to retain that

17         policy with New York Life unless the

18         agent gives him follow up service.

19              And that's what we're talking about

20         here, the follow up service that was

21         clearly a benefit and which benefitted

22         the estate and accepted by this Debtor

23         when they accepted the information via

24         the computer and via the phone.

25              I will close with one of the

125

WORLDCOM, INC.

1              elements for determining, Your Honor,

2              whether to aware administrative expense.

3              And the issue is not so much what will

4              happen in the future with other agents

5              but what are the facts of this case.

6              And that is, one of the focuses and you

7              may take a look at whether or not you

8              need to award an administrative claim to

9              prevent unjust enrichment.

10             That is exactly what we're asking

11             the Court to take a look at here,

12             because what you have is Worldcom

13             wanting my client not to solicit and

14             wanting my client to continue to provide

15             services but it may not have been the

16             most important, but clearly, it didn't

17             stop them from doing that.  And my

18             client was not soliciting the customer

19             base and at the same time, they were not

20             paying them and then after they

21             solicited and then after they didn't pay

22             them, they still wanted or threatened

23             them to bring an action for violating

24             the automatic stay.

25             Your Honor, I submit we're entitled

WORLDCOM, INC.                                    126

1        to our administrative relief as

2        suggested so that we don't have to incur

3        this and so that the Debtor doesn't get

4        this unjust enrichment and I would add

5        on one final thing that I will close,

6        Your Honor, with this.  We're at the

7        very last and second attempt asking

8        about the repayment on the post-petition

9        payments from my client.  And I would

10       refer the Court to Paragraph No. 20 of

11       the admitted statement of fact that

12       says, "HSG" is only a representative

13       agent that Worldcom has [inaudible]

14       payment of commissions after the filing

15       date".

16            This, Your Honor, I would submit is

17       in line with the approach of Worldcom to

18       my client and that is, let's take

19       punitive action against them.  Let's

20       benefit from them and tell them not to

21       solicit.  But let's not pay them.  Thank

22       you very much, Your Honor.

23            THE COURT:   I'll order a

24       transcript and render a decision.  Thank

25       you.

127

WORLDCOM, INC.

1                    [Whereupon, the hearing was

2                    closed]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

128

## C E R T I F I C A T I O N

I, EVELYN SALAS, certify that the
foregoing transcript of proceedings in
the matter of Worldcom, Inc., Case No.
02-13533 (AJG), was prepared using standard
electronic transcription equipment and
is a true and accurate record of the
proceedings.

Signature---------------------------

Date:    July 21, 2003

Reported by Bob Sokol, #XI00372