LEXSEE 308 BR 157

In re: WORLDCOM, INC. et al., Debtors.

Chapter 11, Case No. 02-13533 (AJG) (Jointly Adminstered)

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*308 B.R. 157; 2004 Bankr. LEXIS 536; 42 Bankr. Ct. Dec. 268*

**April 27, 2004, Decided**

**DISPOSITION:** Motion for allowance and payment of administrative claim denied. Debtor's motion for return of inadvertent post-petition payments denied.

**COUNSEL:** [**1] For HSG/ATN, Inc.: David Wm. Engelman, Esq., Steven N. Berger, Esq., Richard Koral, Esq., Kevin M. Judiscak, Esq., Of Counsel, ENGELMAN BERGER, P.C., Phoenix, Arizona.

For HSG/ATN: RICHARD L. KORAL, ESQ., New York, New York.

For Debtors and Debtors-In Possession: Marcia Goldstein, Esq., Lori Fife, Esq., Alfredo R. Perez, Esq., Christopher Marcus, Esq., Kristin King, Esq., Of Counsel, WEIL, GOTSHAL & MANGES LLP, New York, NY.

**JUDGES:** Arthur J. Gonzalez, United States Bankruptcy Judge.

**OPINION BY:** Arthur J. Gonzalez

**OPINION:**

[*160] MEMORANDUM DECISION AND ORDER REGARDING MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM BY HSG/ATN, INC.

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

I. Introduction

On February 19, 2003, HSG/ATN, Inc. ("HSG") filed a Notice of Motion For Allowance And Payment Of Administrative Claim By HSG/ATN, Inc. ("Motion"), pursuant to which HSG seeks: earned commissions for the post-petition period of October 1, 2002 through December 16, 2002 in the approximate amount of $600,000; and ongoing commissions that come due in the future. WorldCom, Inc. and certain of its direct and indirect subsidiaries, as the debtors and the debtors-in-possession [**2] (collectively, "WorldCom" or the "Debtors") filed an objection to the Motion on March 14, 2003 ("Objection"). The Debtors respond that HSG is not entitled to an administrative claim because the subject residual commissions did not arise out of a transaction with the debtors-in-possession and HSG did not provide any benefit to the Debtors' estates.

The Objection also demands that HSG turnover the residual commissions inadvertently paid by the Debtors to HSG for the period July 21-31, 2002 and the months of August and September 2002 (the "Inadvertent Payments"). In the alternate, to the extent the Court is not prepared to order HSG to immediately turnover the Inadvertent Payments, the Debtors request that the Court establish the scheduling for further proceedings in respect of the Debtors' demand for turnover of the Inadvertent Payments. HSG did not file a response to the Debtors' turnover demand.

The Official Committee of Unsecured Creditors filed a Joinder to the Objection on March 17, 2003. Hearings were held with regard to the Motion on June 17, 2003 n1 and July 1, 2003 n2 (the "Hearing").

 n1 The transcript to the June 17, 2003 hearing hereinafter will be referred to as "Tr. 1 at    ".
[**3]

 n2 The transcript to the July 1, 2003 hearing hereinafter will be referred to as "Tr. 2 at    "

Based on the testimony and exhibits admitted into evidence, as well as the agreed facts in the parties' Agreed Statement Of Facts, dated June 16, 2003, the

Case 1:07-cv-03271-RMB   Document 5-13   Filed 05/14/2007   Page 2 of 8

Page 2

308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

Court finds that HSG is not entitled to an administrative claim. Regarding the post-petition period during which HSG complied with its non-solicitation obligation under the Representation Agreement, HSG has failed to establish that such compliance was "rendering services" under chapter 11 of *title 11 of the United States Code (the "Bankruptcy* [*161] *Code"), section 503(b)(1)(A)*, so as to qualify for an administrative claim under *section 507(a)(1) of the Bankruptcy Code*. Further, regarding the "call center service," HSG has failed to establish that (1) the service was required under the Representation Agreement, and (2) the performance of the service was induced by the debtors-in-possession. With respect to the Debtors' demand for the return of the inadvertent post-petition payments, pursuant to *section 549 of the Bankruptcy Code*, the Debtors are [**4] directed to initiate an adversary proceeding pursuant to the Federal Rules of Bankruptcy Procedure.

**II. Factual Background**

On August 4, 1998, HSG and MCI WorldCom Communications, Inc. ("MCI WorldCom") one of the Debtors herein, entered into a Representation Agreement that appointed HSG as an authorized sales representative of MCI WorldCom to procure orders for services provided by WorldCom. This original Representation Agreement was subsequently amended on numerous occasions, with the last amendment being entitled the "*Sixth Amendment* to Representation Agreement" dated November 1, 2001 (the original Representation Agreement and subsequent amendments thereto are hereinafter referred to collectively as the "Representation Agreement"). Pursuant to the Representation Agreement, MCI WorldCom would pay HSG commissions (the "Residual Commissions") based upon a percentage of the amount that MCI WorldCom billed to the customers (the "Customers" or "Customer") procured by HSG. The Residual Commissions were due and payable, pursuant to the terms of the Representation Agreement, forty-five (45) days from the end of the month in which the Customers received their bills for the services [**5] from MCI WorldCom. Pursuant to the Representation Agreement, "Services" is defined as the services identified in Exhibit A to the Representation Agreement that MCI WorldCom offers and provides to the Customers.

HSG had an exclusive agreement with MCI WorldCom. (Tr. 1 at 49.) Pursuant to the Representation Agreement, HSG was not permitted to offer the services of any other vendor except for WorldCom. (Tr. 1 at 50.) As permitted under the Representation Agreement, HSG sent a letter to MCI WorldCom on June 28, 2002, seeking to terminate the Representation Agreement. HSG terminated the Representation Agreement because of its desire to become a nonexclusive agent. (Tr. 1 at 52.) On July 21, 2002 (the "Filing Date") and November 8, 2002, WorldCom commenced cases under the Bankruptcy Code. WorldCom continues to operate its businesses and manage its properties as the debtors-in-possession pursuant to *sections 1107(a)* and *1108 of the Bankruptcy Code*.

By letter, dated August 6, 2002, MCI WorldCom accepted HSG's termination of the Representation Agreement effective July 28, 2002. n3 MCI WorldCom contends that its decision to accept HSG's termination of the Representation Agreement was triggered [**6] by HSG's solicitation of Customers in July 2002. (Tr. 2 at 38-40, 74.) However, Ray Ahern, MCI WorldCom's director of business operations in the art [*162] channel department, testified at the hearing that he never saw any written documentation or electronic communication to substantiate the allegations (of MCI WorldCom Los Angeles sales director) that HSG was soliciting the Customers. (Tr. 2 at 73-75.) MCI WorldCom's August 6, 2002 letter also provided, *inter alia*, that HSG was required to comply with the provisions of section 8.1 of the Representation Agreement. Exhibit 10. n4

---

n3 On or about January 3, 2003, Debtors filed a notice of rejection (the "Notice of Rejection") of approximately 1,300 representation agreements on the basis that same did not provide a benefit to Debtors' estates. The Representation Agreement was included in the Notice of Rejection. By Objection dated January 21, 2003, HSG opposed the Notice of Rejection, asserting that the Representation Agreement was no longer "executory" within the meaning of *section 365 of the Bankruptcy Code*. The Debtors have reserved their right to respond to the objection and to challenge the timeliness of the objection.

[**7]

n4 The exhibits to the parties' Agreed Statement of Facts, dated June 16, 2003, hereinafter will be referred to as "Exhibit    ". The exhibits which were submitted by the Debtors at the June 2003 and July 2003 hearings, hereinafter will be referred to as "Debtors' Exhibit    ". The exhibits which were submitted by HSG at the June 2003 and July 2003 hearings, hereinafter will be referred to as "Movant's Exhibit    ".

---

Section 8.1 of the Representation Agreement states as follows:

Case 1:07-cv-03271-RMB    Document 5-13    Filed 05/14/2007    Page 3 of 8

Page 3
308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

For as long as WorldCom pays Representative commissions in accordance with Exhibit B, Representative agrees that Representative will not contact any Customers or WorldCom Group customers procured pursuant to this Agreement or any other Agreement with the WorldCom Group for the purpose of inducing them to switch to another provider of any service which competes with the Services. Representative warrants that Representative's agreements with Representative's agents and distributors presently include, and shall continue to include, the non-solicitation and non-competition covenants contained in [**8] this Section 8.1 and shall be enforceable against such agents and distributors to the same extent that this Section 8.1 is enforceable against Representative.

According to MCI WorldCom, the August 6, 2002 letter referenced Section 8.1 because it was MCI WorldCom's understanding that this section was violated by HSG. (Tr. 2 at 40.)

On August 2, 2002, WorldCom mass mailed a memorandum ("Memorandum") to agents who had recently received commissions. (Tr. 2 at 42-44; Exhibit 11.) The Memorandum provided that monies earned by the agent under their respective agreements with WorldCom after July 22, 2002 would be paid according to the terms and conditions in the respective Representation/Partner Agreements. The Memorandum also indicated that WorldCom was prohibited from paying any amounts due for pre-petition commissions. On August 5, 2002, WorldCom posted a letter ("Letter") on a website that was accessible by active representative agents. (Tr. 2 at 44-45; Exhibit 12.) The Letter also served as a reminder to the agents that they were "required by federal law to abide by all terms and conditions of your existing Representation Agreement."

As of the Filing Date, MCI WorldCom provided [**9] services to approximately 169,000 Customers. As of the Filing Date, HSG's monthly Residual Commissions totaled approximately $ 200,000.00 and were entirely based upon orders procured pre-petition. HSG did not obtain any new Customers after the Filing Date. The Customers had access to and were made aware of MCI WorldCom's 24 hour customer service center by (a) the 800 number which was listed on several parts of the initial welcome letter, (b) the customer service number listed on the back of the calling card, and (c) a public web site which explained how to contact MCI World-Com's customer service. HSG's number was also placed on the calling card in the event customers needed to request additional cards or wanted to purchase additional services. But if customers needed customer service, they were directed to the back of the [*163] calling card which listed WorldCom's customer service number.

At the time HSG sent the abovementioned termination letter, dated June 28, 2002, HSG and representatives of MCI WorldCom were negotiating a *seventh amendment* to the Representation Agreement. The *seventh amendment* to the Representation Agreement had been drafted and signed by HSG, but was never signed by [**10] MCI WorldCom. The *seventh amendment* sought to make HSG a nonexclusive agent. (Tr. 1 at 52.)

WorldCom paid HSG, subsequent to the Filing Date, for Residual Commissions for the periods of July 21, 2002 through July 31, 2002, and for the full months of August and September 2002. WorldCom has made no further payments for Residual Commissions to HSG.

Aside from the alleged July 2002 solicitation, the evidence reveals that HSG solicited Customers on two other separate occasions for the purpose of enticing the Customers to a different service provider for their telecom services. (Tr. 1 at 57.) HSG's initial solicitation was by a letter, dated September 25, 2002 (the "September Solicitation"), to a Customer offering to provide a lower cost phone service than was presently available with WorldCom. Exhibit 15. According to HSG, the September Solicitation was in response to a call that was initiated by a Customer to HSG. (Tr. 1 at 61.) HSG contends that the Customer's initial concern was about the bankruptcy. (Tr. 1 at 61.) After answering the Customer's questions, HSG offered to provide the Customer with a lower cost phone service than was presently available with MCI WorldCom. (Tr. 1 at 61.) [**11] HSG testified at the hearing that it did not solicit any other Customers other than the aforementioned Customer.

By letter dated November 14, 2002, MCI WorldCom, referring to HSG's September 25, 2002 letter, informed HSG that it was in violation of Section 8.1 of the Representation Agreement. Said letter set forth that HSG should immediately cease sending letters to or contacting the Customers. Debtor's Exhibit F. Said letter was sent to HSG by overnight mail and facsimile. Debtor's Exhibit F.

HSG's second solicitation attempt took place on November 15, 2002 and continued for about 30 days thereafter (the "November Solicitation"). (Tr. 1 at 64, 102.) HSG testified that by the end of August/September, HSG believed that it was a matter of time before MCI WorlCom stopped payment of the commissions. (Tr. 1 at 62.) HSG believed MCI WorldCom no longer valued HSG as an agent. *Id.* The factors that led HSG to this

Case 1:07-cv-03271-RMB    Document 5-13    Filed 05/14/2007    Page 4 of 8

Page 4
308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

conclusion included the following: the *seventh amendment* was never executed; HSG was not offered the advanced commission program as other agents that WorldCom wanted to retain; and Brent Lako's (sales director in Los Angeles) statement that WorldCom was no longer interested [**12] in residential type of customer but wanted agents who could sell the business and data programs. (Tr. 1 at 62-63.)

Based upon the above, between November 15, 2002 through December 15, 2002, HSG began targeting the customers it had procured for MCI WorldCom to switch to another vendor called PowerNet Global ("PNG"). (Tr. 1 at 64-65.) The targeted Customers were tagged as former customers of MCI WorldCom. (Tr. 1 at 65.) HSG contends that it had a very carefully delineated tracking system so that it could track its efforts and success -- HSG especially coded the Customers' account numbers so it would know "precisely who they were that switched their services." (Tr. 1 at 65-66.) HSG estimates that February 2003 is the first full month that can be used to measure the revenues generated in [*164] December 2002 due to the time it took the Customers to receive HSG's mailings, to enroll, to use the services and for the Customers to be billed. (Tr. 1 at 66.) HSG contends the February 2003 billings were $ 133,000.00 as reported to HSG by PNG. (Tr. 1 at 66.) HSG contends that the March 2003 figure was about the same. (Tr. 1 at 66.)

HSG kept a record of all incoming calls to its customer service call [**13] center. (Tr. 1 at 68; Movant's Exhibit B.) All of the calls to HSG's call center were either from existing WorldCom Customers or prospective customers. (Tr. 1 at 68.) In August 2002, HSG began its attempts to procure customers or new prospects for PNG. (Tr. 1 at 73, 101.) Thus, beginning August 2002, HSG offered the services of PNG to all prospects who called the HSG call center. (Tr. 1 at 73.) According to HSG's call records, there were approximately 10,000 calls to the call center between the period of July 1, 2002 and end of December 2002. (Tr. 1 at 69, 91.) HSG assumes that of the 10,000 calls, over 9,000 calls were from existing Customers and the calls were customer service related. (Tr. 1 at 69, 74, 91.) During the same time period, HSG estimates that it enrolled 1,237 customers in PNG. (Tr. 1 at 75, 90.) The 1,237 figure only includes prospective customers who selected the PNG service; it does not include prospective customers who did not select the PNG service. (Tr. 1 at 92.) HSG estimates that it was able to enroll a "very high percentage" of the prospect calls into the PNG service. (Tr. 1 at 90.) There is no way of knowing exactly what was offered by HSG to the Customers [**14] by looking at the call record. (Tr. 1 at 93.)

WorldCom's counsel sent two letters, one dated December 23, 2002 and the other February 3, 2003, stating that the aforementioned solicitation efforts by HSG were in violation of the automatic stay pursuant to *section 362(a)(3) of the Bankruptcy Code.* Exhibits 18 & 19. HSG discontinued its solicitation efforts after receiving the December 2002 letter from WorldCom's counsel.

To counter HSG's solicitation letters, WorldCom sent out separate letters to its residential and business customers. The cost of sending out these letters was $ 35,000.00. (Tr. 2 at 54-55, Debtors' Exhibits G & H.)

The number of Customers and the amount of gross revenue to MCI WorldCom received from the Customers for the periods of July 21, 2002 through April 2003, according to MCI WorldCom's records, are as follows:

| Month | Approximate Number Of Customers | Billing Amount | Number Of Customers Lost Per Month |
|---|---|---|---|
| July 21, 2003 through July 30, 2002 | 169,424 | $ 171,351.82 | |
| August 2002 | 168,420 | 1,493.771.77 | 1,004 |
| September 2002 | 167,314 | 1,410,493.56 | 1,106 |
| October 2002 | 166,254 | 1,331.641.46 | 1,060 |
| November 2002 | 165,145 | 1,330,211.40 | 1,109 |
| December 2002 | 164,261 | 1,187,955.54 | 884 |
| January 2003 | 162,674 | 1,061,493.56 | 1,587 |
| February 2003 | 160,875 | 1,028,490.60 | 1,799 |
| March 2003 | 159,537 | 880,357.15 | 1,338 |
| April 2003 | 158,234 | 888,075.48 | 1,303. |

[**15]

Case 1:07-cv-03271-RMB   Document 5-13   Filed 05/14/2007   Page 5 of 8

Page 5

308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

[*165] As per the parties's agreement, MCI WorldCom was obligated to pay HSG's commissions approximately forty-five (45) days after the subject billing month. (Tr. 2 at 27-28.) Therefore, MCI WorldCom paid the July 21-July 30, 2002 commission on approximately September 15, 2002. (Tr. 2 at 28.) The August 2002 commission was paid on or about October 15, 2002 (Tr. 2 at 29-30) and the September 2002 commission was paid on or about November 15, 2002. (Tr. 2 at 30.) The total post-petition commissions paid by the Debtors to HSG was $ 435,211.33. (Tr. 2 at 30; Debtors' Exhibit E.)

III. Discussion

A. Legal Standard For Administrative Expense Claims

The Court has previously discussed the legal standard regarding administrative claims in, among other decisions, *In re Enron Corp., 279 B.R. 79, 84-88 (Bankr. S.D.N.Y. 2002)* and *In re Enron Corp., 279 B.R. 695, 704-07 (Bankr. S.D.N.Y. 2002). Section 503(b)(1)(A) of the Bankruptcy Code* provides a priority for "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." Pursuant to *section 507(a)(1) of the Bankruptcy Code* [**16] , these expenses for administering the estate are afforded a first priority. Thus, expenses that the debtor-in-possession incurs during the reorganization effort are afforded a first priority. *In re Jartran, Inc., 732 F.2d 584, 586 (7th Cir. 1984)*.

This priority is based on the premise that the operation of the business by a debtor-in-possession benefits pre-petition creditors; therefore, any claims that result from that operation are entitled to payment prior to payment to "creditors for whose benefit the continued operation of the business was allowed." *In re Mammoth Mart,536 F.2d 950, 954 (1st Cir. 1976)*. While *Mammoth Mart* was decided under the *Bankruptcy Act*, its analysis is applicable under the Bankruptcy Code. *In re Drexel Burnham Lambert Group, Inc., 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991)*. Administrative expenses are afforded a priority to facilitate the reorganization effort by encouraging third parties, who might be reluctant to deal with a debtor-in-possession, to transact such business. *Amalgamated Ins. Fund v. McFarlin's Inc., 789 F.2d 98, 101 (2d Cir. 1986)* [**17] (citing *Mammoth Mart, 536 F.2d at 953*). Otherwise, absent this incentive, the third parties would refrain from dealing with the debtor-in-possession, thereby inhibiting the reorganization effort and harming pre-petition creditors. *Id.*

Nevertheless, in light of the bankruptcy goal of providing equal distribution of a debtor's assets to all creditors, priorities are narrowly construed. *Amalgamated Ins. Fund, 789 F.2d at 100*. Strictly construing the terms "actual" and "necessary" minimizes administrative expense claims by requiring that the estate receive a "real benefit from the transaction," thereby preserving the estate to benefit all creditors. *Drexel, 134 B.R. at 488*. If claims not intended to have priority are afforded such, the value of the priority for those creditors Congress intended to prefer would be diluted. *Mammoth Mart, 536 F.2d at 953*. It is important to note that once a debtor is in bankruptcy, an ordinary contract action between a provider of goods or services and the solvent recipient of such goods or services becomes a contest among the debtor's creditors to share in the distribution of the debtor's [**18] assets. *In re Mid-Region Petroleum, 1 F.3d 1130, 1133* [*166] *(10th Cir. 1993)*. Any priority given to one creditor is done to the detriment of other creditors. *In re Patient Educ. Media, Inc., 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998)*

The focus on allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss. *In re R.H. Macy & Co., Inc., 170 B.R. 69, 78 (Bankr. S.D.N.Y. 1994)*. Thus, a court looks to the actual benefit to the estate as opposed to the loss sustained by a creditor. *In re CIS Corp., 142 B.R. 640, 642 (Bankr. S.D.N.Y. 1992)*. The claimant has the burden of establishing entitlement to the priority. *Drexel, 134 B.R. at 489*.

An expense will be accorded administrative status (1) if it arises out of a transaction between the creditor and the bankrupt's trustee or the debtor-in-possession, and (2) only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business. *Amalgamated Ins. Fund, 789 F.2d at 101*; [**19] *Mammoth Mart, 536 F.2d at 954*.

The services performed by the claimant must have been "induced" by the debtor-in-possession, not the pre-petition debtor. *In re Jartran, Inc. 732 F.2d at 587* (citing *Mammoth Mart, 536 F.2d at 954*).

Where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *Patient Education Media, 221 B.R. at 101* (quoting *NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.E.2d 482 (1984))*; see also *In re Continental Airlines, Inc., 146 B.R. 520, 526 (Bankr. D.Del.1992)*.

A debtor-in-possession must derive a benefit under a contract in order for its claim to be accorded administrative expense priority. *Macy, 170 B.R. at 77-78*. The benefit must run to the debtor-in-possession. *Continental Airlines, 146 B.R. at 526*. If the consideration was supplied pre-petition, the claim is not entitled to administra-

Case 1:07-cv-03271-RMB   Document 5-13   Filed 05/14/2007   Page 6 of 8

Page 6
308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

tive priority even where [**20] the right to payment arises post-petition. *In re Jartran, Inc., 732 F.2d at 587*.

The inclusion of the words "actual" and "necessary" in *section 503(b)(1)(A)* requires that the estate receive a "real benefit from the transaction." *Drexel, 134 B.R. at 488*. A potential benefit is not sufficient. *Id.*

HSG asserts that it is entitled to an administrative expense claims for the services it provided to the Debtors post-petition through December 16, 2002. HSG argues that it preserved the customer base by: (a) providing certain maintenance services, including fielding questions and complaints, implementing change order, and responding to inquires; and (b) not soliciting the Customers. In support of its argument, HSG relies heavily on the language of section 8.1 of the Representation Agreement regarding non-solicitation of the Customers for so long as the commissions are paid by MCI WorldCom.

WorldCom, relying on *Denton & Anderson Co.* and its progeny, argues that HSG is not entitled to an administrative claim because its claim for services relates to pre-petition services. *Denton & Anderson Co. v. Induction Heating Corp., 178 F.2d 841 (2d Cir. 1949)* [**21] (holding that certain claims for commissions were not entitled to administrative priority because the services were performed before the filing of the case and claimant's services did not benefit the debtor's estate). WorldCom argues that, as a debtor-in-possession, [*167] it did not induce HSG to provide services. WorldCom further contends that HSG has not demonstrated that the considerations supporting its claim for payment of the Residual Commissions were actual, necessary and conferred a benefit upon WorldCom's estate. Last, WorldCom points out that even if refraining from soliciting customers could provide a benefit to a debtor's estate, HSG has admitted that it did not comply with the solicitation provision and solicited Customers during the post-petition period.

With respect to HSG's claims against WorldCom, the Court finds that WorldCom's obligation to pay the Residual Commissions arose pre-petition when HSG procured the orders for services provided by MCI WorldCom. The Residual Commissions were based upon a percentage of the amount that MCI WorldCom billed to the Customers who were procured by HSG prior to the filing of the instant petition. HSG had fully performed any related services [**22] prior to the commencement of the Debtors' bankruptcy case. The Residual Commissions were derived from the pre-petition "services" of HSG in procuring the Customers and not from any post-petition services performed by HSG. Therefore, the Residual Commissions were not the result of post-petition services incurred post-petition and thus not entitled to administrative priority. *See Denton & Anderson Co. v. Induction Heating Corp., 178 F.2d at 843*.

With respect to HSG's contention of post-petition services, the Court finds that HSG's alleged compliance with the non-solicitation provision of section 8.1 of the Representation Agreement was not a "service" for purposes of *section 503(b)(1)(A)* and with respect to the "call center service" that HSG was neither required under the contract nor induced by the debtors-in-possession to provide such service. Therefore, HSG is not entitled to an administrative expense priority for any of its alleged services.

B. Non-solicitation Does Not Constitute "Services" Under *Section 503(b)(1)(A)*

HSG argues that it was induced to continue service by way of the following: (1) section 8.1 of the Representation Agreement regarding non-solicitation; [**23] (2) WorldCom's August 6, 2002 letter stating that section 8.1 survives the termination of the contract for so long as WorldCom has an obligation to pay HSG any post-petition termination commissions, WorldCom's memoranda, dated August 2, 2002 and August 5, 2002, (Exhibit 11 & 12); and (3) negotiations regarding the *seventh amendment*.

For a claim to be allowed as an administrative expense, services must be provided pursuant to a post-petition transaction. Another required element is that the debt "arise[s] from a transaction with the debtor-in-possession." *In re Jartarn, Inc., at 587* (citing *In re Mammoth Mart, Inc., 536 F.2d at 954*). However, before reaching the issues of inducement and benefit to the estate, HSG must establish that compliance with the "non-solicitation" requirement under the agreement is a "service" for purposes of the "services rendered" term in *section 503(b)(1)(A)*.

1. Non-solicitation

As stated above, the threshold question presented is whether HSG's post-petition non-solicitation of the Customers is a "service" for purposes of the administrative request analysis. Such analysis begins with the language of the statute itself. See [**24] *United States v. Ron Pair Enters.,489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed. 290 (1989). Section 503(b)(1)(A) of the Bankruptcy Court* provides a priority for the actual, necessary [*168] costs and expenses of preserving the estate, including wages, salaries or commissions for "services rendered after the commencement of the case." The phrase "services rendered" is not defined in the statute. In ascertaining the meaning of the statute, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson, 479 U.S. 36, 43, 107*

308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

S.Ct. 353, 93 L.Ed.2d 216 (1986)*; *Kokoszka v. Belford, 417 U.S. 642, 645, 94 S.Ct. 2431, 2433, 41 L.Ed.2d 374 (1974)* (stating that "purposes of the Bankruptcy Act must ultimately govern" in determining scope and limitations of the term "property" in *11 U.S.C. 110(a)(5)*).

To serve the policy behind the priority, inducement of the creditor's performance by the debtor-in-possession is crucial to a claim for administrative priority in the context of furnishing goods or services to the debtor. *In Jartan at 587* [**25] (citing *In re Mammoth Mart, Inc., at 954*). Administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization. *In re Jartran at 588* (citing *In re Mammoth Mart, Inc., at 954*).

No others authorities or courts appear to have confronted the present issue of whether non-performance is a service entitled to priority under *section 503(b)(1)(A) of the Bankruptcy Code. Andrews* involved an analogous situation where the Fourth Circuit held that payments due under the non-compete agreement could not be classified as "earnings form services performed" under *section 541(a)(6) of the Bankruptcy Code. Andrews v. The Riggs Nat'l Bank of Washington, D.C. (In re Andrews), 80 F.3d 906, 910-12 (4th Cir.1996)* reh'g and reh'g en banc denied, *90 F.3d 102 (4th Cir.1996)*. The Fourth Circuit concluded that the non-compete agreement was an integral part of the pre-petition sale of the debtor's business, and that the payments due thereunder were plainly rooted in the debtor's pre-petition activities. *Id. at 910*. The Fourth Circuit's decision [**26] relied primarily on the Supreme Court's decision in *Segal v. Rochelle, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966)*, which held that post-petition loss-carryback tax refunds relating to pre-petition losses were estate property because they were "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start." *Andrews v. The Riggs Nat'l Bank of Washington, D.C. (In re Andrews), 80 F.3d at 910-12*.

Similarly, the question presented in *In re Schneeweiss* was whether post-petition payments received by a chapter 7 debtor under a non-compete agreement were property of the estate and thus estate assets by virtue of *section 541(a)(6) of the Bankruptcy Code*, which excludes from the estate "earnings after the commencement of the case." *In re Schneeweiss, 233 BR 28, 29 (N.D.N.Y. 1998)*. The court recognized that the debtor was "simply not performing any services under the Agreement, and it is legal sophistry to suggest otherwise." *Id. at 31*.

The court in *In re Schneeweiss* followed the reasoning in *Segal v. Rochelle* and agreed with past authorities [**27] which had concluded that payments received in consideration of not competing do not constitute "earnings from services performed" for purposes of *section 541(a)(6)*. *Id. at 30-1. See Johnson v. Taxel (In re Johnson), 178 B.R. 216, 220 (B.A.P. 9th Cir. 1995)* (holding that compliance with an anti-competition agreement is not "services performed" because refraining from the performance of a services is not the performance of a service); *Unsecured* [*169] *Creditors Committee v. Prince (In re Prince), 127 B.R. 187 (N.D.Ill.1991)* (holding that the debtor's covenant not to compete did not contemplate "services," nor can any portion of the purchase price allocable to the covenant be considered "earnings from services." The debtor was not agreeing to perform services; he was agreeing *not* to perform services for a period of time in certain geographical areas); *In re Weyland, 63 B.R. 854, 863 (Bankr. E.D.Wis.1986)* (stating that it does not read "earnings from services performed by an individual debtor after the commencement of the case" to include payments for services *not* performed by the debtor.) (emphasis in original); *In re Leonard Bluman, 125 B.R. 359, 367 (Bankr. E.D.N.Y.1991)* [**28] (consideration paid by purchaser of the debtor's business in exchange for the debtor's covenant not to compete did not constitute earnings from post-petition services).

Adopting this analysis, the Court concludes that HSG's non-solicitation was not a service for purposes of *section 503(b)(1)(A)*. Only the performance of a service gives effect to the statute's purpose which is to encourage third parties to continue providing goods and services necessary for a successful reorganization. In this case, the services which were contemplated by the Representation Agreement were for HSG to procure orders for the services provided by WorldCom. Compliance with a non-solicitation covenant is not a "service" but merely a condition subsequent under the contract that if not complied with would, *inter alia*, be a "defense" to payment of the commissions. Having determined that non-solicitation does not qualify as a service for purposes of *section 503(b)(1)(A)*, the Court will not address the other aspect of the administrative claim analysis.

2. Call Center Service Was Neither Induced By The Debtor-In-Possession Nor Required Under The Agreement

Regarding the call center service, the issues [**29] are whether the debtors-in-possession induced HSG to provide a call center service or whether HSG's administrative claim arises out of a transaction between HSG and the debtors-in-possession. *See Mammoth Mart, 536 F.2d at 954*.

HSG failed to evidence either inducement or a post-petition transaction with the Debtors for a call center service. Under the Representation Agreement HSG was not obligated to provide a call center service. According

Case 1:07-cv-03271-RMB    Document 5-13    Filed 05/14/2007    Page 8 of 8

Page 8

308 B.R. 157, *; 2004 Bankr. LEXIS 536, **;
42 Bankr. Ct. Dec. 268

to section 3.1 of the Representation Agreement, HSG was required to answer calls of potential customers using inbound telemarketing with the object of obtaining "orders" for services. Despite the fact that the Representation Agreement fails to reference a call center service, HSG is seeking to recover priority administrative expense status for providing certain maintenance services including, fielding questions and complaints, implementing a change order, and responding to inquires. Accordingly, this Court concludes that there was no post-petition transaction between HSG and the debtors-in-possession for HSG's maintenance of a call center service. The Court will not reach the issue of benefits since HSG was neither required under [**30] the contract nor induced by the debtors-in-possession to provide the "call center service."

C. WorldCom's Request For The Turnover Of The Inadvertent Payments

Bankruptcy *Rule 3007* states that "if an objection to a claim is joined with a demand for relief of the kind specified in *Rule 7001*, it becomes an adversary proceeding." *Fed. R. Bankr. P. 3007*. [*170] When a claims objection becomes an adversary proceeding pursuant to Bankruptcy *Rule 3007*, this Court may direct, in complicated matters, that the trustee comply with the procedural requirements of Part VII of the Bankruptcy *Rule 3007*, "including requiring the objecting party to institute an adversary proceeding by filing a complaint." *In re Danbury Square Assocs., Ltd. Partnership, 153 B.R. 657, 661 (Bankr. S.D.N.Y. 1993)* (directing the trustee to supply a "more detailed memorialization" rather than commencing a new adversary proceeding).

Here, WorldCom's Objection, which incorporates WorldCom's request for relief pursuant to *section 549 of the Bankruptcy Code*, was filed on March 14, 2003. WorldCom's requested relief (for refund of the Inadvertent Payments pursuant to *section 549 of the Bankruptcy* [**31] *Code*) meets the notice pleading requirements of *Federal Rule of Civil Procedure 8(a) and (e)* as incorporated by *Bankruptcy Rule 7008*. However, given HSG's failure to file a response it is arguable whether HSG's rights have been adequately presented to avoid prejudice. The Court cannot determine, based upon the evidence before it, whether HSG has any legitimate defenses to the refund of the Inadvertent Payments or whether further discovery will be required by the parties.

Based upon the foregoing HSG has failed to establish its entitlement to an administrative expense priority under *sections 503(b)(1)(A) and 507(a)(1)* of the Bankruptcy Code. With respect to the Debtors' demand for the return of the inadvertent post-petition payments, pursuant to *section 549 of the Bankruptcy Code*, the Debtors are directed to initiate an adversary proceeding pursuant to the Federal Rules of Bankruptcy Procedure.

The parties are directed to settle an order consistent with the decision herein.

Dated:

April 27, 2004

s/ Arthur J. Gonzalez [**32]

United States Bankruptcy Judge