1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 02-13533

5    - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    WORLDCOM, INC., ET AL.,

9

10             Debtor.

11

12   - - - - - - - - - - - - - - - - - - -x

13

14                 U.S. Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 April 25, 2006

19                 11:09 A.M.

20

21   B E F O R E :

22   HON. ARTHUR J. GONZALEZ

23   U.S. BANKRUPTCY JUDGE

24

25

RECEIVED
MAY 1 0 2006

2

1

2   MOTION by Defendant for Summary Judgment.

3   Opposition by Plaintiff Filed.

4

5   MOTION by Debtors for Summary Judgment With

6   Respect to Claims Filed by HSG/ATN, Inc.

7   Opposition by HSG/ATN, Inc. Filed.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Esther Accardi

25

3

1    A P P E A R A N C E S :

2

3    MORGENSTERN JACOBS & BLUE, LLC

4          Attorneys for HSG/ATN, Inc.

5          885 Third Avenue

6          New York, New York 10032

7

8    BY:   ERIC B. FISHER, ESQ.

9

10   STINSON MORRISON HECKER, LLP

11         Attorneys for MCI

12         1150 18th Street, N.W.

13         Washington, D.C. 20036

14

15   BY:   MICHAEL E. TUCCI, ESQ.

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1

2       THE COURT:  Please be seated.  All

3 right.  State your names for the record,

4 please.

5       MR. FISHER:  Eric Fisher from

6 Morgenstern Jacobs & Blue, for HSG/ATN, Inc.

7       MR. TUCCI:  Michael Tucci on behalf

8 of MCI.

9       THE COURT:  This is the debtor's

10 motion, I believe.

11       MR. TUCCI:  There are two motions,

12 Your Honor.  There's a motion of HSG for

13 summary judgment with respect to the adversary

14 proceeding.  There's also the debtor's motion

15 for summary judgment with respect to HSG's

16 claim.  We believe both will take,

17 approximately, a half an hour each and that's

18 why they're on the docket for an hour this

19 morning.  Counsel had previously conferred and

20 discussed since HSG had filed first that it

21 would go first.

22       THE COURT:  All right.

23       MR. FISHER:  Good morning, Your

24 Honor.  Just one minute of background about

25 HSG.  HSG was an agent for WorldCom.  They

5

1  sold WorldCom services and were paid a

2  commission based on revenue that WorldCom

3  earned due to customers that HSG brought to

4  WorldCom.  And WorldCom has earned, and

5  continues to earn, substantial revenues post-

6  petition from customers that HSG brought to

7  WorldCom.  For example, and this is an exhibit

8  to my declaration, Exhibit E, WorldCom's

9  expert has stated that just in the first half

10  of 2005, WorldCom has earned more than two

11  million dollars from revenue that -- customers

12  that HSG brought to WorldCom.  We've been

13  involved in litigation surrounding HSG's claim

14  against WorldCom since, at least, February

15  2003.  And yet, somehow, it wasn't until

16  November 11, 2005, that WorldCom brought an

17  adversary proceeding against my client seeking

18  the return of a portion of payments that were

19  made back at the end of 2002.  We promptly

20  filed an answer to that new adversary

21  proceeding and then we promptly brought on

22  this motion for summary judgment.  The claims

23  in the adversary proceeding are untimely and

24  they're legally deficient for other reasons

25  that I'll try to highlight very briefly.

6

1   First, in terms of the untimeliness of the

2   claim, the heart of the matter really is

3   WorldCom's claim for a return of approximately

4   455,000 dollars in commissions that were paid

5   to my client in three trounces.  The last

6   payment was made on November 12, 2002.  They

7   bring this claim under section 549.  Under

8   549(d)(1), the applicable statute of

9   limitations for this claim would be two years.

10  So it would have expired in November, 2004.

11  So, that makes that claim approximately one

12  year too late.  And I think that the lateness

13  of the claim is compounded by the fact that --

14  perhaps Your Honor will remember, I was not

15  counsel at the time, but my clients initially

16  brought a motion seeking to have their

17  continuing residual commissions recognized as

18  an administrative claim.  And there were two

19  days of hearings with regard to that motion.

20  That motion of my clients was denied by Your

21  Honor, they were not entitled to

22  administrative claim priority and my clients

23  never appealed that decision.  In connection

24  with Your Honor's decision, you issued an

25  order dated May 11, 2004, and the order, of

7

1    course, appears as an exhibit to our papers.

2    And in that order, among other things, Your

3    Honor directed "order that to the extent the

4    debtors seek return of the inadvertent post-

5    petition payments, pursuant to section 549 of

6    the Bankruptcy Code, the debtors are directed

7    to initiate an adversary proceeding pursuant

8    to the Federal Rules of Bankruptcy Procedure."

9    So, nearly six months before the statute of

10   limitations expired, Your Honor directed the

11   debtors to file an adversary proceeding if

12   they wanted these payments back.  I think that

13   that makes it all the more compelling that

14   there's just no excuse at all for one year

15   delay.  WorldCom's only argument, really, in

16   opposition to our argument that the 549 claim

17   is untimely is that they did raise this issue

18   of the 455,000 dollars in post-petition

19   payments in their objection to our motion for

20   an administrative claim.  I think that this

21   argument really fails miserably for a number

22   of reasons.  First, they overlooked the fact

23   that Your Honor specifically directed them to

24   commence an adversary proceeding.  And so,

25   Your Honor put them on notice that their

8

1    objection to -- that was contained in their

2    motion was just not enough.  There's also no

3    question here that my clients have been

4    prejudiced by this very significant delay.  In

5    the record, you will find that we've attached

6    certain correspondence indicating, for

7    example, and I don't believe that WorldCom's

8    counsel will dispute this, the key witnesses

9    here are individuals by the name of Ahern,

10   Hampton, Lako, and Kirk Reynolds.  We've been

11   trying to get their documents from WorldCom.

12   WorldCom has had a very difficult time

13   retrieving their files due to the passage of

14   time.  In particular, they have not been able

15   to retrieve their electronic files.  Most

16   recently, they told us that it would cost

17   approximately 300,000 dollars to retrieve

18   those files and they've told us that they're

19   not going to produce the files unless we share

20   in the costs of getting those files.  So,

21   there's no question here that the passage of

22   time has caused evidence to be, essentially,

23   unreachable.  It's made the cost of litigation

24   potentially prohibitive.  And I think that

25   that highlights why, not only strictly by the

9

1    terms of the statue is the claim late, but it
2    also would be very unfair to allow this
3    particular adversary proceeding to proceed.    I
4    now want to just turn, briefly, to another set
5    of claims that WorldCom asserts in their
6    adversary proceeding.    They have claims for
7    tortious interference with WorldCom's
8    contracts.    In connection with the claim
9    proceeding, WorldCom contended that my clients
10   solicited certain customers of WorldCom.    And
11   Your Honor made certain findings that, in
12   fact, there were a number of instances of
13   solicitation.    WorldCom is now suing my client
14   for tortious interference with contract for
15   solicitation that they allege occurred back in
16   2002.    As Your Honor will hear when we argue
17   the second motion that is before Your Honor,
18   there is a claim objection proceeding that has
19   been out there for a long time now.    At the
20   heart of the claim objection proceeding,
21   WorldCom's objection to our claim is that
22   because we solicited, we've breached the
23   contract.    And because we've breached the
24   contract, we have to forfeit all the residual
25   commissions that were otherwise owed.    And, I

10

1    should point out that those residual

2    commissions, according to their expert, are

3    approximately 5.4 million dollars in residual

4    commissions that we're being asked to forfeit.

5    But, in any event, that issue is front and

6    center independent claim objection proceeding.

7    The claim objection proceeding, in effect, is

8    about breach of contract.  And what WorldCom

9    is doing here now is they're bootstrapping.

10   This tortious interference with contract

11   claim, it just alleges that we solicited.  And

12   so as a result, WorldCom is entitled to

13   damages.  Well, that's exactly what's already

14   at issue in the claim objection proceeding.

15   If WorldCom prevails then we lose significant

16   commissions because of alleged breach of

17   contract.  And there's well established law

18   that, of course, you cannot bring a tort claim

19   for a claim that is essentially a breach of

20   contract claim.

21           THE COURT:  Explain the damage to

22   the relationship.  If they breached the

23   contract -- if there was a breach of contract,

24   which is the issue in the claims objection,

25   and then you have to return commissions

11

1    received.  And at the same time that conduct

2    interfered with WorldCom's relationship with

3    customers and therefore they lost -- they

4    could establish damages from that

5    interference, why wouldn't they be cumulative?

6    You seem to be arguing that they're one and

7    the same damage.

8            MR. FISHER:  The contract prohibits

9    a certain kind of solicitation by my client.

10   WorldCom alleges that that nonsolicitation

11   provision was breached by my client.  The

12   contract then spells out what damages that

13   WorldCom's entitled to in the event of such a

14   breach.  When we get to the other motion, I'll

15   tell you why they're not entitled to those

16   damages.  But what the contract spells out is

17   the damages that they're entitled to, by the

18   terms of the contract, are commissions that

19   have been earned due to revenue generated by

20   WorldCom.  All of those commissions are

21   forfeited.  So the contract spells out the

22   damages for breach and that's essentially all

23   they're entitled to and the contract spells

24   out the damages.  So that's why I think that

25   these tort claims are entirely duplicative.

12

1    And I think that, when you consider what's

2    happening here, I think what's really going on

3    here is that this is a case of WorldCom making

4    it very, very difficult for what is a

5    relatively small family business to litigate

6    what I consider to be an extremely valid claim

7    against WorldCom by -- in late 2005 greatly

8    multiplying the litigation in circumstances

9    where we can't even reasonably proceed with

10   discovery.  We also -- with respect to the

11   solicitation that forms the basis for

12   WorldCom's tortious interference with contract

13   claim, one of the alleged acts -- there are

14   two alleged acts of solicitation.  One of

15   those alleged acts is clearly outside of the

16   statute of limitations for tortious

17   interference with contract.  The statute of

18   limitations is three years and the alleged act

19   of solicitation occurred on September 25,

20   2002.  So that particular act of solicitation

21   is time barred.  WorldCom can't seek to

22   recover for that.  Finally, WorldCom also has

23   brought account for a violation of the

24   automatic stay.  This is, again, this is all

25   cumulative.  What's the violation of the

13

1  automatic stay, that we allegedly solicited

2  their customers and that their customers were

3  allegedly property of the estate.  It's

4  entirely cumulative of a tort claim.  But, in

5  any event, there's well established second

6  circuit law that a corporate debtor, such as

7  WorldCom, cannot bring a claim under 362(h).

8  That claim is limited to individuals.  So what

9  does WorldCom say in response?  They say,

10  well, effectively construe it as a claim for

11  contempt.  And the Court, in its equitable

12  powers can hear a contempt claim, but they

13  haven't brought a contempt claim, they haven't

14  amended their complaint to bring a contempt

15  claim.  And the reason they haven't is because

16  they know they can't meet threshold for a

17  contempt claim.  So, the 362(h) claim for

18  violation of the stay should be dismissed as

19  well.  Also on the 362(h) claim, I'm not sure

20  whether Your Honor wants me to get into this,

21  it's briefed in the papers.  We also think the

22  362(h) claim fails because the customers were

23  not property of the estate.  And if Your Honor

24  wishes, I can go into that.  But otherwise,

25  perhaps I should reserve some time for a

14

1   reply.

2          THE COURT:  You can address whatever

3   you need to in reply.  The debtor.

4          MR. TUCCI:  Thank you, Your Honor.

5   I will briefly address each of the points

6   raised by counsel for HSG.  As the Court's

7   fully aware, exact language of section

8   549(d)(1) or (d) in subsection 1 is "an action

9   or proceeding under this section may not be

10  commenced after the earlier of two days."  We

11  will admit that an action was not instituted

12  within the two years, however, proceedings

13  were.  When HSG filed its claim --

14         THE COURT:  Well, what did my order

15  tell you to do?

16         MR. TUCCI:  It told us to file an

17  adversary proceeding.  That is correct.

18  Which, under the Farmland case, which we have

19  cited to Your Honor, would take the objection

20  coupled with a request for payment.  And once

21  the adversary proceeding was filed, the time

22  period or the time with which we would judge

23  whether it was barred or not would be the time

24  that the request was made for the payment.

25  And we believe that the Farmland case is

15

1    correctly decided and that the time should

2    relate back to the original request, not the

3    date upon which the adversary proceeding was

4    filed.

5         THE COURT:  Is there any explanation

6    as to what took you so long to file the

7    adversary proceeding or you just think that's

8    irrelevant?

9         MR. TUCCI:  I do not know the answer

10   to that question, Your Honor, why it took that

11   long to file the adversary proceeding.  Now,

12   with respect to prejudice, there is absolutely

13   no prejudice.  The witnesses that Mr. Fisher

14   speaks of have absolutely nothing to do with

15   the issue related to the post-petition

16   transfer.  The monies that are sought to be

17   returned to the estate are funds that were

18   paid post-petition with respect to the claim

19   for continuing commissions.  Once Your Honor

20   ruled that they weren't entitled to

21   administrative priority they were a classics

22   claim.  That's as a matter of law.  These

23   people have absolutely nothing to say about

24   that.  That would change the classification of

25   those payments.  They were paid 100 cents on

16

1   the dollar in post-petition monies and they

2   should have been paid, if at all, which we'll

3   get to here in a minute as a classics claim.

4   There is no prejudice.  HSG has known since

5   March of 2003, when the objection to the claim

6   for administrative priority was filed, that

7   the debtors sought the return of those funds.

8   With respect to the tort claims, it is useful

9   to actually read what the debtor said in the

10  adversary proceeding.  In -- and, by the way,

11  Your Honor, there are three tort claims here,

12  not just one.  There is tortious interference

13  with customer contracts, tortious interference

14  with business relationships and tortious

15  interference with agency contracts.  In the

16  prayer for relief under each count the debtor

17  stated, "because of HSG's tortious

18  interference, reorganized debtor's request

19  relief for any compensatory damages not

20  remedied under section 8.3 of the agreement."

21  It's not duplicative.  It's if there are

22  damages over and above the contractual damages

23  then the tort claim would be used to obtain

24  compensatory damages.

25          THE COURT:  What are the rights to

17

1    get any damages even if you could assert them

2    over and above what the contract provides?

3              MR. TUCCI: Well, that leads me to

4    my next point. The debtor has not asserted

5    any breach of contract claim, there is no

6    breach of contract claim asserted by the

7    debtor. What this is, is a claim by HSG for

8    the residual commissions that's been defended

9    by the debtor with the assertion that a

10   condition to that payment has not been

11   satisfied. It is not an affirmative claim by

12   the debtor that HSG breached the contract.

13   The contract, and I'll be happy to get into

14   this now, but we'll probably get into it in

15   more detail on the debtor's motion, the

16   contract says, "if you engage in this

17   particular type of conduct, you are not

18   entitled to any further residual commission."

19   HSG engaged in that conduct. Therefore,

20   they're not entitled to any further

21   commission, it's a condition. Your Honor even

22   found in the administrative priority decision

23   that this was a condition subsequent which

24   might provide the debtor a defense to payment,

25   that's a paraphrasing of what Your Honor

18

1    found.  It's not a breach of contract claim,

2    we've not made an allegation that it's a

3    breach of contract claim.  With respect to the

4    statute of limitations, again, there are three

5    tort claims here.  HSG has alleged the statute

6    has run with respect to only one, it's a

7    contact with a customer so it would only apply

8    to one count not all three tort counts, number

9    one.  Number two, under New York law, the

10   cause of action does not accrue until the

11   damages have been sustained by the debtor.

12   There's no allegation as to when the damages

13   have been sustained, the burden is on HSG and

14   the motion for summary judgment to establish

15   that there's no genuine issue with respect to

16   any material fact that the cause of action

17   accrued outside the limitations period.

18   Without an allegation of when the damages --

19   that the damages occurred prior to or outside

20   the statute of limitations period, the motion

21   for summary judgment cannot be granted.  And

22   finally, with respect to the 362, there again,

23   looking at the actual language of the

24   adversary complaint -- adversary proceeding

25   complaint, 362(h) does not appear anywhere in

1   the count.  The claim was not that the debtor

2   was entitled to damages under 362(h), the

3   claim was that because of the willful,

4   malicious and intentional violation of the

5   automatic stay, HSG has been damaged and that

6   the debtors requested relief for any, again,

7   compensatory damages not remedied under

8   section 8.3 of the agreement.  It's not a

9   claim under 362(h).  Finally, with respect to

10  whether the customers are property of the

11  estate, we've cited, Your Honor, to Judge

12  Brosman's opinion in Alert Holdings which

13  shows, in virtually identical circumstances,

14  that customers in this type of situation where

15  there's a proscription on contacting those

16  customers are property of the estate.  And a

17  violation of that proscription can be remedied

18  by the Court as a violation of the automatic

19  stay.  We think that the entire motion should

20  be denied for the reasons stated.

21          THE COURT:  All right.  Thank you.

22          MR. FISHER:  Your Honor, if I can

23  briefly reply to those points.  Mr. Tucci says

24  that it's not -- the claim is not time barred

25  because there was a proceeding that was

20

1    commenced within the statute of limitations

2    period, and he's referring to the objection to

3    our motion for administrative claim.    None of

4    the cases, including Farmland, that the debtor

5    cite in their paper relate in any way to

6    construing 549(d).    They're dealing generally

7    with the meaning of proceeding.    And here I

8    think the circumstances are quite unique

9    because Your Honor specifically directed that

10   the proceeding that was pending was just not

11   enough, they had to commence an adversary

12   proceeding.    And due to their delay, as I've

13   indicated, there has been substantial

14   prejudice.    Now, if Mr. Tucci says there

15   hasn't been prejudice because the documents

16   from these witnesses are not relevant and the

17   witnesses themselves are not relevant, that's

18   absolutely not the case.    What we intend to

19   show, and this will perhaps come out more

20   clearly when we argue the second motion, is

21   that what happened here is that WorldCom

22   decided to reject the residual commission

23   obligation in a motion that it brought on

24   January 3, 2003.    And up until that point, it

25   did what it was supposed to do, at least

21

1    through the November 15th payment, which is it

2    honored the contract.  And those payments that

3    were made in full were appropriately made to

4    our client.  And if WorldCom is now denying

5    that that's what happened then we're entitled

6    to get the decision makers who are

7    specifically -- WorldCom had an internal

8    debate, what should we do, we learned that HSG

9    engaged in this act of solicitation, should we

10   terminate the residual commission obligation,

11   we seem to have that right under the contract,

12   or should we let it go.  And they decided to

13   let it go and they didn't reject the contract

14   until January 3, 2003.  When we get to the

15   other motion I can explain why I think it is

16   that they decided to do that.  But in any

17   event, we're entitled to testimony of the

18   witnesses who were involved in that decision

19   to show that's what really happened.  Mr.

20   Tucci says there's no affirmative claims for

21   breach, there certainly is an affirmative

22   claim for breach in the objection to our

23   claim.  Paragraph 24, for example, but there

24   are many other instances.  The claim says --

25   the objection to claim says, "WorldCom

22

1    provided notice to HSG of its breach."  And

2    then proceeds to explain why, under the

3    contract, they don't have any further

4    commission obligation that's a claim for

5    breach.  It may not have been asserted as an

6    adversary proceeding, but the breach of

7    contract issue is there front and center.  I

8    disagree with Mr. Tucci's reading of the

9    contract, we'll get to that on the other

10   motion.  Mr. Tucci says, on the topic of

11   damages, he says that with regard to the

12   September 25, 2002 solicitation, that's not

13   time barred.  Because there's no evidence in

14   the record as to when WorldCom sustained

15   damages as a result of that solicitation and

16   that's when the statute of limitations should

17   begin to accrue.  Well, in connection with the

18   claim proceeding, on July 1, WorldCom's

19   witness testified that with respect to both

20   episodes of solicitation that are potentially

21   at issue here, there was no discernible change

22   at all in WorldCom's revenue stream from what

23   it could perceive.  So there are no damages,

24   that is a complete red herring.  If there are

25   damages, WorldCom knows what they are and when

23

1    they were accrued.  So really it should be

2    WorldCom who's telling you, here's when the

3    damages accrued and that's why the claim is

4    timely.  They're not telling you that, they're

5    just saying there's nothing in the record

6    about damages.  But there is from the claim

7    proceeding.

8            THE COURT:  Let's proceed to the

9    next motion.

10           MR. TUCCI:  Thank you, Your Honor.

11   This is WorldCom's motion and bear with me, I

12   am going to go a little bit farther into the

13   facts here because they're important to

14   understanding the debtor's motion for summary

15   judgment.  The agreement at issue here was an

16   agreement whereby HSG obtained customers,

17   telecom services customers for WorldCom.  Then

18   was paid a commission on a continuing basis to

19   do that.  The parties entered into this

20   contract approximately four years prior to the

21   bankruptcy filing.  And front and center in

22   the contract, in at lease three places, there

23   is an express prohibition on HSG soliciting

24   the customers if procured for WorldCom.  And

25   there were specific consequences for that

24

1    solicitation.  Under paragraph 8.1 of the

2    agreement, "for as long as WorldCom pays

3    representative commissions in accordance with

4    Exhibit B, representative agrees," that's HSG,

5    "that representative will not contact any

6    customers for the purpose of inducing them to

7    switch to another provider or any service

8    which competes with the services of defined

9    term."  8.3 under the agreement,

10   "representative agrees that if representative

11   does so contact a customer -- a WorldCom group

12   customer, WorldCom will give representative

13   five days prior written notice at the end of

14   which period WorldCom's obligation to pay

15   representative any commissions not yet earned

16   under this agreement will cease."  Now, HSG

17   became somewhat nervous, apparently, when it

18   read reports that WorldCom was contemplating a

19   bankruptcy, a reorganization.  And about a

20   month before that it sent a letter, which it

21   was entitled to do under the agreement,

22   terminating the agreement.  What that allowed

23   HSG to do was no longer be an exclusive seller

24   of WorldCom services, it could out and market

25   other telecom service providers to other

25

1  customers because, obviously, we had the

2  prohibition on contacting these customers.  So

3  it sent a letter to MCI WorldCom and on August

4  6th, MCI WorldCom responded stating that they

5  have accepted the termination effective as of

6  July 28th, 2002, which was 30 days after the

7  notice was sent.  And then it followed, "this

8  letter is a reminder that during this post-

9  termination period ATN", which is another name

10 for HSG, "is required to comply with the

11 provisions of section 8.1 and section 13 of

12 the agreement."  And it went on to say, "that

13 ATN is required not to contact any MCI

14 WorldCom or TTI customers procured under the

15 agreement or under any other agreement between

16 ATN and WorldCom for the purposes of inducing

17 such customers to switch to another provider

18 of similar services."  Approximately a month

19 later, ATN sends a letter to one of its

20 customers saying "as you know, ATN's been

21 taking care of your phone services since June

22 because of the uncertain future of TTI

23 National which is wholly owned by bankrupt

24 WorldCom.  We would like to switch your

25 account to another provider that we are now,"

26

1  I can't read it, it's a bad fax, "utilizing,"

2  I believe.  "We strongly recommend your

3  allowing us to transition your account to DNG.

4  You will save about five percent over TTI, but

5  the bigger concern is that TTI WorldCom may

6  not survive the bankruptcy.  There could be

7  service disruptions and other problems.  DNG

8  would accept your account without additional

9  credit checks."  That was in September, a

10  month after MCI WorldCom warned HSG not to

11  solicit any of its customers.  WorldCom found

12  out about that and wrote, on November 14th, to

13  HSG.  The beginning sentence of the letter is

14  "With this letter, MCI WorldCom

15  Communications, successor in interest to

16  WorldCom Technologies, gives notice to HSG/ATN

17  that ATN has acted in violation of section 8.1

18  of the representation agreement dated August

19  4, 1998."  What was HSG's response to that?

20  Their response was to engage in a massive

21  solicitation campaign involving 152,000

22  WorldCom customers that they had procured on

23  behalf of WorldCom and so solicit them to

24  switch service providers.  WorldCom had

25  already notified HSG that it was in violation

27

1  of the agreement.  When it found out about the

2  152,000 what did it do?  Its counsel, at that

3  time Weil Gotshal, sent a letter saying

4  "you're in violation of the automatic stay,

5  these customers are property of the estate,

6  stop it right now."  What did HSG do, this is

7  somewhat of an aside, Your Honor, but once

8  they got that letter they switched from

9  soliciting the customers to soliciting the

10 agents.  And then January and February of

11 2003, they solicited approximately 14,000

12 agents of MCI, which was also prohibited under

13 the terms of the agreement.  MCI told HSG, at

14 this time, it was no longer getting any money

15 from MCI, which it had been paying all of the

16 post-petition amounts that we were talking

17 about under the 549 claim up to that point.

18 It told them it was going to reject the

19 contract and it told them it was in violation

20 of the automatic stay.  None of that is in

21 dispute.  All of that happened, there's not a

22 scintilla of evidence before this Court that

23 that is factually inaccurate.  The only issue

24 is what effect does that conduct have.  Under

25 the express terms of the agreement, WorldCom's

28

1    obligation to pay the future commissions

2    ceased.   There is no dispute that that's what

3    the agreement says.   So we have no genuine

4    issue of any material fact with respect to the

5    facts of solicitation or what the agreement

6    says about solicitation.   HSG throws up

7    several arguments to try and get out of this

8    summary judgment, is basically where we are.

9    The first argument they said well, the notice

10   on November 14th wasn't good enough because it

11   happened with respect to the September

12   solicitation not the other 152,000

13   solicitations.   Well, that's just absurd.

14   There was no requirement to renotify them.

15   The solicitation occurring was a violation of

16   the agreement, HSG was notified of the

17   violation of the agreement; five days

18   thereafter WorldCom's obligation to pay

19   ceased.   In effect, HSG had a choice.   And to

20   kind of paraphrase Yogi Berra, they went to

21   the fork in the road and they took it.   They

22   could have gone to the left side which was

23   leave the MCI customers alone and continue

24   collecting the residual commissions, or they

25   could go the right side and solicit the MCI

29

1    customers and forego the commissions.  They

2    are trying to do both.  They solicited 100 --

3    at least 152,001 customers and they're trying

4    to collect the commissions at the same time.

5    Because they're saying, if I'm understanding

6    Mr. Fisher correctly, well, it wasn't very

7    successful solicitation so we shouldn't have

8    to forego, we shouldn't have to live up to the

9    terms of the contract.  Now, in its brief HSG

10   has said WorldCom is judicially estopped from

11   making this argument because it didn't make

12   this argument when it defended the

13   administrative priority.  Judicial estoppel

14   simply does not apply in this instance.  And

15   the reason it doesn't apply is because

16   WorldCom took no position with respect to

17   whether the commissions were ultimately owed

18   in the administrative proceeding.  All it did

19   was defend the administrative proceeding under

20   503.  It didn't engage in a discussion at that

21   time nor would it have been appropriate to,

22   that the claim was in of itself improper.  As

23   a matter of fact, HSG hadn't even filed a

24   claim at that point in time, it filed a claim

25   in November -- excuse me, in October, I

30

1  believe it was of 2004.  It's also said well,
2  wait a minute, you can't give us -- you can't
3  give WorldCom summary judgment because we
4  haven't had an opportunity to engage in
5  discovery.  So it's raised this Rule 56(f)
6  defense that it should be either denied or
7  delayed, the summary judgment.  And to that,
8  and we say this in our papers, in order to
9  prevail on this type of 56(f) defense, if you
10  will, you have to come forward and say what
11  those facts are and why they would have
12  mattered.  As I stated earlier, here we have
13  undisputed facts of solicitation and an
14  undisputed consequence of that solicitation
15  under the terms of the agreement.  There
16  aren't any facts that are out there that shed
17  light on that.  It's an unambiguous
18  solicitation and it's an unambiguous
19  agreement.  The agreement speaks for itself.
20  And the sort of final group of defenses that
21  HSG raises are related to enforceability of
22  the agreement.  Well, number one, when they
23  answered the adversary proceeding and all this
24  is laid out in the adversary proceeding and
25  the objection to the amended claim, they never

31

1    once said that the agreement was

2    unenforceable, and it's an affirmative

3    defense.  So they waived it, number one.

4    Number two, they don't come forward.  The

5    burden is on them to come forward with facts

6    showing that the agreement is either void,

7    violates public policy or is unconscionable.

8    And as we set forth in the brief, agreements

9    just like this are routinely upheld,

10   especially under the employee choice doctrine,

11   which is -- there are many decisions under the

12   employee choice doctrine in the Second Circuit

13   which, quite frankly, recognize the choice

14   that HSG had to make here.  Continue

15   collecting the commissions and respect the

16   terms of the agreement or forego the

17   commissions and violate the agreement.  An

18   entity -- a sophisticated entity such as HSG

19   or a sophisticated employee is viewed as

20   making an intelligent choice when faced with

21   that type of situation.  And for all those

22   reasons, Your Honor, we believe that summary

23   judgment on this claim should be granted

24   denying it.

25            MR. FISHER:  Your Honor, I'd like to

32

1   really just go to the heart of the matter.

2   And I think the heart of the matter is did the

3   letter that WorldCom sent on November 14,

4   2002, after they learned of this September 25,

5   2002 single incident of solicitation, did that

6   cut off their obligation to pay residual

7   commissions.  And I think that it is very

8   clear that it did not.  At a minimum, there

9   are very serious factual issues here that need

10  to be explored before one conclusion can be

11  made one way or the other.  And I want to

12  highlight, again, that there have been no --

13  despite the fact that I sent deposition

14  notices in October and November, despite the

15  fact that I put document requests out there in

16  August and have been pressing for documents

17  and depositions ever since, we haven't gotten

18  the discovery that we're entitled to.  But

19  going right to the heart of the matter, the

20  November 14, 2002 letter, Mr. Tucci read to

21  you the first part of it, but it concludes by

22  saying, one, "ATN should immediately cease

23  sending letters to or contacting in any way

24  any MCI WorldCom or TTI National customers

25  procured under the agreement."  If section

33

1    8.1, which is the non-solicitation provision,

2    if WorldCom was terminating its residual

3    commission obligation, then ATN was no longer

4    prohibited from soliciting.  What WorldCom did

5    is they decided, notwithstanding the fact that

6    they had learned of the solicitation, they

7    didn't want to let HSG off of the hook.  They

8    wanted to maintain the ability to keep HSG

9    from soliciting.  And, so as a result, they

10   continued to pay residual commissions.  That

11   was under the circumstances of the time when

12   WorldCom was dealing with a whole mess from

13   their agents, a strategic choice.  Actually,

14   their counsel referred to it as business

15   judgment when he made closing argument in the

16   administrative claim proceeding.  They then

17   say "MCI WorldCom is considering what steps to

18   take to protect MCI WorldCom's rights

19   including, but not limited to, ceasing payment

20   to ATN of any commissions not yet earned under

21   the agreement pursuant to section 8.3 of the

22   agreement."  So, obviously, I concede that

23   this is an authentic letter and I concede that

24   Mr. Reynolds of WorldCom told my client that

25   WorldCom was considering whether to cut off

34

1    residual commissions, but they ultimately did

2    not.  And I should point out that this letter,

3    it's signed by Kirk Reynolds, it's cc'd to Mr.

4    Lako, Mr. Ahern and Mr. Hampton.  There are

5    deposition notices outstanding for all four of

6    them.  There are document requests even the

7    files of all four of those individuals and we

8    don't have it yet.  Now, I think that there's

9    more compelling evidence in the record as to

10   why that November 14th letter is not notice of

11   termination of the residual commission

12   obligation.  And all this evidence could be

13   found as exhibits to the Batten declaration

14   that we submitted in connection with our

15   opposition.  One, a WorldCom witness testified

16   before Your Honor that, with regard to the

17   November 14th letter, "rather than separate

18   this agent," that's the quote they decided not

19   to separate the agent, WorldCom decided to

20   send a, "strong reminder, letting them know

21   that we're aware of the activities."  This is

22   a strong reminder letter.  It's not a letter

23   cutting off commissions.  Then WorldCom's

24   counsel, in closing, argued, Your Honor, it

25   was a business judgment whether they acted

35

1    correctly in not terminating the contract or

2    taking some other avenue.  Effectively,

3    WorldCom's counsel conceded that they decided,

4    at the time, not to terminate the contract.

5    That was their business judgment.  WorldCom

6    sends an e-mail on December 17, 2002, to my

7    client.  WorldCom has made a determination to

8    reject your residual commission obligations.

9    This is what they say in December 17, 2002.

10   By then they know of both episodes of

11   solicitation.  "WorldCom has made a

12   determination to reject your residual

13   commission obligations as part of its

14   management of the bankruptcy process.  We

15   regret the impact on your company, but can

16   assure you that you have the right to file a

17   claim against the company as part of the

18   bankruptcy claims process."  This was not a

19   foreign e-mail, this was an e-mail from Mr.

20   Lako, with whom my client had been dealing

21   regularly, that begins, dear George.  This was

22   not an oversight.  WorldCom had made a

23   decision to reject.  Then on January 3, 2003,

24   they filed a motion seeking to reject the

25   contract -- the residual commission

36

1    obligation.  If they're filing a motion to

2    reject, why are they filing a motion to reject

3    if it's WorldCom's view that they had already

4    terminated that obligation due to

5    solicitation?  Plainly, they had not.  And I

6    think that that's really where the heart of

7    our estoppel argument is.  Your Honor granted

8    the motion to reject.  In effect, by bringing

9    the motion to reject, WorldCom admitted that

10   as of January 3, 2003, when they made the

11   motion, the contract was still in existence,

12   the residual commission obligation was still

13   in existence.  So those are really, I think,

14   the more salient facts that we rely on to say

15   that this letter, the November 14, 2002

16   letter, was not notice of termination.  And,

17   you know, counsel used the expression that

18   WorldCom came to a fork -- that HSG came to a

19   fork in the road and that they decided to go

20   both ways.  Well, actually, I think that

21   that's exactly what WorldCom has done here.

22   They learned of HSG's solicitation and they

23   had a decision.  Do we terminate residual

24   commissions, thus freeing up HSG to solicit,

25   or do we just live with it and send them

37

1  strong reminder letters because we want to

2  have the leverage to continue to keep them

3  from soliciting.  And they decided to send the

4  strong reminder letter, that's a choice that

5  they made.  I do think that one way through

6  the thicket for Your Honor is simply our 56(f)

7  argument.  We put in a very detailed

8  declaration specifying exactly what it is that

9  we're trying to get to the bottom of and

10  exactly what discovery we've been denied.  And

11  finally, Your Honor, with regard to the

12  enforceability of this nonsolicitation

13  provision and the -- really what we're

14  challenging is -- we're challenging it as an

15  unenforceable liquidated damages provision

16  because, what we know here as a matter of

17  fact, we know that with respect to the two

18  instances of solicitation, WorldCom's witness

19  said, and this is highlighted in our brief,

20  said that there was no change in WorldCom's

21  revenue stream.  So we know that there were no

22  damages to WorldCom.  And we also know, if you

23  just credit WorldCom's expert report, that if

24  we're entitled to residual commissions they're

25  in the amount of 5.4 million dollars.  Now, we

38

1  would be an unsecured creditor, so ultimately,
2  we would get approximately 30 percent of that.
3  But it is a very substantial claim and
4  WorldCom is seeking to have us forfeit all of
5  it for solicitation that they decided never to
6  act on and that they concede did not have any
7  real impact on their revenue stream.  So we
8  think that's what makes it an unenforceable
9  liquidated damages provision.  HSG has been
10  described as a sophisticated company.  My
11  clients, in certain respects, are
12  sophisticated.  But at the end of the day it's
13  a father/son company.  It is a small company
14  and I do not think that they had any leverage
15  whatsoever and if the discovery proceeds we'll
16  be able to show this.  When it came to
17  negotiating the terms of this representation
18  agreement, there's a limitation of damages
19  provision that applies to WorldCom.  There's
20  no limitation of damages that applies to my
21  client.  So WorldCom had enormous leverage
22  here, they're seeking to have this family
23  company forfeit a very sizeable commission
24  based on conduct that WorldCom has conceded
25  had no impact on their revenue stream, and

39

1    even more to the point, based on conduct that

2    WorldCom decided not to act upon and not to

3    terminate the residual commission obligations

4    for their own strategic reasons.

5            THE COURT:  All right, before you

6    sit down, let me -- and your point has been

7    made clear, but let me just try to understand.

8    If, as you suggest, I believe you suggest,

9    that WorldCom never terminated the agreement

10   pursuant to the contract and the only thing

11   WorldCom, in your view, ultimately did was

12   reject it, which would then be treated as a

13   breach of the agreement relieving the other

14   side from performance under the agreement that

15   the ability of WorldCom to say that you can't

16   get, or any of your accrued commissions should

17   be disallowed, would not be triggered because

18   there was never a termination.  So you're left

19   with a rejected contract with the damages that

20   then flow from a rejected contract.  What

21   then, in your view, defenses would WorldCom

22   have?  You're saying that the defense that you

23   solicited in violation of the contract doesn't

24   really get them anywhere because their

25   obligation then was to terminate, and since

40

1    they didn't terminate that solicitation would

2    be limited to what, establish damages?

3              MR. FISHER:  Correct, Your Honor.

4              THE COURT:  It would be the only

5    offset?

6              MR. FISHER:  And that's exactly the

7    ground where our experts disagree, how do you

8    cal -- because there's a certain projection

9    that's involved here.  WorldCom, as I

10   mentioned, continues to earn very substantial

11   revenue from customers that HSG brought to it.

12   So our experts disagree about how do you

13   project into the future when that revenue

14   stream will ultimately trail off, such that

15   residual commissions stop accruing.  Their

16   expert comes to a number of 5.4 million and

17   our expert, depending on which attrition rate

18   he used, says we need some more discovery but

19   the claim is between 5.1 million and 9

20   million.  And I think that ultimately that's

21   where this dispute should be.  It should be a

22   dispute about what are the damages as a result

23   of the rejection, exactly as Your Honor

24   indicated.

25             THE COURT:  All right.  The debtor.

41

1           MR. TUCCI:  Very briefly, Your

2    Honor.  There are a couple of facts that we

3    need to make sure are very straight here.

4    Number one, the agreement has been terminated.

5    As you might recall, I read the letter

6    accepting the termination that was sent by HSG

7    in the summer of 2002.  The agreement was

8    terminated effective July 28, 2002.  All that

9    remained was the continuing obligation to pay

10   residual commissions and the continuing

11   obligation not to solicit the customers and

12   the agents.  That is what was rejected.  We

13   can have an academic discussion on what that

14   means in the grand scheme of things, but

15   termination, notice of termination, all of

16   that is meaningless.  The agreement was

17   terminated.  All the agreement required

18   WorldCom to do was give notice of a violation

19   of that section 8.1, the nonsolicitation

20   provision.  It gave that notice on November

21   14, 2002.  It was received, it was

22   unambiguous, it says "hereby gives notice to

23   HSG/ATN that ATN has acted in violation of

24   section 8.1."  Under the terms of the

25   agreement, once that notice was given,

42

1    WorldCom's obligation to make further residual

2    commission payments ceased five days after

3    that.  That's it, that's the facts.  One other

4    thing that we need --

5              THE COURT:  So what was its conduct

6    then, thereafter continuing to pay the

7    residuals?

8              MR. TUCCI:  I'm sorry?

9              THE COURT:  I mean, how do you

10   explain this conduct thereafter, when it

11   continued to pay them?

12             MR. TUCCI:  It didn't.  Let's get

13   the dates straight here.  It made a payment on

14   September 15th, that was for the period

15   petitioned to the end of July.  It made a

16   payment on October 15th that was for August.

17   It made a payment on November 12th or so, that

18   was for September.  This letter is dated

19   November 14th, two days later.  It never made

20   another payment after that.  It told them it

21   wasn't making any payments, it rejected the

22   agreement; it wrote them a letter and said

23   they were violating the automatic stay.

24             THE COURT:  Well, you're merging a

25   number of events into one particular letter, I

43

1    think, and one date.  On November 14th, what

2    did -- how do you construe that as a notice of

3    termination?

4            MR. TUCCI:  It's a notice of

5    violation of section 8.1 of the agreement.

6    And under 8.3 of the agreement, once the

7    notice of violation is given, WorldCom's

8    obligation ceases five days after that.

9            THE COURT:  Did the letter infer

10   that it wasn't then going to pay any more

11   commissions?  I mean, what did the letter say

12   about commissions?

13           MR. TUCCI:  Well, it said it was

14   considering what steps to take to protect its

15   rights.  And what steps it took was, stop

16   paying the commissions, noticed that it was

17   rejecting the contract, sent a letter that HSG

18   had violated the automatic stay and there is

19   e-mail correspondence saying we're rejecting

20   this contract, we're not paying you anymore.

21           THE COURT:  What do you need to

22   reject a terminated contract?

23           MR. TUCCI:  Well, it's an

24   interesting question.

25           THE COURT:  Well, it is interesting,

44

1    but I think the burden may very well lie with

2    WorldCom to explain.

3            MR. TUCCI:   I think at the time, and

4    again, the dates here are critical, this

5    letter is dated November 14.   This massive

6    solicitation occurred somewhere from mid-

7    November to mid-December.   And, with

8    everything that was going on, there were

9    152,000 solicitations that occurred in this

10   approximately 30 day period.   And one of the

11   reactions was, let's not pay them anymore,

12   let's reject the contract.   And that's what

13   happened.

14           THE COURT:   If the contract was

15   terminated, what rights did they have to

16   solicit thereafter that?   The contract, in

17   your view, is terminated by this notice on

18   November 14th.

19           MR. TUCCI:   No, the contract was

20   terminated by the notice in August of 2002.

21   The contract specifically provided that it

22   could be terminated by either party.   But some

23   of the obligations survived termination.   One

24   of the obligations was WorldCom's obligation

25   to continue paying residual commissions

45

1    conditioned upon HSG's continuing obligation

2    not to solicit agents and customers.  So there

3    were -- the agreement itself had been

4    terminated.  There were some continuing

5    obligations that required both parties to do

6    certain things.  Not to solicit by HSG and to

7    make payments by MCI.

8            THE COURT:  But on November 14, if

9    WorldCom says that they're considering their

10   remedies which would be, I'm giving you notice

11   of a violation of the section that said you

12   can't solicit WorldCom's customers.  What is

13   that supposed to mean to HSG?  Does that mean

14   that you're not going to get commissions

15   anymore?  And if it means you're not going to

16   get commissions anymore, what were then the

17   continuing obligations that HSG had?

18           MR. TUCCI:  If they were not getting

19   commissions anymore for subject to their

20   rights in bankruptcy because they weren't

21   getting paid commissions on a post-petition

22   dollar for dollar basis.  That's clear.

23   Whether they had the opportunity to present a

24   claim, I think they would have some continuing

25   obligations to not solicit.  But at that point

46

1    in time, if they're not getting paid or --

2    take it outside the context of bankruptcy, if

3    WorldCom breaches and doesn't pay, they have

4    no obligation to not solicit any longer.

5              THE COURT:  All right, thank you.

6              MR. TUCCI:  Thank you.

7              MR. FISHER:  Thank you.

8              THE COURT:  All right.

9              MR. FISHER:  Your Honor, I'm sorry.

10   Just before we wrap up, as part of our

11   opposition to the motion, we also ask that

12   today's oral argument be treated as a pre-

13   motion discovery conference.  And in

14   particular, all I seek is the Court's

15   permission to bring a motion to compel the

16   depositions and the documents that I highlight

17   in my 56(f) declaration as being essential and

18   that have not been provided to date.

19             THE COURT:  Well, that may be a bit

20   premature.  I mean, I -- let me determine what

21   direction I'm going in first before I rule on

22   that.  All right.  Chambers will contact you.

23   If you haven't heard from chambers in 30 days

24   I could set up a conference call with

25   chambers.

47

1          MR. FISHER:  Thank you, Your Honor.

2          MR. TUCCI:  Thank you.

3          THE COURT:  All right, thank you.

4      (Proceedings concluded at 12:00 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48

1

2                    C E R T I F I C A T I O N

3        I, Esther Accardi, hereby certify that

4    the foregoing is a true and correct

5    transcription, to the best of my ability, of

6    the sound recorded proceedings submitted for

7    transcription in the matter of:

8    WorldCom, Inc., et al.

9

10        I further certify that I am not employed

11    by nor related to any party to this action.

12

13        In witness whereof, I hereby sign this

14    date:

15    May 9, 2006

16

17    _____

18    Esther Accardi

19

20

21

22

23

24

25