WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors in Possession
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Perez, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                         :
                                                              :        **Chapter 11 Case No.**
**WORLDCOM, INC., et al.,**                                   :        **02-13533 (AJG)**
                                                              :
                                                              :        **(Jointly Administered)**
                             **Debtors.**                     :
-----------------------------------------------------------------x

### DEBTORS' OBJECTION TO MOTION OF HSG/ATN, INC. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as

debtors and debtors in possession (collectively, "WorldCom" or the "Debtors"),

respectfully represent:

### BACKGROUND

1.      On July 21, 2002 (the "Commencement Date") and November 8,

2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries commenced cases

under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By

Orders, dated July 22, 2002 and November 12, 2002, the Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered. The

Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### THE HSG REQUEST FOR PAYMENT

2.      On August 4, 1998, MCI WorldCom Communications, Inc. ("MCI WorldCom"),[1] one of the Debtors herein, and HSG/ATN, Inc. ("HSG") entered into a representation agreement (as amended, the "Representation Agreement"), pursuant to which HSG was appointed as an authorized sales representative of MCI WorldCom to procure orders for services provided by the Debtors. Upon MCI WorldCom's acceptance of such orders and the commencement of billing of the customers (the "Customers") for the services provided thereunder, MCI WorldCom would pay HSG certain commissions. The commissions payable to HSG were based upon a percentage of the amount billed to the Customer (the "Residual Commissions").

3.      As of the Commencement Date, the Debtors were providing services to 147,000 Customers whose orders were procured by HSG. HSG did not procure any orders on or after the Commencement Date.[2] As of the Commencement Date, HSG's monthly Residual Commissions totaled approximately $200,000 and were entirely based upon orders procured prepetition.

4.      By letter, dated June 28, 2002 (the "Termination Letter"), HSG sought to terminate the Representation Agreement. A copy of the Termination Letter is

---

[1]  WorldCom Technologies, Inc., the party to the original Representation Agreement, subsequently became MCI WorldCom.

[2]  The Debtors have identified one order that appears to have been placed after the Commencement Date. The Debtors believe that this order was erroneously attributed to HSG but have not yet been able to confirm that fact. Nevertheless, for the first two months of billing on this account, the Debtors have billed this Customer $15.92 and $0.73, respectively.

annexed hereto as Exhibit A.  By letter, dated August 6, 2002 (the "Response Letter"),

MCI WorldCom acknowledged HSG's termination of the Representation Agreement

effective as of July 28, 2002.  The Response Letter is annexed as Exhibit I to the HSG

Motion.

        5.      Subsequent to the Commencement Date, the Debtors undertook an

extensive analysis of their contracts, including in excess of 1,300 representation

agreements.  On or about January 3, 2003, the Debtors filed a notice of rejection (the

"Notice of Rejection") of approximately 1,300 representation agreements that provided

no benefit to the Debtors' estates.  The Representation Agreement was included on the

Notice of Rejection.  By objection dated January 21, 2003 (the "Objection"), HSG

opposed the Notice of Rejection, asserting that the Representation Agreement was no

longer "executory" within the meaning of section 365 of the Bankruptcy Code.[3]

        6.      By motion dated February 14, 2003 (the "HSG Motion"), HSG

now seeks allowance and payment of Residual Commissions for the months of October

2002 through February 2003 in the approximate amount of $600,000 and of Residual

Commissions arising "in the future" (all of which arise from orders procured prepetition)

as an administrative expense of the Debtors' estates.

### HSG IS NOT ENTITLED TO AN<br>ADMINISTRATIVE CLAIM AS A MATTER OF LAW

        7.      HSG's attempt to characterize the Residual Commissions as an

administrative expense claim has no basis in law and is merely an attempt to circumvent

the consequences of the termination or rejection of the Representation Agreement.  In

---

[3]  The Debtors reserve the right to respond to the objection and to challenge the
timeliness of such Objection.

fact, HSG fails to cite a single decision supporting the proposition that HSG is entitled to

an administrative expense claim.  HSG cannot demonstrate that the Residual

Commissions arose from a transaction with the debtors in possession, that the Residual

Commissions were actual and necessary expenses of preserving the estates, or that HSG

provided any benefit to the Debtors' estates.  11 U.S.C. § 503(b)(1)(A).  HSG is,

therefore, not entitled to payment of any Residual Commissions as an administrative

expense of the Debtors' estates.

> 8.      As set forth by the United States Court of Appeals for the Second

Circuit in *Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98 (2d Cir. 1986):

> [A]n expense is administrative only if it arises out of a
> transaction between the creditor and the bankrupt's trustee
> or debtor in possession, and "only to the extent that the
> consideration supporting the claimant's right to payment
> was both supplied to and beneficial to the debtor-in-
> possession in the operation of the business."

*Id*. at 101 (citations omitted from quotation) (citing *In re Jartran, Inc.*, 732 F.2d 584, 587

(7th Cir. 1984) and *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d

950, 954 (1st Cir. 1976)); *see also In re Enron Corp.*, 279 B.R. 79, 85 (Bankr. S.D.N.Y.

2002); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 482 (Bankr. S.D.N.Y.

1991).

> 9.      Priority under section 503(b) of the Bankruptcy Code is afforded to

certain claims in order to facilitate the reorganization by incentivising creditors to

transact business with a debtor in possession.  *See Amalgamated Ins. Fund*, 789 F.2d at

101; *Enron Corp.*, 279 B.R. at 85.  However, in light of the Bankruptcy Code's objective

of ensuring equality of distributions of a debtor's assets among all creditors, priorities are

narrowly construed.  *Drexel*, 134 B.R. at 488.  Accordingly, "[t]he modifiers 'actual' and

'necessary' must be observed with scrupulous care." 4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY, ¶ 503.06 at 503-23 (15th ed. rev. 1994). The party asserting the right to the administrative claim bears the burden of establishing entitlement to the administrative claim. *Enron*, 279 B.R. at 85; *Drexel*, 134 B.R. at 489.

10. In *Denton & Anderson Co. v. Induction Heating Corp*., 178 F.2d 841 (2d Cir. 1949), a case in which the facts are nearly identical to the instant facts, the United States Court of Appeals for the Second Circuit considered whether, pursuant to section 64(a) of the Bankruptcy Act, the precursor to section 503(b) of the Bankruptcy Code, a sales representative was entitled to commission payments as an administrative expense for orders procured by the sales representative prior to the commencement of the debtor's bankruptcy case. In *Denton & Anderson*, the contract between the debtor and the sales representative provided the sales representative the right to procure orders, subject to acceptance by the debtor, for the debtor's goods in a designated geographic area. *Id*. at 842. Prior to the commencement of the bankruptcy case, the sales representative had obtained orders for the debtor's goods, which the debtor had accepted but not filled. *Id*. at 843. After the filing of the bankruptcy case, such orders were filled by the debtor and paid for by the customers. *Id*. Thereafter, the sales representative moved to compel the debtor to pay the commissions on such orders as an administrative expense. *Id*.

11. The Second Circuit denied the sales representative's motion holding that, because the sales representative had fully performed prior to the commencement of the bankruptcy case and did not confer a benefit upon the debtor's

estate, the sales representative was not entitled to an administrative expense claim.  *See
id.*  The Second Circuit explained:

> We see nothing in appellant's contention that appellant
> should have a preferred claim because the debtor's estate
> was, by appellant's services, enriched when debtor, having
> filled the orders, was paid.  The estate was no more
> enriched than it would have been had the debtor bought
> goods on credit before the filing of the arrangement and
> sold them afterwards; and no one would argue that the
> unpaid seller of such goods is entitled to more than a
> general claim.

*Id*. at 844.

12.    The Second Circuit's holding in *Denton & Anderson* has gone
undisturbed for 50 years and, indeed, along with the First Circuit's holding in *Mammoth
Mart*, has formed the basis for determining whether a claim is entitled to administrative
expense priority under the Bankruptcy Code.  *See Mammoth Mart*, 536 F.2d at 954
(relying on the holding in *Denton & Anderson*); *Jartran, Inc.*, 732 F.2d at 586-87, 589
(relying on the holdings in *Denton & Anderson* and *Mammoth Mart*); *Enron*, 279 B.R. at
85 ("While *Mammoth Mart* was decided under the former Bankruptcy Act, its analysis is
applicable under the Bankruptcy Code."); *Drexel*, 134 B.R. at 489 (same).

13.    For example, in *In re Dynacircuits, L.P.*, 143 B.R. 174, 179
(Bankr. N.D. Ill. 1992), the United States Bankruptcy Court for the Northern District of
Illinois held that a sales representative's commissions that came due postpetition for
orders procured prepetition were not entitled to administrative expense priority.  The
*Dynacircuits* court reasoned that:

> First, the services performed [by the sales representative] to
> obtain orders for the Debtor occurred pre-petition and
> therefore did not arise from a transaction with the debtor-
> in-possession. . . . Second, because [the sales
> representative's services resulted in orders placed

> prepetition, before Dynacircuits as a debtor-in-possession
> existed, the benefit of [the sales representative's] services
> was not a benefit conferred upon the debtor-in-possession.

*Id*. at 177 (citing *Denton & Anderson*).

14. Again in *In re Fagel's Corp.*, No. 95-60545, 1995 WL 646835, *1 (Bankr. N.D. Ohio 1995) a sales representative moved for allowance and payment of a commission arising from an order procured by the sales representative prepetition as an administrative expense. The United States Bankruptcy Court for the Northern District of Ohio, relying on the holding in *Denton & Anderson*, denied the sales representative's motion stating:

> [The] claim for an administrative expense must fail because
> it relates to a commission for services which were rendered
> prior to the commencement of the Debtor's case. In
> addition, the obligation to pay the commission did not arise
> from a transaction with the debtor-in-possession. . . . In
> addition, the court finds that the claim did not directly and
> substantially benefit the estate. The services performed by
> [the sales representative] resulted in orders placed and
> filled prepetition. The only benefit conferred by those
> services was conferred on the prepetition debtor, and thus,
> not on the estate which did not come into existence until
> after the petition was filed. That the Debtor's customer
> paid for the order which generated the claimed commission
> after the petition was filed does not lead to a contrary
> conclusion.

*Id*. at *2.

## A.    Residual Commissions Do Not Arise Out Of A Transaction With The Debtors In Possession

15. The first prong of the test articulated in *Amalgamated Ins. Fund* requires that the claim must arise out of a transaction between the creditor and the debtor in possession. "[I]t is the time at which the services are rendered that is dispositive of the issue of whether an administrative expense is allowed. The fact that a creditor's right to

payment depends on a post-petition contingency is irrelevant." *Dynacircuits*, 143 B.R. at

176. The Representation Agreement (and each of the amendments) was executed by the

parties prepetition. Moreover, each and every Customer order procured by HSG was

obtained prior to the July 21, 2002 date of commencement of these chapter 11 cases. The

Residual Commissions arise out of prepetition transactions with MCI WorldCom in its

capacity as a prepetition debtor and, therefore, are not entitled to administrative expense

priority.

16.    Apparently recognizing that obtaining the Customer orders in the

prepetition period does not entitle HSG to an administrative expense claim, HSG craftily

argues that the Residual Commissions should be afforded administrative expense priority

because (i) HSG provided certain services including fielding questions and complaints,

implementing change orders, and responding to inquiries, *see* HSG Motion at ¶ 9 and (ii)

HSG did not solicit the Debtors' Customers. *See* HSG Motion at ¶ 13. Neither of these

alternatives arise out of a transaction with the debtors in possession.

17.    The fact that HSG claims to have performed certain services and

refrained from soliciting the Debtors' Customers in the postpetition period is of no

moment. In order for HSG to be entitled to an administrative expense claim, HSG must

have been <u>induced</u> to provide such services by MCI WorldCom in its capacity as a debtor

in possession. *See Jartran*, 732 F.2d at 587 ("To serve the policy of the priority,

inducement of the creditor's performance *by the debtor-in possession* is crucial to a claim

for administrative priority in the context of furnishing of goods or services to the

debtor.") (emphasis in original); *Enron*, 279 B.R. at 86 ("Considering inducement by the

debtor-in-possession to be a crucial element comports with the policy reason for allowing

the priority, which is to encourage third-parties to supply the debtor-in-possession with

goods and services with the goal of achieving a reorganization to benefit all creditors.")

(citations omitted).

18.     With respect to the services HSG alleges to have performed, it is

clear that, assuming HSG actually performed such services, MCI WorldCom did not

induce HSG to perform these services and actually advised HSG, both orally and

pursuant to the Response Letter, that HSG should no longer provide any services under

the Representation Agreement.  *See* Response Letter annexed as Exhibit I to the HSG

Motion.  In fact, Jeff Bein, HSG's principal, admits that, notwithstanding contrary advice

from MCI WorldCom, HSG continued to provide the services.  In his affidavit annexed

as Exhibit J to the HSG Motion, Mr. Bein states:

> [A]t the end of August [2002], HSG was verbally advised
> by a WorldCom representative that the Representation
> Agreement would be rejected and that no further
> commissions would be paid.  Despite the termination of the
> Representative Agreement, and advisement by WorldCom
> of its upcoming actions, HSG continued to service the
> Customers until approximately December 16, 2002 at
> which time the Debtors prevented HSG from continuing to
> provide such service . . . .

*See* HSG Motion at Exhibit J ¶ 9-10 (emphasis supplied).  By HSG's own account, MCI

WorldCom could hardly have made it more clear that it did not want HSG to provide any

further services for the Customers.  Awarding HSG an administrative expense claim in a

situation where it is clear the debtors in possession did not induce such services does not

further the policy behind section 503(b) of the Bankruptcy Code and falls well beyond

the narrow definition of an administrative expense claim.

### B.     HSG Did Not Provide Any Benefit To The Debtors' Estates

19.     HSG must also demonstrate that the consideration supporting its claim for payment of the Residual Commissions was actual, necessary, and conferred a benefit upon MCI WorldCom's estate.  HSG cannot satisfy any of the foregoing conditions.

20.     The services that HSG claims to have provided were not necessary to the debtors in possession.  In fact, the Debtors were trying to rid themselves of such services from HSG.  As set forth above, MCI WorldCom advised HSG, both orally and in writing, that HSG should no longer provide any services to the Customers.  In addition, the Debtors, recognizing that the Representation Agreement did not benefit their estates and that HSG was no longer providing any valuable services to the estates, sought to reject the Representation Agreement.  Simply put, the Debtors no longer needed HSG. Such services, therefore, were not necessary or beneficial to the Debtors or their estates.[4]

21.     HSG's second asserted benefit (i.e., it has benefited the Debtors' estates by not soliciting the Debtors' Customers), also is without merit.  Initially, compliance with the non-solicitation provision cannot give rise to an administrative

---

[4]   In addition, even if these services were actually provided and somehow benefited MCI WorldCom's estate, HSG is only entitled to receive the reasonable value for the services provided.  *See Enron*, 279 B.R. at 86.  HSG asserts that the value of the services is the Residual Commissions.  This assertion is meritless.  There is simply no rational relationship between the services HSG alleges to have provided from the Commencement Date through December 16, 2002 and the Residual Commissions (and undeniably no relationship between such services and the Residual Commissions that arise "in the future").  If HSG is at all entitled to an administrative expense claim (which the Debtors believe it is not), such claim must be limited to the value to the Debtors of HSG's ministerial tasks of answering phones and responding to complaints.  *See Enron*, 279 B.R. at 85 (holding that an administrative expense claim is meant to prevent unjust enrichment to the estate, not to compensate the creditor for its loss and, therefore, the administrative expense claim is equal to the value of the services to the debtor).

expense claim as the provision is part of a prepetition agreement and, therefore, not a

transaction with the debtors in possession.  Moreover, in order to give rise to an

administrative expense claim, the "benefit" to the estate must be actual and necessary.

*See Drexel*, 134 B.R. at 488.  Potential or speculative benefits are not sufficient to

establish a benefit to the estate.  *See Enron*, 279 B.R. at 86.  HSG asserts that by not

soliciting customers, it has provided a benefit to MCI WorldCom.  *See* HSG Motion at

¶ 13.  Presumably, HSG speculates that if it were to solicit the Debtors' Customers, HSG

could effortlessly convince the Customers to terminate their relationships with the

Debtors thereby depriving the Debtors of the revenues associated with such lost

Customers.  Such speculation is insufficient as a matter of law to provide HSG with an

entitlement to an administrative expense claim.  If such speculation entitled HSG to an

administrative expense claim, the floodgates would be open for anyone in the

telecommunications business to seek an administrative expense claim on the basis that it

has not sought to deprive the Debtors of their Customers.

        22.     Finally, even if refraining from soliciting a debtor's customers

could provide a benefit to a debtor's estate (which it does not), HSG admits that it has not

complied with the non-solicitation provision and has solicited Customers during the

postpetition period.[5]  *See* HSG Motion at ¶ 13 fn. 4 ("In November, 2002, after receiving

notification from WorldCom that it would not be paying any further Commissions, HSG

did contact Customers."); HSG Motion at Exhibit J ¶ 13 ("Beginning on or around

November 15, 2002 and ending on or around December 15, 2002, in response to

WorldCom's position it would pay no further commissions, HSG sent out a notice to

---

[5]  The Debtors reserve all rights to assert that such actions violated section 362 of the
Bankruptcy Code.

prospects offering a new service provider."). [6]  It is wholly disingenuous that HSG has

argued that it has benefited MCI WorldCom's estate and is therefore entitled to an

administrative expense claim for complying with a non-compete provision that HSG

admits to breaching.

        23.     Accordingly, for all of the foregoing reasons, the HSG Motion

should be denied in its entirety.

### DEBTORS' DEMAND FOR TURNOVER OF POSTPETITION RESIDUAL COMMISSIONS PAYMENTS

        24.     Pursuant to Rule 3007 of the Federal Rules of Bankruptcy

Procedure, if a debtor joins an objection to a claim with a demand for payment, such

demand becomes an adversary proceeding.  *See* Fed. R. Bankr. P. 3007.  The Debtors

hereby demand that HSG turnover the Residual Commissions inadvertently paid to HSG

for the period July 21-31, 2002 and the months of August and September 2002 (the

"Inadvertent Payments").

        25.     Following the commencement of the Debtors' chapter 11 cases, the

Debtors took all precautions to ensure that payments would not be made on account of

prepetition liabilities absent an order of this Court.  Due to the size of the Debtors'

operations, the practical impossibility of monitoring each and every disbursement, and

the confusion over whether and to what extent the Representation Agreement was

---

[6]  As further confirmation of HSG's non-compliance, the Debtors have obtained several mass mailings and a copy of a letter that HSG sent to Customers that directly violate, *inter alia*, the non-solicitation provisions of the Representation Agreement.  Copies of the mass mailings and the letter are annexed hereto as Exhibit B.  Far from benefiting the Debtors' estates, HSG has caused the Debtors to expend in excess of $31,000 and significant human resources on a marketing campaign designed and implemented specifically to counteract HSG's solicitation of Customers.

executory and may require on-going payments, the Debtors inadvertently paid the

Inadvertent Payments.

26.    Pursuant to section 549 of the Bankruptcy Code,[7] because there was no order authorizing the Debtors to have paid the Inadvertent Payments and the Inadvertent Payments are not entitled to administrative expense priority, such payments may be recovered by the Debtors.  The Debtors request that the Court order HSG to immediately turnover the Inadvertent Payments to the Debtors.

27.    The Debtors anticipate that the resolution of the issue of whether the Residual Commissions (and similar commissions to other sales representatives) are entitled to administrative expense priority will eliminate the need for any contested hearings regarding the rejection of HSG's Representation Agreement and other similar representation agreements.  Therefore, the Debtors respectfully request, to the extent the Court is not prepared to order HSG to immediately turnover of the Inadvertent Payments in connection with the Court's decision on the HSG Motion and the instant objection, that the Court bifurcate the issues and (i) rule on the HSG Motion and the instant objection and (ii) establish the scheduling for further proceedings in respect of the Debtors' demand for turnover of the Inadvertent Payments.

WHEREFORE the Debtors respectfully request that the Court (i) deny the HSG Motion in its entirety, (ii) compel HSG to immediately turnover to the Debtors the

---

[7] Section 549 of the Bankruptcy Code provides, in relevant part:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate --
        (1) that occurs after the commencement of the case; and . . .
        (2)(B) that is not authorized under this title or by the court.

11 U.S.C. § 549.

Inadvertent Payments, and (iii) grant the Debtors such other and further relief as is just.

Dated: New York, New York
     March 13, 2003

/s/ Lori R. Fife
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

    and

Alfredo R. Perez, Esq.

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors and
 Debtors in Possession

# EXHIBIT A



# HSG / ATN INC.

PMB 275
1357 ASHFORD AVENUE    SUITE TWO
SAN JUAN, PUERTO RICO    00907-1420

PHONE / TOLL FREE: 1-888-291-7834
FAX / TOLL FREE: 1-888-759-6255

George Hampton
c/o R. Ahern
Worldcom Inc.
1 Meadowlands Plaza
E. Rutherford, NJ 07073

6/28/02

Dear George Hampton,

Please accept this 30-day notice of termination of our representation agreement. As per our contract, commissions are still due on our base of customers for as long as the customers are producing revenue.

Based upon feedback from our dealers, if our only products are from Worldcom, we will be out of business. We are happy to represent Worldcom products as needed by our dealers, but in order for us to survive, we will need to remove the exclusivity.

We will be happy to rescind this notice if Worldcom releases HSG/ATN from the exclusivity provision in the current agreement. Worldcom can overnight a signed release to the above address and a fax copy to 1-800-700-4387.

With either above action, HSG/ATN will remove the exclusivity. Your voluntarily removing the exclusivity in the next day will at least leave the door open for more orders to come to Worldcom.

Sincerely,

Jeffrey P. Bein
President

**EXHIBIT B**

OCT 28 2002 16:10

OCT 28 '02    12:50 No.003 P.1 2

PAGE.01

ID:



*"Your Direct Line To Savings"*

10211 N 32ND STREET, SUITE A5
PHOENIX, ARIZONA 85028
CORPORATE: 800-705-4000
FAX: 800-700-6367
CUSTOMER SERVICE: 800-477-9692
www.callatn.com

September 25, 2002

■■■■■■■■■■

Via fax number 310■■■■

Dear ■■■■

As you know, ATN has been taking care of your phone services since June. Because of the uncertain future of TTI National which is wholly owned by bankrupt WorldCom, we would like to switch your account with another provider that we are now utilizing.

The other provider is PowerNet Global (PNG). They are an outstanding company with excellent service; they conduct their operation with high standards of ethics. ATN can handle all of the paperwork to affect a smooth transition of your account from TTI National to PNG.

Your current rate with TTI is 4.25 cpm; your current CA instate rate is 3.62 cpm.

With PNG, I can offer you 4.5 cpm with an 11% discount for an effective rate of just 4.01 cpm; that represents a savings of almost 6%. Your CA rate with PNG will be 3.9 cpm; however, the 11% discount provides an effective rate of just 3.47 cpm for a savings of just over 4%. In addition, we will provide 60 free minutes of state-to-state calling. The same rates also apply for toll-free numbers.

■■■■, we strongly recommend your allowing us to transition your account to PNG. You will save about 5% over TTI, but the bigger concern is that TTI/WorldCom may not survive the bankruptcy. There could be service disruptions and other problems. PNG would accept your account without any additional credit checks.

Please let me know if you would want me to prepare the paperwork. And, please call if you have any questions or concerns.

Sincerely,

George Bela, VP
800-705-4000, Ext. 9112

10/28/02  14:48 FAX                                                                    ☎001

10/28/02  14:48 FAX



Account Name: ███████████████
Account Number: ATN███████

Welcome to the American Telecom Network (ATN) and PowerNet Global (PNG)!

## LONG DISTANCE
You currently have (or recently had) long distance service from TTI on the phone number(s) shown below:

███████████

Begin saving money with our low rate of just 5.4 cents/minute by ordering the switching of your service to PNG. Simply call us toll-free **1-888-523-5924** today to receive the low rate of 5.4 cents per minute with no monthly fees.

## IT IS NOT NECESSARY FOR YOU TO CALL TTI; THAT MAY DELAY YOUR SAVINGS.

## CALLING CARD(S)
You currently have one or more calling cards with TTI National. Please begin using the enclosed ATN calling card(s). Your calling card authorization code is the same as what you have previously used and is listed below. With the ATN calling card you will receive the low rate of 13.9 cents per minute.

Auth code #1: ███████████████

## TOLL-FREE NUMBER(S)
You currently have one or more toll-free numbers from TTI as shown on the enclosed Toll-free Form. If you want to have the same toll-free number(s) with PNG, you will need to sign the Toll-free Form and return it in the enclosed envelope or fax it to 1-877-823-7413. The transfer process could take 30 days or longer, so please do this right away.

However, if you are willing to get a new toll-free number or numbers, the process will be much quicker. Simply call us toll-free at **1-888-523-5924**. By using the new toll-free numbers, you can start saving money immediately rather than waiting for the transfer. All your toll-free calls will be billed at just 5.4 cents per minute.

## INTERNET ACCESS SERVICE - EXCLUSIVE LIMITED TIME OFFER
Now is the time to get Internet access for only $9.95 per month. This exclusive offer for ATN customers includes email and FREE 24 hour technical support. But hurry! This is a limited time offer. Call us toll-free today at **1-888-523-5924**.

## 60 FREE MINUTES OF STATE-TO-STATE CALLING - EXCLUSIVE LIMITED TIME OFFER
To thank you for your loyalty and support, ATN has arranged for you to get 60 FREE MINUTES of state-to-state calling. In order to receive these free minutes, you must have PNG's long distance service and/or toll-free service. But hurry! This is a limited time offer. Call us toll-free today at **1-888-523-5924**.

All services are billed on one convenient monthly invoice.

Enjoy the savings and the service! We appreciate your business and look forward to serving you.

60 free minutes and $9.95 Internet offers expire 11/30/02. Internet access is subject to availability. Credit for 60 minutes will appear on third invoice. All phone rates listed apply to domestic state-to-state calling. Call 1-888-523-5924 if you have questions about specific intrastate and international rates. A per call surcharge applies to all toll-free and calling cards calls made from a payphone. All calls are billed with 6 second billing with an 18 second minimum. All applicable federal, state, and local taxes apply. View full terms and conditions at http://www.pngcom.com/corporatesite/servagree.php

8.1999

# atn

## American Telecom Network[SM]

## PLEASE READ THIS IMPORTANT LETTER
## FOR INFORMATION REGARDING THE QUALITY
## OF YOUR TTI NATIONAL TELEPHONE SERVICE*

*Dear American Telecom Network Customer:*

As an independent telecom agent, ATN is committed to providing you with premium quality telephone service at the lowest rates. At the time of your enrollment, TTI National, Inc. was able to best meet your telecom service requirements.

Because TTI National is owned by MCI WorldCom, a company which recently filed for bankruptcy, that level of service has been severely compromised: *TTI's customer service hours have been reduced by 39%.* Due to the WorldCom bankruptcy, TTI faces an uncertain future. As a result, we have ended our relationship with TTI National, Inc.

To better serve you, ATN has aligned with PowerNet Global (PNG) - a nationwide leader in telecom services. As a loyal customer, this means big benefits for you, including:

- **5.4 cents per minute for Long Distance** state-to-state calls; no monthly fees, no hidden charges. Call 1-888-523-5924 today to get 60 minutes of FREE calls as an additional bonus!

- **5.4 cents per minute for your own Toll-Free** state-to-state calls; no monthly fees, no hidden charges

- **13.9 cents per minute for Calling Card** calls; no monthly fees or hidden charges

- **$9.95 Monthly Internet Access** *(a 33% savings off the low PNG rate of $14.95, and 60% less than AOL monthly access!)*

**As a convenience, ATN has opened a pre-approved account with PNG for you.**
*Please read the enclosed letter carefully.*

If you have any questions or concerns, our friendly associates are standing by to help you make a smooth transition to the PNG calling plan. Call 1-888-523-5924 today to experience a new level of savings and service through PowerNet Global.

Thank you for your continued support as an ATN customer. It is our goal to provide you with low cost telephone services from companies with high standards of ethics and honesty. PNG is exactly such a company. We look forward to hearing from you. *You have a choice and a voice!*

*Sincerely,*

**Jeffrey P. Bein**    *President, American Telecom Network*

\* *Industry analysts believe that the quality of service offered by WorldCom will probably degrade.*
*See"What Should WorldCom's Customers Do?" Business Communications Review, September 2002, pp.10-12.*

83999