STINSON MORRISON HECKER LLP
Attorneys for Debtors and Debtors in Possession
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Mark A. Shaiken, Esq.
Douglas Y. Curran, Esq.
Angela G. Heppner


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re                                          :
                                               :        Chapter 11 Case No.
WORLDCOM, INC., et al.,                        :        02-13533 (AJG)
                                               :
                                               :        (Jointly Administered)
                        Reorganized Debtors. :
                                               :
MCI WORLDCOM                                   :
COMMUNICATIONS, INC., and                      :
WORLDCOM, INC.                                 :
                                               :
                        Plaintiffs             :
                                               :
              v.                               :        Adversary Proceeding No. _____
                                               :
HSG/ATN, INC.,                                 :
                                               :
                                               :
                        Defendant.             :
------------------------------------------------------x


## OBJECTION TO CLAIM NOS. 38580 AND 38583 (FILED BY HSG/ATN, INC.) AND ADVERSARY PROCEEDING

MCI, Inc., (successor to WorldCom, Inc.), and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "Reorganized Debtors")

hereby commence this Claim Objection and Adversary Proceeding against HSG/ATN, Inc. (the

"Claimant" or "HSG") and aver as follows:

## I.  JURISDICTION

1.      The Court has jurisdiction to consider this Claim Objection and Adversary Proceeding and the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334 and Fed. R. Bankr. P. 3007 and 7001.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      As set forth hereafter, the Claimant filed two identical Claims numbered 38580 and 38583 on or about September 26, 2005, which Reorganized Debtors will therefore respond to and consider as one claim (the "Claim"), to which the Reorganized Debtors hereby object (the "Objection").  The Objection is coupled with Reorganized Debtors' affirmative claim for relief and recovery against the Claimant for the amount owed by the Claimant to the Reorganized Debtors; therefore, this Objection is filed as an adversary proceeding pursuant to Fed. R. Bankr. P. 3007 and 7001.

## II.  GENERAL BACKGROUND

3.      On July 21, 2002 (the "Petition Date") and November 8, 2002, WorldCom, Inc., and certain of its direct and indirect domestic subsidiaries commenced cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  By Orders dated July 22, 2002 and November 12, 2002, the Reorganized Debtors' Chapter 11 cases were consolidated for procedural purposes only and are being jointly administered herein.  By order entered on October 31, 2003, the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") was confirmed.  On July 29, 2002, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Committee").

4.      On November 21, 2002, the Reorganized Debtors filed their Schedules of Liabilities (as amended and supplemented, the "Debtors' Schedules") and their Schedules of

2

Executory Contracts and Unexpired Leases. On December 5, 2002, the Reorganized Debtors filed their Statements of Financial Affairs.

5.      On October 29, 2002, this Court entered its Order (a) Pursuant to Bankruptcy Rule 3003 (c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). The Bar Date Order established January 23, 2003 as the bar date (the "Bar Date") for filing proofs of claim in these cases. Pursuant to the terms of the Bar Date Order, on or about November 22, 2002, the Reorganized Debtors mailed notice of the bar date (the "Bar Date Notice") to in excess of 1.2 million creditors and potential claimants.

6.      On March 25, 2003, the Court entered its Order Pursuant to 11 U.S.C. § 105 Approving Notice Procedures Regarding Claim Objections and Deemed Schedule Amendment Motions (the "Claim Objection Procedure Order"), approving certain procedures regarding noticing of claims objections and omnibus motions for deemed schedule amendments.

### III.  OBJECTION TO CLAIM

7.      On or about November 18, 2003, HSG filed amended proof of claim no. 36482 for $7,106,348.44 for services performed. Claim no. 36482 included one attachment, which set forth the method HSG used in calculating the claim amount. Claim no. 36482 did not reference an earlier filed claim.

8.      On or about October 13, 2004, Reorganized Debtors objected to claim no. 36482 as part of their Fifty-Ninth Omnibus Objection to Proofs of Claim on the following grounds:

> The claim was not timely filed. The claim purports to be an administrative claim, but is not entitled to administrative status. The claimant has not provided sufficient information to support the claim or to permit the Debtors to evaluate it. . . . The Debtors disagree with the amount claimed. The Debtors dispute the basis of the claim. The claimed amount should be

offset or reduced by the amount owed by the claimant to the Debtors. (offset should be $435,211.33).

9.     On or about November 8, 2004, HSG responded to Reorganized Debtors' objection and referenced an earlier proof of claim.

10.     After some investigation, Reorganized Debtors, with the assistance of Herb Baer from Bankruptcy Services LLC ("BSI"), discovered that HSG filed a proof of claim on January 23, 2003. However, HSG filed the proof of claim electronically rather than by the methods prescribed in this Court's Bar Date Order.

11.     On or about November 10, 2004, HSG's January 23, 2003 claim was printed from the Court's docket by BSI and forwarded to the Clerk's Office where it was bate-stamped and assigned the claim number 38458.

12.     On or about November 24, 2004, Reorganized Debtors objected to claim no. 38458 on the following grounds:

> (1) the Claimant has not provided sufficient information to support the claim or to permit the Debtors to evaluate it . . .; (2) the Debtors disagree with the amount claimed; (3) the Debtors dispute the basis of the claim; (4) the claimed amount should be offset or reduced by the amount owed by the claimant to the Debtors (offset should be $435,211.33); (5) the claim is a duplicate, in whole or in part, of another filed claim; (6) the Claimant failed to mitigate damages.

13.     On December 29, 2004, this Court entered a stipulation between HSG and Reorganized Debtors consolidating claim nos. 36482 and 38458 and the Reorganized Debtors objections to claim nos. 36482 and 38458.

14.     On or about September 26, 2005, HSG filed two proofs of claim, nos. 38580 and 38583, purporting to amend an earlier claim filed on November 18, 2003—presumably claim no. 36482.

4

15.     Pursuant to this Court's November 15, 2004 Final Order Extending Deadline to File Objections to Claims, Reorganized Debtors have sixty (60) days after the date on which the Claim was filed to object to the Claim.

## A.  HSG Is Not Entitled to Residual Commissions

16.     On or about August 4, 1998, WorldCom Technologies, Inc. and HSG entered into a Representation Agreement whereby HSG agreed to obtain orders for certain WorldCom services as described in the Representation Agreement ("Services").  WorldCom agreed to pay HSG commissions based upon the Adjusted Billed Usage of Services by the WorldCom customers obtained by HSG ("Customers" or "WorldCom Customers").

17.      WorldCom Technologies, Inc., later MCI WorldCom Communications, Inc., (collectively "WorldCom") and HSG amended the Representation Agreement six times between July 1999 and November 2001 (the Representation Agreement and the amendments, collectively the "Agreement").

18.     Except as set forth in certain sections of the Agreement, including Section 8.3, WorldCom agreed to pay HSG residual commissions after termination of the Agreement as long as the Customer's Adjusted Billed Usage, as defined in the Agreement, exceeds $25,000 per month.  WorldCom's obligation to pay commissions ceases the first month that the Customer's Adjusted Billed Usage drops below that threshold.

19.     On June 28, 2002, HSG sent a notice of termination of the Agreement to WorldCom.

20.     On August 6, 2002, WorldCom sent a letter to HSG accepting the termination and reminding HSG that it is required to comply with Section 8.1 of the Agreement.

21.     Section 8.1 of the Agreement states:

> For so long as WorldCom pays Representative commissions in accordance with Exhibit B [of the Agreement], Representative agrees that Representative will not contact any Customers or WorldCom Group customers procured pursuant to this Agreement or any other Agreement with the WorldCom Group for the purpose of inducing them to switch to another provider of any service which competes with the Services. Representative warrants that Representative's agreements with Representative's agents and distributors presently include, and shall continue to include, the non-solicitation and non-competition covenants contained in this Section 8.1 and shall be enforceable against such agents and distributors to the same extent that Section 8.1 is enforceable against Representative.

22.    Despite Section 8.1 of the Agreement and WorldCom's August 2002 letter, HSG solicited a Customer for another service provider in violation of the Agreement on or about September 25, 2002.

23.    Under Section 8.3 of the Agreement, WorldCom was permitted to terminate commission payments to HSG as a result of its violation of Section 8.1.  Section 8.3 of the Agreement states:

> If Representative contacts a Customer or WorldCom Group customer as described in Section 8.1, WorldCom will suffer harm that WorldCom cannot now measure.  Therefore, WorldCom and Representative agree that if Representative does so contact Customer or WorldCom Group customer, WorldCom will give Representative five (5) days prior written notice, at the end of which period WorldCom's obligation to pay Representative any commissions not yet earned under this Agreement will cease.

24.    On or about November 14, 2002, after discovering HSG's solicitation, WorldCom sent HSG notice of its breach as required under Section 8.3 of the Agreement.

25.    Beginning on or about November 15, 2002 and continuing for approximately thirty days, HSG sent over 150,000 solicitations to Customers that it was prohibited from soliciting under Section 8.1 in an effort to switch those Customers to another service provider.

26.     WorldCom made commission payments to HSG in both September 2002 and November 2002 when each solicitation effort commenced.

27.     As a result of HSG's solicitations in violation of 8.1, Section 8.3 authorized WorldCom to terminate commission payments to HSG.  Therefore, WorldCom is not liable to HSG for any commissions that would have been payable in and after December 2002.

## B.  Any Recovery for HSG Must Be Offset by Inadvertent Overpayments

28.     Reorganized Debtors paid HSG $435,211.33 in residual commissions allegedly due in September, October and November 2002.  Reorganized Debtors paid this amount at 100 cents on the dollar instead of as Class 6 claims under the Bankruptcy Plan.

29.     This Court determined in its April 27, 2004 Memorandum Decision and Order Regarding Motion for Allowance and Payment of Administrative Claim by HSG/ATN, Inc. ("Order") that the residual commissions are not entitled to administrative expense priority.

30.     As a result of the Order, it is apparent that Reorganized Debtors overpaid HSG in September, October and November 2002.  Therefore, the amount that the Reorganized Debtors owes to HSG, if any, should be offset by the overpayments that occurred in September, October and November 2002.

31.     The overpayments were not authorized transfers by the Reorganized Debtors, and therefore, could be avoided pursuant to § 549 of the Bankruptcy Code.

## C.  HSG's Commission Calculation Is Erroneous

32.     Even if WorldCom had been obligated to continue making commission payments to HSG despite HSG's breach of Section 8.1 of the Agreement, HSG has significantly over-estimated the commissionable revenue that Customers have produced and will produce for WorldCom.

7

33.     HSG estimates that Customers have produced and will produce enough commissionable revenue to entitle it to commissions totaling $9,667,051.

34.     In calculating the Claim amount, HSG has erroneously relied upon an irrelevant and incorrect customer attrition rate instead of a revenue attrition rate based upon actual commissionable revenue.

35.     HSG overestimates by at least 26 years the length of time that WorldCom will retain sufficient Customers obtained by HSG for WorldCom to produce $25,000 in monthly commissionable revenue.

**D.  HSG's Damages Are Speculative**

36.     Even if WorldCom had been obligated to continue making the commission payments to HSG after November 2002, HSG's calculation of future commissions are too speculative to be recoverable.

37.     The expert opinion attached to HSG's Claim projects that WorldCom will retain enough of the Customers that were obtained by HSG for WorldCom prior to July 2002 to produce $25,000 per month in commissionable revenue through the year 2036.

38.     Several factors, such as changes in the telecommunications industry, Customer deaths and dissolutions and other intervening factors, render future damages (which are based on potential revenue that may or may not be produced until years and even decades into the future) non-recoverable because they are too speculative.

**E.  HSG Failed to Properly File the Claim**

39.     The bar date for filing proofs of claim was January 23, 2003 ("Bar Date").  HSG purports to amend it original proof of claim nearly three years after the bar date has passed.

40.     HSG did not seek the Court's permission to amend its November 18, 2003, proof of claim.

41.     Even if HSG had sought permission to amend its original proof of claim, HSG has provided no justification for its failure to file the amendment by the Bar Date.

42.     HSG's Claim purports to simply increase the damages the HSG is seeking but provides no justification for the recent increase in the claim amount.

43.     HSG's new Claim calculation relies upon a customer attrition rate using data that HSG had obtained prior to filing claim no. 36482 in November 2003.

44.     Despite having access to the data that it now relies upon for at least two years, HSG chose to calculate its claim total for its November 2003 claim using a projected revenue attrition rate.

45.     The expert report attached to HSG's Claim makes it clear that the calculation that HSG used for its November 2003 claim, no. 36482, underestimated the revenue attrition rate resulting in an overestimation of its maximum damages by over $2 million in claim no. 36482. Despite or because of that revelation, nearly two years after its November 2003 amendment, HSG now has changed its method of estimating its damages in order inflate its damage calculation even more.

46.     The amendment would cause undue prejudice to Reorganized Debtors because the amendment seeks to increase the claim amount by $2 million nearly three years after the Bar Date.  Such a substantial increase after such a long delay will require additional time and expense to be devoted to the review of the HSG's claims, which will cause undue prejudice to the Reorganized Debtors.  In addition, if creditors are permitted to file this type of substantial amendment years after the Bar Date, the accuracy of the Reorganized Debtors' liabilities will be

distorted potentially delaying the plan process to the detriment of the Reorganized Debtors and all of the creditors who complied with the Bar Date.

47.     Because of its lack of justification for the late amendment as well as the undue prejudice that it will cause to the Reorganized Debtors and other claimants, HSG should not be permitted to increase its claimed amount by over $2 million nearly three years after the Bar Date.

### F.  Additional Defenses

48.     HSG's Claim is barred, in whole or in part, by the equitable doctrines of waiver estoppel, laches and unclean hands.

### IV.  AFFIRMATIVE REQUEST FOR RELIEF AND JUDGMENT AGAINST CLAIMANT

### (Adversary Proceeding)

### A.  The Parties

49.     The specific Plaintiffs to the adversary proceeding are MCI WorldCom Communications, Inc., and WorldCom, Inc., Delaware corporations having their principal place of business in Ashburn, Virginia.  In 2002 and until April 14, 2003, Plaintiffs' principal place of business was Clinton, Mississippi.

50.     The Defendant to the adversary proceeding herein is HSG/ATN, Inc. ("HSG"), which WorldCom is informed and believes that HSG is a corporation organized and existing under the laws of Puerto Rico, having its principal place of business in Puerto Rico or Arizona.

### B.  General Allegations

51.     WorldCom Technologies, Inc., later MCI WorldCom Communications, Inc., (collectively "WorldCom") and HSG entered into a Representation Agreement and various amendments (the Representation Agreement and the amendments, collectively the "Agreement") whereby HSG agreed to obtain orders for certain WorldCom services, as described in the

10

Agreement ("Services").  WorldCom agreed to pay HSG commissions based upon the Adjusted Billed Usage of Services, as defined in the Agreement, by the WorldCom customers obtained by HSG ("Customers" or "WorldCom Customers").

52.    Except as set forth in certain sections of the Agreement, including Section 8.3, WorldCom agreed to pay HSG residual commissions after termination of the Agreement as long as the Customer's Adjusted Billed Usage exceeds $25,000 per month.  WorldCom's obligation to pay commissions ceases the first month that the Customer's Adjusted Billed Usage drops below that threshold.

53.    Section 8.1 of the Agreement states:

> For so long as WorldCom pays Representative commissions in accordance with Exhibit B, Representative agrees that Representative will not contact any Customers or WorldCom Group customers procured pursuant to this Agreement or any other Agreement with the WorldCom Group for the purpose of inducing them to switch to another provider of any service which competes with the Services.  Representative warrants that Representative's agreements with Representative's agents and distributors presently include, and shall continue to include, the non-solicitation and non-competition covenants contained in this Section 8.1 and shall be enforceable against such agents and distributors to the same extent that Section 8.1 is enforceable against Representative.

54.    On June 28, 2002, HSG sent a notice of termination of the Agreement to WorldCom.

55.    On August 6, 2002, WorldCom sent a letter to HSG accepting the termination and reminding HSG that it is required to comply with Section 8.1 of the Agreement.

56.    Despite Section 8.1 of the Agreement and WorldCom's August 2002 letter, HSG solicited a WorldCom Customer on or about September 25, 2002.

57.    The solicitation letter not only sought the Customer's permission to switch its Service to another provider but also questioned the future of WorldCom.

58.    On or about November 14, 2002, after discovering HSG's solicitation, WorldCom sent HSG notice of its breach as required under Section 8.3 of the Agreement.

59.    Beginning on or about November 15, 2002 and continuing for approximately thirty days, HSG commenced a large-scale solicitation effort directed at WorldCom Customers that it was prohibited from soliciting under Section 8.1.

60.    HSG's outrageous solicitation effort in November and December 2002 involved HSG sending out at least 150,000 solicitations to "prospects."  At least part, if not all, of those solicitations were sent to the very Customers that HSG had solicited on WorldCom's behalf prior to WorldCom's bankruptcy.

61.    The November and December solicitations sought the Customers' permission to move their Service from WorldCom to another provider, and many of the solicitations warned that contacting WorldCom may delay the Customers' savings.

62.    Many of November and December solicitations also warned that WorldCom's level of service had been severely compromised and that WorldCom faces an uncertain future. Many of the solicitations were even titled "Please Read This Important Letter for Information Regarding the Quality of Your TTI National Telephone Service[1]."

63.    As part of HSG's November and December 2002 solicitation effort of WorldCom Customers, HSG opened pre-approved accounts for at least some of the solicited Customers with another service provider.  HSG's solicitation notices state that this act was done as a convenience to the Customer.

64.    HSG switched some of the solicited Customers to another service provider ("Other Provider") as a result of its November and December 2002 solicitation effort.

---

[1] "TTI National Telephone Service" is a type of WorldCom telephone service.

65.     In February and March 2003, the first full months representing the billings from the switched Customers, the switched Customers produced approximately $133,000 in monthly revenue for the Other Provider.

66.     HSG commenced the September and November 2002 solicitation efforts despite its contractual relationship with WorldCom and despite the fact that WorldCom was still paying HSG commissions for the revenue produced by the very Customers that HSG was attempting to move to another service provider.

67.     As a result of HSG's solicitation, WorldCom was forced to mail letters to its business and residential Customers in an effort to retain its Customers and prevent loss of future business relationships.

68.     On December 23, 2002, WorldCom's counsel sent a letter to HSG warning HSG that it had violated the automatic stay in place because of the bankruptcy and quoting 11 U.S.C. § 362(a)(3).

69.     On or about January 2, 2003, despite WorldCom's December 23, 2002 letter, HSG commenced yet another solicitation effort, this time targeting over 1,400 agents and former agents from WorldCom's agent base.

70.     The agent solicitations focused directly on WorldCom's current and former agents and indirectly on WorldCom's customers.

71.     The agent solicitations generally sought to enroll the agents as HSG dealers and to convince those agents to move the customers they obtained for WorldCom to another service provider.

72.     On February 3, 2003, WorldCom's counsel sent yet another letter to HSG warning that it was continuing to violate the automatic stay by broadening its solicitation efforts through its solicitation of WorldCom agents.

### C. Count I – Tortious Interference with Customer Contracts

73.     WorldCom incorporates the allegations contained in paragraphs 51 through 72 of this Adversary Proceeding as though fully set forth herein.

74.     HSG tortiously interfered with WorldCom's contractual relationships with Customers through its egregious solicitation of Customers.

75.     HSG's solicitations of current WorldCom Customers were intentional, willful and malicious.

76.     HSG's solicitations were calculated to cause damage to WorldCom's business and to interfere with its current contractual relationships with its Customers.

77.     HSG's solicitations were wrongful, egregious and without justification.

78.     HSG benefited and WorldCom was injured and suffered damages as a result of the solicitations.

79.     The Customer contracts that were breached or otherwise ended as a result of the solicitations would have been performed but for the solicitations.

80.     Because of HSG's tortious interference, Reorganized Debtors request relief for any compensatory damages not remedied under Section 8.3 of the Agreement, including expenses associated with the Reorganized Debtors' letter to Customers targeted by the solicitations, as well as punitive damages due to the egregiousness of HSG's solicitations, costs, attorneys' fees, and any other relief as the Court deems just.

### D. Count II – Tortious Interference with WorldCom's Business Relationships

14

81.    WorldCom incorporates the allegations contained in paragraphs 51 through 72 of this Adversary Proceeding as though fully set forth herein.

82.    HSG's egregious solicitation of Customers, which HSG claims ended in December 2002, and its solicitation of WorldCom agents and future agents, tortiously interfered with WorldCom's business and prospective business relationships.

83.    HSG's solicitations were intentional, willful and malicious.

84.    HSG's solicitations were calculated to cause damage to WorldCom's business and to interfere with its current and prospective relationship with Customers and agents.

85.    HSG's solicitations were wrongful, egregious and without justification.

86.    HSG benefited and WorldCom was injured and suffered damages as a result of the solicitations.

87.    Because of HSG's tortious interference, Reorganized Debtors request relief for any compensatory damages not remedied under Section 8.3 of the Agreement, including expenses associated with the Reorganized Debtors letter to Customers targeted by the solicitations, as well as punitive damages due to the egregiousness of HSG's solicitations, costs, attorneys' fees, and any other relief as the Court deems just.

### E.  Count III – Tortious Interference with Agency Contracts

88.    WorldCom incorporates the allegations contained in paragraphs 51 through 72 of this Adversary Proceeding as though fully set forth herein.

89.    HSG tortiously interfered with WorldCom's contractual relationships with its agents by egregiously soliciting the agents beginning on or about January 2, 2003.

90.    HSG's solicitations of WorldCom's agents were intentional, willful and malicious.

91.    HSG's solicitations were calculated to cause damage to WorldCom's current contractual relationships with its agents.

15

92.    HSG's solicitations were wrongful, egregious and without justification.

93.    HSG benefited and WorldCom was injured and suffered damages as a result of the solicitations.

94.    The representation contracts that were breached or otherwise ended as a result of the solicitations would have been performed but for the solicitations.

95.    Because of HSG's tortious interference, Reorganized Debtors request compensatory relief, punitive damages due to the egregiousness of HSG's solicitations, costs, attorneys' fees, and any other relief as the Court deems just.

### F.  Count IV – Violation of Automatic Stay

96.    WorldCom incorporates the allegations contained in Paragraphs 51 through 72 of this Adversary Proceeding as though fully set forth herein.

97.    Upon the commencement of these bankruptcy cases, an automatic stay was put into place under 11 U.S.C. § 362  to protect the property of the estate.

98.    Under 11 U.S.C. § 362(a), HSG was prohibited from acting to obtain possession of property from the estate or exercise control over property of the estate.

99.    WorldCom's Customer accounts are and were property of the estate.

100.    HSG was aware of both the bankruptcy and the automatic stay at the time of the solicitations.

101.    Despite that knowledge, HSG undertook several solicitation efforts focused on Customers both through direct solicitations of the Customers and through indirect solicitations through WorldCom agents and former agents.

102.    HSG's multiple solicitation efforts violated the automatic stay because they were actions taken to obtain possession of estate property, namely WorldCom's Customer accounts, for itself or for other service providers.

16

103.    HSG's violation of the automatic stay was willful and malicious and was a deliberate disregard of bankruptcy rules

104.    HSG's violation of the stay injured the Reorganized Debtors' estate and benefited HSG.

105.    Because of HSG's violation of the stay, Reorganized Debtors request relief for any compensatory damages not remedied by Section 8.3 of the Agreement, costs, attorneys' fees and any other relief as the Court deems just.

### G.  Count V—Overpayments Are Avoidable Under Section 549

106.    WorldCom incorporates the allegations contained in paragraphs 51 through 72 of this Adversary Proceeding as though fully set forth herein.

107.    Reorganized Debtors made a post-petition payment dated September 13, 2002, to HSG for $28,345.19.

108.    Reorganized Debtors made a post-petition payment dated October 16, 2002 to HSG for $185,658.90.

109.    Reorganized Debtors made a post-petition payment dated November 12, 2002 to HSG for $221,207.24.

110.    Reorganized Debtors' post-petition payments to HSG totaling $435,211.33 were not authorized by the Bankruptcy Code or by this Court.

111.    Reorganized Debtors' post-petition payments were residual commission payments allegedly due under the Representation Agreement and were paid at the rate of 100 cents on the dollar.

DB02/048629 0094_3782/6906101.1

112.    This Court determined in its April 27, 2004 Memorandum Decision and Order Regarding Motion for Allowance and Payment of Administrative Claim by HSG/ATN, Inc. ("Order") that the residual commissions are not entitled to administrative expense priority.

113.    As a result of the Order, the residual commission payments paid in September, October and November 2002, if owed, should have been paid as Class 6 claims under the Plan.

114.    Under 11 U.S.C. § 549(a), the Reorganized Debtors may avoid post-petition transfers that are not authorized by the Bankruptcy Code or by the Court.

115.    Pursuant to 11 U.S.C. §549(a) and the Court's determination in its Order, Reorganized Debtors are entitled to recover the post-petition residual commission payments made to HSG, at least to the extent they were paid in excess of any amounts that should have been paid under the Plan.

116.    Because the post-petition payments were unauthorized, at least at the rate paid, Reorganized Debtors request that they be permitted to avoid the unauthorized payments or overpayments and either recoup the avoidable amounts or use such amounts to offset any liability that they are found to have to HSG.

## V.  NOTICE

117.    In accordance with the Claim Objection Procedures Order, notice of this Objection has been provided to counsel for the U.S. Trustee, the Committee, the Reorganized Debtors' post-petition lenders, the United States Attorney for the Southern District of New York, the ad hoc MCI Noteholders Committee, AT&T Corporation, Puerto Rico Telephone Company, Inc., and the Mid-Size Carrier Group.  Also in accordance with the Claim Objection Procedures Order, this Objection has been provided to HSG.

118.    No previous application for the relief sought herein has been made to this or any other Court.

DB02/048629 0094_3782/6906101.1

WHEREFORE the Reorganized Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: November 11, 2005
New York, New York

_s/ Douglas Y. Curran_____

Mark A. Shaiken, Esq.
Douglas Y. Curran, Esq.
Angela G. Heppner, Esq.
STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2800
Kansas City, MO  64106-2150
(816) 842-8600-Telephone
(816) 691-3495- Facsimile
Attorneys for Reorganized Debtors

19