UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
*In re*                                        :
                                               :          07 Civ. 3271 (RMB)
WORLDCOM, INC., *et al.*,                       :
                                               :          ECF Case
                        Reorganized Debtors. :
----------------------------------------------------------x
                                               :
  HSG/ATN, INC.,                               :          Chapter 11 Case No.
                                               :          02-13533 (AJG)
                        Appellant,             :          (Jointly Administered)
                                               :
              v.                               :
                                               :          Adv. Proc. No. 05-3143 (AJG)
  MCI WORLDCOM                                 :
  COMMUNICATIONS, INC., and                    :
  WORLDCOM, INC.,                              :
                                               :
                        Appellees.             :
----------------------------------------------------------x

## Notice of Appeal

Notice is hereby given that HSG/ATN, Inc. appeals to the United States Court of Appeals for the Second Circuit from the Decision and Order of the Hon. Richard M. Berman entered in this action on October 19, 2007 (the "Order") (a copy of which is annexed hereto as Exhibit A) affirming Bankruptcy Judge Arthur J. Gonzalez's (i) Order Granting Reorganized Debtors' Motion for Summary Judgment With Respect to Claim Nos. 38580 and 38583 Filed by HSG/ATN, Inc., and Granting, In Part, HSG/ATN, Inc's Motion for Summary Judgment, entered March 22, 2007 (a copy of which is annexed hereto as Exhibit B) and (ii) Opinion Regarding Motions for Summary Judgment (a copy of which is annexed hereto as Exhibit C).

The names of all parties to the Order appealed from and the names, addresses, and telephone numbers of their respective counsel are as follows:

| Party | Counsel |
|---|---|
| HSG/ATN, Inc. | Eric B. Fisher (EF-1209)<br>Morgenstern Jacobs & Blue, LLC<br>885 Third Avenue<br>New York, New York 10022<br>(212) 750-6776 |
| MCI Worldcom Communications, Inc., and Worldcom, Inc. | Michael E. Tucci, Esq.<br>Stinson Morrison Hecker LLP<br>1150 18th Street, N.W. Suite 800<br>Washington, D.C. 20036<br>(202) 728-3010 |

Dated: New York, New York
      October 24, 2007

MORGENSTERN JACOBS & BLUE, LLC

By: _____

      Eric B. Fisher (EF-1209)
      885 Third Avenue
      New York, New York 10022
      Telephone: (212) 750-6776
      Facsimile:  (212) 750-3128

ATTORNEYS FOR HSG/ATN, INC.

# Exhibit A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10-19-07

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

In re                             :

WORLDCOM, INC., et al.,       :

         Reorganized Debtors.  :
------------------------------------------------------------X
HSG/ATN, INC.,            :

         Appellant,         :

         v.                :

MCI WORLDCOM COMMUNICATIONS, INC.  :
and WORLDCOM, INC.,       :

         Appellees.         :
------------------------------------------------------------X

07 Civ. 3271 (RMB)

Chapter 11

Case No. 02-13533 (AJG)
Adv. Proc. No. 05-3143 (AJG)

**DECISION & ORDER**

## I.    Background

On or about March 28, 2007, HSG/ATN, Inc. ("HSG" or "Appellant") appealed, pursuant to 28 U.S.C. § 158(a) and Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure, from a March 22, 2007 order ("Order") issued by the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, Southern District of New York ("Bankruptcy Court"). The Order granted summary judgment to WorldCom, Inc. and MCI WorldCom Communications, Inc. (collectively, "WorldCom" or "Debtors" or "Appellees") in connection with HSG's breach of an agreement, dated August 4, 1998, with WorldCom ("Representation Agreement") pursuant to which HSG received commissions for certain orders it procured for WorldCom ("Residual Commissions"). See In re WorldCom, 361 B.R. 697 (Bankr.S.D.N.Y.2007). The Bankruptcy Court found, among other things, that "WorldCom's obligation to pay Residual Commissions terminated five business days after HSG received written notice from WorldCom" in a November 14, 2002 letter ("November 2002 Letter"). See id. at 704–05, 711, 713.

HSG's briefing papers in support of its appeal argue, among other things, that: (1) certain evidence "concerning whether WorldCom terminated the Residual Commission obligation in November 2002" "was completely overlooked by the Bankruptcy Court"; (2) "[t]he Bankruptcy Court erred when it determined as a matter of law that the November 2002 Letter served to terminate WorldCom's Residual Commission obligation"; (3) "WorldCom is judicially estopped from arguing that the November 2002 Letter terminated its Residual Commission obligation"; and (4) "the Bankruptcy Court erred when it refused to permit HSG to take discovery on material issues of fact." (See Appellant HSG/ATN, Inc.'s Brief in Support of Appeal, dated May 14, 2007 ("HSG Brief"), at 12–13, 16–17.)

On or about June 1, 2007, WorldCom filed an opposition brief, arguing, among other things, that: (1) "the Bankruptcy Court properly considered all material facts"; (2) "[t]he Bankruptcy Court properly . . . determined . . . that WorldCom's Residual Commission obligations terminated in November 2002 as a matter of law"; (3) "WorldCom was not judicially estopped from arguing that the November 2002 Letter terminated its Residual Commission obligation"; and (4) HSG "did not specifically identify the facts it wished to discover or explain how those facts were reasonably expected to create a genuine issue of material fact." (See Brief of Appellees MCI Communications Corporation and Verizon Business Global, LLC, dated June 1, 2007 ("WorldCom Brief"), at 8, 12–13, 15.) On or about, June 18, 2007, HSG filed a reply brief ("Reply").

The parties have not requested oral argument.

**For the reasons set forth below, the Bankruptcy Court's Judgment is affirmed.**

2

**II.    Standard of Review**

"On appeal, a district court reviews a bankruptcy court's finding of facts under a clearly

erroneous standard . . . and its conclusions of law de novo." In re Enron Corp., 364 B.R. 482,

485 (Bankr.S.D.N.Y.2007) (citing In re AroChem Corp., 176 F.3d 610, 620 (2d Cir. 1999)). "In

applying the 'clearly erroneous' standard of review, a district court may reverse the bankruptcy

court only where it is 'left with the definite and firm conviction that a mistake has been

committed.'" BP Energy Co. v. Bethlehem Steel Corp., No. 02 Civ. 6419, 2002 WL 31548723,

at *2 (S.D.N.Y. Nov. 15, 2002) (quoting United States v. United States Gypsum Co., 333 U.S.

364, 395 (1948)).

**III.    Analysis**

**(1)    Evidence Regarding November 2002 Letter**

The Bankruptcy Court properly found that the "the language of the Representation

Agreement is unambiguous" and that the November 2002 Letter served "as adequate notice to

HSG" of the termination of the Representation Agreement. See In re WorldCom, 361 B.R. at

705, 708, 713. Thus, there was no reason to "go beyond the text to determine the parties' true

intent." See One South, Inc. v. Hollowell, 963 So.2d 1156, 1162 (Miss. 2007).

**(2)    Valid Notice of Termination**

The Bankruptcy Court properly found that "only notice of HSG's breach, not notice of

termination, was required," In re WorldCom, 361 B.R. at 713, and such notice was supplied by

the November 2002 Letter. See Gorman v. Consolidated Edison Corp. 488 F.3d 586, 596 n.9 (2d

Cir. 2007); see also Hollowell 963 So.2d 1156.

### (3)    Judicial Estoppel

The Bankruptcy Court properly concluded there was no estoppel because the "Debtors' position in the prior action was that HSG was not entitled to administrative priority," and "the Debtors' position in the current [Bankruptcy] proceeding [was] that . . . the Residual Commissions Obligation was terminated via the November 2002 Letter." In re WorldCom, 361 B.R. at 714.  HSG has not shown that WorldCom's position is "clearly inconsistent" with its earlier position.  See New Hampshire v. Maine 532 U.S. 742, 750 (2001) (internal quotation and citation omitted).

### (4)    Additional Discovery

The Bankruptcy Court properly found that HSG "did not specifically request what facts it wished to discover and how such facts were reasonably expected to create a genuine issue of material fact." In re WorldCom, 361 B.R. at 715-16.  Because, among other reasons, HSG "submitted a skeletal affidavit" in support of its request for discovery, see Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 606 (2d Cir. 2005), the Bankruptcy Court did not abuse its discretion in denying the request.  See Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 n.1 (2d Cir. 2004).

## IV.    Conclusion and Order

For the foregoing reasons, the Bankruptcy Court's Judgment is affirmed and the appeal in 07 Civ. 3271 [#1] is dismissed.

Dated: New York, New York
      October 19, 2007



            **RICHARD M. BERMAN, U.S.D.J.**

# Exhibit B

STINSON MORRISON HECKER LLP
Attorneys for Debtors and Debtors in Possession
1201 Walnut Street
Kansas City, MO  64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
Mark A. Shaiken
Douglas Y. Curran
Angela G. Heppner

1150 18th Street, N.W., Suite 800
Washington, DC 20036
Telephone:  (202) 785-9100
Facsimile:  (202) 785-9163
Michael E. Tucci


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **WORLDCOM, INC., et al.,** | : | **02-13533 (AJG)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Reorganized Debtors.** | : | |
| | : | |
| **MCI WORLDCOM** | : | |
| **COMMUNICATIONS, INC. and** | : | |
| **WORLDCOM, INC.** | : | |
| | : | |
| **Plaintiffs,** | : | **Adv. Pro. No. 05-3143 (AJG)** |
| | : | |
| **v.** | : | |
| | : | |
| **HSG/ATN, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

------------------------------------------------------x

**ORDER GRANTING REORGANIZED DEBTORS' MOTION FOR**
**SUMMARY JUDGMENT WITH RESPECT TO CLAIM NOS. 38580 AND 38583**
**FILED BY HSG/ATN, INC., AND GRANTING, IN PART,**
**HSG/ATN, INC'S MOTION FOR SUMMARY JUDGMENT**

1

THIS MATTER having been brought before the Court on Reorganized Debtors' Motion for Summary Judgment (docket no. 17995 in Case No. 02-13533) and HSG/ATN, Inc.'s ("HSG") Motion for Summary Judgment (docket no. 12 in Adv. Pro. No. 05-3143) and at a hearing on April 25, 2006, the Court having reviewed the papers submitted in support of the Motions, the oppositions thereto, and the parties arguments at the hearing, and the Court having issued a Memorandum Opinion regarding this matter on February 14, 2007 (docket no. 18715 in Case No. 02-13533 and docket no. 26 in Adv. Pro. No. 05-3143), it is ORDERED that

1.  The Reorganized Debtors' Motion for Summary Judgment is GRANTED with respect to claim nos. 38580 and 38583 (amending claim nos. 36482 and 38458). HSG's pre-petition and post-petition allowable claim amount for residual commissions earned through November 21, 2002,[1] is $1,516,830.53, payable as a general unsecured claim ("HSG's General Unsecured Claim").

2.  HSG's Motion for Summary Judgment is GRANTED in part and DENIED in part. HSG's Motion for Summary Judgment with respect to Reorganized Debtors' claims against HSG for tortious interference is granted. HSG's Motion for Summary Judgment for alleged violations of the automatic stay is granted without prejudice to the portion of the Reorganized Debtors' Complaint seeking compensatory damages in the form of sanctions under Section 105(d) of Title 11 of the United States Code (the "Bankruptcy Code"). HSG's Motion for Summary Judgment with respect to Reorganized Debtors' claim under Section 549 of the Bankruptcy Code is denied.

---

[1] The Court's Memorandum Opinion incorrectly noted the date through which Commissions were earned as November 24, 2002. The correct date is November 21, 2002.

2

3.    Reorganized Debtors have claimed in Adv. Proc. No. 05-3143 that, under section

549 of the Bankruptcy Code, they are entitled to recoup or offset the post-petition

payments, at least to the extent they were paid in excess of any amounts that

should have been paid under the Debtors' Modified Second Amended Joint Plan

of Reorganization. Reorganized Debtors' claim under section 549 is still pending.

Because the section 549 claim remains pending in Adv. Proc. No. 05-3143,

Reorganized Debtors are not obligated to pay HSG's General Unsecured Claim

until resolution of the adversary proceeding.

Therefore,

a.   Subject to paragraph 3 above, Claim Numbers 38580 and 38583 (amending

claim nos. 36482 and 38458) are hereby reduced and allowed in the amount of

$1,516,830.53, payable as a general unsecured claim.

b.   A pretrial conference concerning the Reorganized Debtors' remaining claims

(Section 549 and 105 claims) in Adv. Pro. No. 05-3143 is set for April 17,

2007 at 10 a.m. (Eastern Daylight Savings Time).

SO ORDERED.

Dated: New York, New York
       March 22, 2007

                              s/Arthur J. Gonzalez
                              THE HONORABLE ARTHUR J. GONZALEZ
                              UNITED STATES BANKRUPTCY JUDGE

3

# Exhibit C

UNITED STATES BANKRUPTCY COURT                 For Publication
SOUTHERN DISTRICT OF NEW YORK

---

In re                                    :

WORLDCOM, INC. et al.,                   :

               Reorganized Debtors. :

---

MCI WORLDCOM                             :
COMMUNICATIONS, INC., and                :
WORLDCOM, INC.,                          :

                    Plaintiffs,     :

            v.                    :

HSG/ATN, INC.,                           :

                   Defendant.      :

---

Chapter 11

Case No. 02-13533 (AJG)

(Confirmed Case)

Adv. Proc. No. 05-3143

**OPINION REGARDING MOTIONS FOR SUMMARY JUDGMENT**

APPEARANCES

STINSON MORRISON HECKER LLP
Attorneys for Reorganized Debtors
1201 Walnut Street
Kansas City, MO 64106

        Angela G. Heppner, Esq.
        Douglas Y. Curran, Esq.
            Of Counsel

1150 18th Street, N.W., Suite 800
Washington, DC 20036

        Michael E. Tucci, Esq.
            Of Counsel

MORGENSTERN JACOBS & BLUE, LLC
Attorneys for HSG/ATN, Inc.

885 Third Avenue, Suite 3040
New York, NY 10022

Eric Fisher, Esq.
Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## I. Introduction

On February 19, 2003, HSG/ATN, Inc. ("HSG") filed a Notice of Motion For

Allowance and Payment of Administrative Claim By HSG/ATN, Inc., pursuant to which

HSG sought (1) earned commissions for the postpetition period of October 1, 2002

through December 16, 2002 in the approximate amount of $600,000, and (2) ongoing

commissions that come due in the future.

On March 14, 2003, WorldCom, Inc. and certain of its direct and indirect

subsidiaries, including MCI WorldCom Communications, Inc., the debtors and the

debtors-in-possession (collectively, "WorldCom" or the "Debtors") filed an objection to

the Motion For Allowance and Payment of Administrative Claim.  In addition, the

Debtors also demanded that HSG turn over the Residual Commissions inadvertently paid

by the Debtors to HSG for the period July 21-31, 2002 and the months of August and

September 2002 (the "Postpetition Payments").

The Official Committee of Unsecured Creditors filed a Joinder to the Objection to

Motion for Allowance and Payment of Administrative Claim on March 17, 2003.  The

Court held hearings on June 17, 2003[1] (the "June Hearing") and July 1, 2003[2] (the "July

Hearing") with regard to the Motion For Allowance and Payment Of Administrative

Claim (collectively, "Administrative Claim Proceeding").

---

[1] The transcript of the June 17, 2003 hearing hereinafter will be referred to as "Tr. 1 at  ."
[2] The transcript of the July 1, 2003 hearing hereinafter will be referred to as "Tr. 2 at  ."

2

On April 27, 2004, the Court denied HSG's administrative claim on the basis that

HSG has failed to establish its entitlement to an administrative expense priority under

sections 503(b)(1)(A) and 507(a)(1) of title 11 of the United States Code (the

"Bankruptcy Code"). With respect to the Debtors' demand for the return of the

postpetition payments, pursuant to section 549 of the Bankruptcy Code, the Court

directed the Debtors to initiate an adversary proceeding pursuant to the Federal Rules of

Bankruptcy Procedure to recover such payments.

On November 11, 2005, the Debtors filed an objection to claim numbers 38580

and 38583 (the "Claims Objection), and filed their adversary proceeding. On February

22, 2006, HSG filed a motion for summary judgment on all matters contained in the

adversary proceeding. On March 9, 2006, the Debtors filed a motion for summary

judgment with respect to the Claims Objection. Thereafter, on April 25, 2006, the Court

held a hearing regarding both motions.[3]

## II. Jurisdiction and Venue

The Court has subject matter jurisdiction over this adversary proceeding under

sections 1334(a) and (b) and 157(a) and (b) of title 28 of the United States Code and

under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of

the United States District Court for the Southern District of New York (Ward, Acting

C.J.). This is a core proceeding within the meaning of section 157(b)(2)(B), (C), (E), and

(F) of title 28 of the United States Code.

Venue is properly before the Court pursuant to section 1409(a) of title 28 of the

United States Code.

---

[3] The transcript of the April 25, 2006 hearing hereinafter will be referred to as "Tr. 3 at  ."

3

### III. Facts

Although the Court assumes familiarity with its prior opinion in this case, the
Court will reiterate certain facts relevant to the relationship between the Debtors and
HSG. *In re WorldCom, Inc.*, 308 B.R. 157 (Bankr. S.D.N.Y. 2004).

On August 4, 1998, HSG and WorldCom Technologies, Inc. ("WorldCom
Technologies") entered into a representation agreement (the "Unamended Representation
Agreement") that appointed HSG as an authorized sales representative of WorldCom
Technologies to procure orders for telecommunications services ("Services") provided by
WorldCom Technologies. Pursuant to the Unamended Representation Agreement,
"Services" is defined as the Services that WorldCom Technologies offers and provides to
the customers (the "Customer" or "Customers"), identified in Exhibit A to the
Unamended Representation Agreement.

In accordance with the Unamended Representation Agreement, WorldCom
Technologies would pay HSG commissions based upon a percentage of the amount that
WorldCom Technologies billed to the Customers procured by HSG (the "Residual
Commissions"). The Residual Commissions were due and payable, pursuant to the terms
of the Representation Agreement, forty-five (45) days from the end of the month in
which the Customers received their bills for the Services provided by WorldCom
Technologies.

The Unamended Representation Agreement between HSG and WorldCom
Technologies was exclusive. (Tr. 1 at 49.) Pursuant to the Unamended Representation
Agreement, HSG was not permitted to offer the telecommunications services of any other
vendor except for WorldCom Technologies. (Tr. 1 at 50.) The Unamended

4

Representation Agreement was subsequently amended on numerous occasions, with the last approved amendment being entitled the "Sixth Amendment to Representation Agreement" dated November 1, 2001 (the Unamended Representation Agreement and subsequent amendments thereto are hereinafter referred to collectively as the "Representation Agreement").[4] Within the second amendment to the Representation Agreement, MCI WorldCom Communications, Inc., an indirect subsidiary of WorldCom, and all of its United States affiliates ("MCI WorldCom") became a named party to the Representation Agreement, replacing WorldCom Technologies.

As permitted under the Representation Agreement, HSG sent a letter to MCI WorldCom on June 28, 2002, seeking to terminate the Representation Agreement (the "Termination Letter"). HSG terminated the Representation Agreement because of its desire to become a nonexclusive agent. (Tr. 1 at 52.)

On July 21, 2002 (the "Filing Date"), and continuing thereafter, WorldCom and certain of its direct and indirect domestic subsidiaries, including MCI WorldCom, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Court approved the Debtors' Modified Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code on October 31, 2003 (the "Reorganization Plan"). The Reorganization Plan became effective April 20, 2004. The Debtors, renamed MCI, Inc., subsequently merged with Verizon Communications, Inc., on January 6, 2006. Under the merger agreement, MCI, Inc., merged with and into Eli Acquisition, LLC, as a direct, wholly owned subsidiary of Verizon Communications, Inc. Eli Acquisition, LLC,

---

[4] At the time HSG sent the Termination Letter, HSG and representatives of MCI WorldCom were negotiating a seventh amendment to the Representation Agreement. The seventh amendment to the Representation Agreement had been drafted and signed by HSG, but was never signed by MCI WorldCom. The seventh amendment would have made HSG a nonexclusive agent. (Tr. 1 at 52.)

5

as the surviving entity, was immediately renamed MCI, LLC. MCI, LLC is now doing

business as Verizon Business Global, LLC.

By letter, dated August 6, 2002 (the "August Letter"), MCI WorldCom accepted

HSG's termination of the Representation Agreement effective July 28, 2002.[5] The

Debtors contend that the decision to accept HSG's termination of the Representation

Agreement was triggered by HSG's solicitation of Customers in July 2002. (Tr. 2 at 38-

40, 74.) However, Ray Ahern, MCI WorldCom's Director for Business Operations in the

Art Channel Department, testified at the hearing that he never saw any written

documentation or electronic communication to substantiate the allegations that HSG was

soliciting the Customers. (Tr. 2 at 73-75.) The August Letter also provided, *inter alia*,

that HSG was required to comply with the provisions of section 8.1 of the Representation

Agreement.

> Section 8.1 of the Representation Agreement states as follows
>
> For as long as WorldCom pays Representative commissions in accordance with
> Exhibit B, Representative agrees that Representative will not contact any
> Customers or WorldCom Group customers procured pursuant to this Agreement
> or any other Agreement with the WorldCom Group for the purpose of inducing
> them to switch to another provider of any service which competes with the
> Services. Representative warrants that Representative's agreements with
> Representative's agents and distributors presently include, and shall continue to
> include, the non-solicitation and non-competition covenants contained in this
> Section 8.1 and shall be enforceable against such agents and distributors to the
> same extent that this Section 8.1 is enforceable against Representative.

---

[5] On or about January 3, 2003, Debtors filed a notice of rejection (the "Notice of Rejection") of
approximately 1,300 representation agreements on the basis that same did not provide a benefit to Debtors'
estates. The Representation Agreement was included in the Notice of Rejection. By Objection dated
January 21, 2003, HSG opposed the Notice of Rejection, asserting that the Representation Agreement was
no longer "executory" within the meaning of section 365 of the Bankruptcy Code. The Debtors have
reserved their right to respond to the objection and to challenge the timeliness of the objection.

According to the Debtors, the August Letter referenced Section 8.1 of the Representation Agreement because it was MCI WorldCom's understanding that this section was violated by HSG. (Tr. 2 at 40.)

On August 2, 2002, the Debtors mass mailed a memorandum ("Memorandum") to agents who had recently received commissions. (Tr. 2 at 42-44.) The Memorandum provided that after July 22, 2002, monies earned by an agent under their respective agreements with the Debtors would be paid according to the terms and conditions in the respective representation agreements. The Memorandum also indicated that the Debtors were prohibited from paying any amounts due for prepetition commissions. On August 5, 2002, WorldCom posted a letter ("Website Letter") on a website that was accessible by active representative agents. (Tr. 2 at 44-45.) The Website Letter also served as a reminder to the agents that they were "required by federal law to abide by all terms and conditions of your existing Representation Agreement."

As of the Filing Date, MCI WorldCom provided services to approximately 169,000 Customers. As of the Filing Date, HSG's monthly Residual Commissions totaled approximately $200,000.00 and were entirely based upon orders procured prepetition. HSG did not obtain any new Customers after the Filing Date. The Debtors paid HSG, subsequent to the Filing Date, for Residual Commissions for the periods of July 21, 2002 through July 31, 2002, and for the full months of August and September 2002. The Debtors have not made any further payments for Residual Commissions to HSG.

Aside from the solicitation that was alleged to have taken place in July 2002, evidence reveals that HSG solicited Customers on two other separate occasions for the

7

purpose of enticing the Customers to a different service provider for their telecom

services. (Tr. 1 at 57.) HSG's initial solicitation was by a letter, dated September 25,

2002 (the "September Letter"), to a Customer offering to provide a lower cost phone

service than was presently available with WorldCom.[6] According to HSG, the September

Letter was in response to a call that was initiated by a Customer to HSG. (Tr. 1 at 61.)

HSG contends that the Customer's initial concern was about the bankruptcy. (Tr. 1 at

61.) After answering the Customer's questions, HSG offered to provide the Customer

with a lower cost phone service than was presently available with MCI WorldCom. (Tr.

1 at 61.) HSG testified at the hearing that the solicitation of the abovementioned

Customer was an isolated incident.

By letter dated November 14, 2002 (the "November Letter"), MCI WorldCom,

referring to the September Letter, informed HSG that it was in violation of Section 8.1 of

---

[6] The September Letter was written by George Bein and provides

> As you know, ATN has been taking care of your phone services since June. Because of the uncertain future of TTI National which is wholly owned by bankrupt WorldCom, we would like to switch your account with another provider that we are now utilizing.
>
> The other provider is PowerNet Global (PNG). They are an outstanding company with excellent service; they conduct their operations with high standards of ethics. ATN can handle all of the paperwork to affect a smooth transition of your account from TTI National to PNG.
>
> Your current rate with TTI is 4.25 cpm; your current CA instant rate is 3.62 cpm.
>
> With PNG, I can offer you 4.5 cpm with an 11% discount for an effective rate of just 4.01 cpm; that represents a savings of almost 6%. Your CA rate with PNG will be 3.9 cpm; however, the 11% discount provides an effective rate of just 3.47 cpm for a savings of just over 4%. In addition, we will provide 60 free minutes of state-to-state calling. The same rates also apply for toll-free numbers.
>
> (Redacted) we strongly recommend your allowing us to transition your account to PNG. You will save about 5% over TTI, but the bigger concern is that TTI/WorldCom may not survive the bankruptcy.
>
> There could be services disruptions and other problems. PNG would accept your account without any additional credit checks.
>
> Please let me know if you would want me to prepare the paperwork. And, please call if you have any questions or concerns.

the Representation Agreement. The November Letter, sent to HSG by overnight mail

and facsimile, set forth that HSG should immediately cease sending letters to or

contacting the Customers.

HSG's second solicitation attempt took place on November 15, 2002 and

continued for approximately 30 days thereafter (the "November Solicitation"). (Tr. 1 at

64, 102.) HSG testified that it believed that it was only a matter of time before MCI

WorldCom stopped payment of the commissions. (Tr. 1 at 62.) HSG believed MCI

WorldCom no longer valued HSG as an agent. *Id.* The factors that led HSG to that

conclusion included the following (1) the seventh amendment was never executed; (2)

HSG was not offered the advanced commission program as other agents that WorldCom

wanted to retain; and (3) Brent Lako's statement that WorldCom was no longer interested

in residential type of Customer but wanted agents who could sell the business and data

programs. (Tr. 1 at 62-63.)

Based upon the above, between November 15, 2002 and December 15, 2002,

HSG began targeting the Customers it had procured for MCI WorldCom to switch to

another vendor called PowerNet Global ("PNG"). (Tr. 1 at 64-65.) The targeted

Customers were "tagged" as former Customers of MCI WorldCom. (Tr. 1 at 65.) HSG

contends that it had a very carefully delineated tracking system so that it could track its

efforts and success. HSG especially coded the Customers' account numbers so it would

know "precisely who they were that switched their services." (Tr. 1 at 65-66.) HSG

estimates that February 2003 is the first full month that can be used to measure the

revenues generated in December 2002. (Tr. 1 at 66.) HSG contends the February 2003

9

billings were $133,000.00 as reported to HSG by PNG. (Tr. 1 at 66.) HSG contends that

the March 2003 figure was about the same. (Tr. 1 at 66.)

HSG kept a record of all incoming calls to its customer service call center.[7] (Tr. 1

at 68.) All of the calls to HSG's call center were either from existing MCI WorldCom

Customers or prospective customers. (Tr. 1 at 68.) In August 2002, HSG began its

attempts to procure Customers or new prospects for PNG. (Tr. 1 at 73, 101.) Thus,

beginning August 2002, HSG offered the services of PNG to all prospects who called the

HSG call center. (Tr. 1 at 73.) According to HSG's call records, there were

approximately 10,000 calls to the call center between the period of July 1, 2002 and end

of December 2002. (Tr. 1 at 69, 91.) HSG assumes that of the 10,000 calls, over 9,000

calls were from existing Customers and the calls were customer service related. (Tr. 1 at

69, 74, 91.) During the same time period, HSG estimates that it enrolled 1,237 customers

in PNG. (Tr. 1 at 75, 90.) The 1,237 figure only includes prospective customers who

selected the PNG service; it does not include prospective customers who did not select

the PNG service. (Tr. 1 at 92.) HSG estimates that it was able to enroll a "very high

percentage" of the prospect calls into the PNG service. (Tr. 1 at 90.) There is no way of

knowing exactly what was offered by HSG to the Customers by looking at the call

record. (Tr. 1 at 93).

MCI WorldCom's counsel sent two letters, one dated December 23, 2002 (the

"December Letter") and the other dated February 3, 2003 (the "February Letter"), stating

---

[7] The Customers had access to and were made aware of MCI WorldCom's 24 hour customer service center
by (a) the 800 number which was listed on several parts of the initial welcome letter, (b) the customer
service number listed on the back of the calling card, and (c) a public web site which explained how to
contact MCI WorldCom's customer service. HSG's number was also placed on the calling card in the event
Customers needed to request additional cards or wanted to purchase additional services. However, if
Customers needed Customer service, they were directed to the back of the calling card, which listed MCI
WorldCom's customer service number.

that the aforementioned solicitation efforts by HSG were in violation of the automatic

stay pursuant to section 362(a)(3) of the Bankruptcy Code. HSG discontinued its

solicitation efforts after receiving the December Letter.

      To counter HSG's solicitation letters, WorldCom sent out separate letters to its

residential and business Customers. The cost of sending out those letters was

$35,000.00. (Tr. 2 at 54-55)

### IV. Discussion

### A. Summary Judgment

      Summary judgment aims primarily at "disposing of factually unsupported claims

or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed.

2d 265 (1986). Under Federal Rule of Civil Procedure 56(c), as incorporated into

Bankruptcy Rule 7056, summary judgment shall be granted if the Court determines that

there is no genuine issue of material fact and that the undisputed facts warrant judgment

for the moving party as a matter of law. A "genuine issue" exists "if the evidence is such

that a reasonable jury could return a verdict for the non-moving party." *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact

is "material" if it "might affect the outcome of the suit under governing law." *Id.* at 248.

The burden is upon the moving party to establish clearly the absence of a genuine issue as

to any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed.

2d 142 (1970).

      When determining whether there is a genuine issue of fact to be tried, the Court,

however, must resolve all ambiguities and draw all reasonable inferences in the light

most favorable to the non-moving party. *United States v. Rem,* 38 F.3d 634, 643 (2d Cir.

11

1994). The movant can meet its burden for summary judgment by showing that little or no evidence may be found to support the non-movant's case. *Celotex,* 477 U.S. at 317. The movant can also meet its burden by showing that the evidence "is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.,* 477 U.S. at 252. Once a movant has demonstrated that no material facts are genuinely in dispute, the non-movant must set forth specific facts indicating a genuine issue for trial exists in order to avoid granting of summary judgment. *Cifarelli v. Village of Babylon,* 93 F.3d 47 (2d Cir. 1996) (citing *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990)).

The non-movant cannot escape summary judgment with mere conclusory allegations, speculation, or conjecture. *Id.* The non-movant, in fact, must do more than simply show that there is some "metaphysical doubt" about the facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Indeed, Federal Rules of Civil Procedure 56(c) and (e) provide that a non-movant may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial. *Celotex,* 477 U.S. at 324.

Therefore, if there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir. 1994). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S. Ct. 152, 116 L. Ed. 2d 117 (1991).

12

## B. Debtors' Motion for Summary Judgment

The Debtors request the Court grant them summary judgment on the objection to HSG's claims numbered 38580 and 38583. The Debtors argue that the Court should grant summary judgment because HSG's act of solicitation represented a violation of the Representation Agreement and five days following MCI WorldCom's notice to HSG, the Debtors' obligation to pay Residual Commissions terminated. The Debtors argue that summary judgment is appropriate because the facts on which they seek declaratory relief are undisputed.

In response, HSG opposes the Debtors' motion for summary judgment on several grounds. First, HSG argues that the November Letter did not serve as notice of termination in accordance with the terms of the Representation Agreement. Second, HSG argues that the Debtors are judicially estopped from arguing that the November Letter terminated the Residual Commission obligation. Third, HSG argues that the Debtors' motion should be denied because the Debtors deprived HSG of any meaningful discovery concerning the issues raised in the Debtors' Motion for Summary Judgment. Fourth, HSG argues that the alleged solicitation did not violate the Representation Agreement. Fifth, HSG argues that there are disputed facts concerning the issue of contractual notice and that summary judgment is not appropriate. Finally, HSG argues that section 8.3 of the Representation Agreement is not enforceable as written because it violates public policy and is unconscionable.

The Court finds that HSG is not entitled to Residual Commissions based on its solicitation of Customers in violation of the surviving obligations of the Representation

13

Agreement. Therefore, the Debtors' motion for summary judgment with respect to the

Debtors' objection to HSG's claims is granted for the reasons set forth below.

## 1. Choice of Law

The Debtors' motion for summary judgment raises a question as to which law

shall govern the interpretation of the Representation Agreement.

Section 18.3 of the Representation Agreement provides

> This Agreement is a Mississippi agreement and is governed by and
> interpreted according to the laws of the State of Mississippi applicable to
> Mississippi agreements. The parties hereby stipulate that any dispute or
> controversy arising from this Agreement or the performance hereof shall
> be heard in a court of competent jurisdiction for the County of Hinds,
> State of Mississippi, and the parties hereby submit to the exclusive
> jurisdiction and venue of such court.

In its choice of law analysis, the Court first looks to the choice of law rules of

New York, the forum state. *See, e.g., Official Comm. of Unsecured Creditors of*

*Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 90

(Bankr. S.D.N.Y. 2001) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487,

496 (1941)) ("When this Court analyzes the conflicts of law with respect to claims arising

under state law, it starts with the choice-of-law rules of New York, the forum state in

which it sits.")).

New York applies the "significant contacts test" to choice of law issues other than

tort law. *Dibbern v. Adelphia Commc'ns. Corp. (In re Adelphia Commc'ns. Corp.)*, 325

B.R. 89, 108 (Bankr. S.D.N.Y. 2005). "New York courts seek to apply the law of the

jurisdiction with the most significant interest in, or relationship to, the dispute." *Lazard*

*Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (citing

*Babcock v. Jackson*, 12 N.Y.2d 473, 481-82 (1963)). Under this approach

14

[C]ourts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.

*Lazard Freres & Co.*, 108 F.3d at 1539 (quoting *In re Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 227 (1993)).

New York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d at 226. The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis. *Id.*

In the instant matter, the Court finds that the Debtors were initially headquartered in Mississippi and eventually moved their headquarters to Virginia. HSG was headquartered and incorporated in the United States territory of Puerto Rico. Although it is unclear from the record where the Representation Agreement was negotiated, and where performance occurred, the Court finds that the decisional law of Mississippi, Virginia, and Puerto Rico have all found forum selection clauses and choice of law clauses to be enforceable.[8] Therefore, the Court finds that section 18.3 of the

---

[8] **Mississippi:** *Tel-Com Management, Inc. v. Waveland Resort Inns, Inc.*, 782 So. 2d 149, 153 (Miss. 2001) (Forum selection clauses in contracts are legal and enforceable in [Mississippi]); *Titan Indem. Co. v. Hood*, 895 So. 2d 138, 151 (Miss. 2004) (the forum selection clause in the Representative Agreement is binding and enforceable); *Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 619 So. 2d 908, 911 (Miss. 1993) (citations omitted) (The general rule is that courts will give effect to an express agreement that the laws of a specified jurisdiction shall govern. The law by which a contract is to be governed is that which parties intended or may fairly be presumed to have intended.). **Virginia:** *Paul Business Systems, Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 342 (Va. 1990) (Contractual provisions limiting the place or court where potential actions between the parties may be brought are prima facie valid and should be enforced, unless the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power); *Union Cent. Life Ins. Co. v. Pollard*, 94 Va. 146 (Va. 1896) (A contract, so far as relates to its validity, nature, interpretation and effect, is to be governed by the law of the place with reference to which it is made, and an express stipulation of the parties that it is to be held and construed as made with reference to a certain jurisdiction shows by what law they intended the transaction to be governed.); *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F.2d 355, 357-358 (4th Cir. 1989) (citing *Tate v. Hain*, 181 Va. 402, 25 S.E.2d 321, 324 (1943)) (Virginia gives effect to parties' choice of law in a contract unless circumstances show a fraudulent purpose.). **Puerto**

Representation Agreement would be enforceable in each of the jurisdictions that could be considered to have the most significant contacts and, therefore, the Representation Agreement shall be interpreted and governed under the laws of the state of Mississippi.

## 2. Solicitation

The Debtors argue that HSG's September Letter constitutes an act of solicitation under section 8.1 of the Representation Agreement, and therefore, the act of solicitation terminated the Debtors' obligation to pay Residual Commissions to HSG. The Court agrees.

According to Mississippi law, "the right to contract is a sacred right, and a contract, entered into in good faith, free from fraud, and not in violation of law by the parties, like a [person's] word, should be respected and enforced." *Employers Mut. Cas. Co. v. Nosser*, 250 Miss. 542, 569 (1964).

Under Mississippi law, "the initial question of whether the contract is ambiguous is a matter of law." *Lamb Constr. Co. v. Town of Renova*, 573 So. 2d 1378, 1383 (Miss. 1990) (citing *Bryant v. Cameron*, 473 So. 2d 174, 179 (Miss. 1985)). The key inquiry in the initial interpretation of the Representation Agreement is whether the contract is unambiguous with respect to the provisions at issue in the instant matter.

"Clear, unambiguous instruments must be construed as written." *Cherry v. Anthony, Gibbs, Sage*, 501 So.2d 416, 419 (Miss. 1987). However, "the subsequent interpretation of the ambiguous contract presents a finding of fact." *Lamb Constr. Co.*,

---

**Rico:** *Unisys P.R. Inc. v. Ramallo Bros. Printing Inc.*, 129 D.P.R. 842, 91 J.T.S. 69 (1991) (forum selection clauses are presumptively valid under Puerto Rican law, and that an opponent thereto bears an extremely heavy burden.); *Walborg Corp. v. Tribunal Superior*, 104 D.P.R. 184, 192 (1975) (Choice of law provisions are generally valid provided the chosen jurisdiction has a substantial connection to the contract unless the provision is contrary to fundamental public policy considerations.)

573 So. 2d at 1383 (citing *Bryant v. Cameron*, 473 So. 2d 174, 179 (Miss. 1985)).  Courts must ascertain the meaning of the language actually used, and not "some possible but unexpressed intent of the parties."  *Simmons v. Bank of Mississippi*, 593 So.2d 40, 42-43 (Miss. 1992) (quoting *Cherry*, 501 So.2d at 416.)  While the parties may disagree over that meaning, a disagreement alone does not render the instruments ambiguous.  *Id.*

Under section 8.1 of the Representation Agreement, HSG would continue to receive commissions so long as they did not contact Customers for, "… the purpose of inducing them to switch to another provider … ."  The Court finds that section 8.1 of the Representation Agreement was clear and unambiguous as to what constituted an act of solicitation and the ramifications of an act of solicitation.

The Court notes that in the June Hearing, George Bein ("Bein"), president of HSG, acknowledged that HSG was, "not permitted to offer the services of any other vender except for WorldCom."  (Tr. 1 at 50.)

Further, the Court notes that upon the termination of the Representation Agreement, the Debtors sent a letter to Bein reinforcing the survival of certain provisions of the Representation Agreement beyond termination, and that HSG would receive Residual Commissions so long as they did not solicit Customers.  With respect to the letters sent by the Debtors, Bein contended, "[t]o me, they were absolutely perfectly clear.  They're saying follow – abide by the terms of your contract or the surviving terms – which essentially means don't solicit the Customers – and you will get your ongoing earned commissions.  It's not even an interpretation.  It says that."  (Tr. 1 at 59.)

When asked if HSG ever deviated from the request not to solicit, Bein responded, "We deviated, perhaps, two times; one was an isolated incident [the September

17

Solicitation] and one was a formal decision that we had to – that our business really needed to do something to survive."  (Tr. 1 at 57.)

Therefore, the Court finds the language of section 8.1 of the Representation Agreement to be unambiguous and, thus, the Court finds that the September Letter constituted an act of solicitation under section 8.1 of the Representation Agreement.

### 3. Termination of the Residual Commissions

The Debtors argue that, under the terms of the Representation Agreement, they are not liable to HSG for the payment of any Residual Commission that may have accrued after HSG received the November Letter, which notified HSG that the solicitation of Customers to change service providers was a violation of section 8.1 of the Representation Agreement.  The Court agrees.

The Debtors' obligation to pay Residual Commissions following termination of the Representation Agreement was defined in the Representation Agreement, Exhibit B, Subpart 3.  Exhibit B, Subpart 3 of the Representation Agreement provides

> Except as set fort in Sections 2.2, 6.2, and 8.3 of [the Representation] Agreement, WorldCom will continue to pay commissions to Representative after this Agreement terminates for as long as Customers' Adjusted Billed usage exceeds the sum of twenty five thousand dollars ($25,000) (the "Amount").  WorldCom's obligation to pay Representative will cease beginning the first month, after the termination of its Agreement, that Representative's Customers' Adjusted Billed Usage is less than or equal to the Amount.

> Exhibit B, Subpart 3 of the Representation Agreement cross-references sections

2.2[9], 6.2[10] and 8.3[11] as exceptions to the continued payment of commissions following the termination of the Representation Agreement.

---

[9]Section 2.2 of the Representation Agreement, when read in conjunction with section 2.2.3 of that agreement, provides

18

Under section 8.3 of the Representation Agreement, if HSG contacted a Customer in violation of section 8.1 of the Representation Agreement, MCI WorldCom was required to give five (5) days prior written notice, and at the end of the five (5) days, the obligation to pay any commissions not yet earned under the Representation Agreement was terminated.

HSG argues that while the Representation Agreement provides MCI WorldCom with the right to cease paying residual commission in the event that HSG solicited in violation of the Representation Agreement, that right is not self-executing and MCI WorldCom did not provide the requisite notice to terminate Residual Commissions. HSG argues that section 8.3 of the Representation Agreement required the Debtors to give notice of their intention to terminate the payment of Residual Commissions and the November letter did not constitute sufficient notice because it did not express any intention to terminate payments. Further, HSG argues that the determination of the

---

WorldCom may terminate this Agreement and cease payment of commissions as set forth in section 6 of this Agreement effective immediately, in the event of Representative's breach of any provision of this agreement and Representative fails to cure such breach within five (5) days after written notification by WorldCom.

[10] Section 6.2 of the Representation Agreement provides

WorldCom shall not pay Representative commissions on any of Representative's Customer accounts:
1) After termination of this Agreement, if termination is by WorldCom according to paragraph 2.2; or
2) If Representative contacts a WorldCom Group customer in violation of Section 8 of this agreement; or
3) If Representative solicits, persuades or entices an employee of the WorldCom Group in violation of paragraph 1.7 of this Agreement.

[11] Section 8.3 of the Representation Agreement provides

If Representative contacts a Customer or WorldCom Group customer as described in 8.1, WorldCom will suffer harm that WorldCom cannot now measure. Therefore, WorldCom and Representative agree that if Representative does so contact a Customer or WorldCom Group Customer, WorldCom will give Representative five (5) days prior written notice, at the end of which period WorldCom's obligation to pay Representative any commissions not yet earned under this Agreement will cease.

19

reasonableness of the notice of termination under the Representation Agreement cannot

be resolved on the Debtors' Motion for Summary Judgment.

The Court finds that the language of the Representation Agreement is

unambiguous. Based on the language of the Representation Agreement, the Court finds

that only notice of HSG's breach, not notice of termination, was required. The Debtors'

obligation to pay future Residual Commissions was expressly conditioned upon HSG's

continuing obligation not to solicit the WorldCom Customers procured by HSG. The

November Letter, served as adequate notice to HSG that it had breached the non-

solicitation provision of the Representation Agreement.[12] Absent any showing that HSG

attempted to cure the breach, the Representation Agreement required no further action on

the behalf of WorldCom other than notice.

With respect to HSG's argument that summary judgment is inappropriate for the

resolution of the termination of the Representation Agreement, the Court finds that the

cases provided by HSG provide very little support and are distinguishable from the

instant matter. HSG cites to *First Mississippi Bank of Commerce v. Latch*, 433 So. 2d

946 (Miss. 1983), where the court found that the reasonableness of a notice to terminate a

contract was an issue that should be presented to a jury. In *Latch*, the court found that

resolution by a jury was necessary because of the "peculiar facts and circumstances" of

the particular case. *Id.* at 950. The agreement at issue in *Latch* was an oral agreement

with no provisions regarding notice of termination. *Id.* at 947. The Court finds that the

facts of *Latch* are distinguishable from the instant matter. Unlike *Latch*, the

Representation Agreement in the instant matter was a written agreement that provided

---

[12] *See supra* p. 5.

20

clear and unambiguous provisions regarding the requisite notice to terminate the obligation to pay Residual Commissions.

In accordance with the terms of the Representation Agreement, the Court finds that the Debtors' obligation to pay Residual Commissions terminated five business days after HSG received written notice from WorldCom of HSG's solicitation.[13]  The Court finds that under sections 8.3 and 16.1 of the Representation Agreement, HSG is deemed to have received notice through the November Letter on Friday, November 15, 2002, and the Debtors obligation to pay Residual Commissions not yet earned terminated on Friday, November 25, 2002 (the "Termination Date").  Therefore, in accordance with the Court's order on April 27, 2004, denying administrative claim status for the Residual Commissions owed to HSG, the Court finds that all Residual Commissions that HSG was entitled to receive up to and including Thursday, November 24, 2002, constitute general unsecured claims.

Furthermore, HSG argues that under the theory of judicial estoppel, the Debtors are prohibited from arguing that the November Letter terminated the Residual Commission obligation.

"Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position taken by that party in a prior legal proceeding." *Mitchell v. Washingtonville Central High School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)

---

[13] Section 16.1 of the Representation Agreement provides

Any notice required by this Agreement will be effective and deemed delivered three (3) business days after posting with the United States Postal Service when mailed by certified mail, return receipt requested, properly addressed and with the correct postage, one (1) business day after pick-up by the courier service when sent by overnight courier, properly addressed and prepaid.

Judicial estoppel requires that a court accept a particular position in the prior action, and, second, that the litigant have benefited from the court's prior acceptance. *New Hampshire v. Maine,* 532 U.S. 742, 121 S. Ct. 1808 (2001).

Although the Debtors did not challenge the validity or amount of the claims for Residual Commissions for the months of October 2002 through February 2003 and for Residual Commissions "arising in the future" in the Administrative Claim Proceeding, their current position is not contrary to their previous position in the Administrative Claim Proceeding.

Within the Debtors' objection to HSG's motion for allowance and payment of administrative claim, the Debtors argued that HSG should not be entitled to an administrative expense claim because HSG admitted that it failed to comply with the section 8.1 of the Representation Agreement. Further, the Debtors argued that, in November of 2002, HSG received notice that the Debtors would no longer be paying any further Residual Commissions.

The Debtors' position in the prior action was that HSG was not entitled to administrative priority for Residual Commissions earned postpetition based on prepetition activities. However, the Debtors' position in the current proceeding, that HSG's claims should be disallowed to the extent they constitute Residual Commissions earned after the Residual Commissions Obligation was terminated via the November Letter, is not contrary to their previous position and merely expounds upon the previous assertion that HSG violated the terms of the Representation Agreement.

22

The Court finds that the Debtors have not asserted contrary factual positions in separate proceedings, and therefore judicial estoppel is inapplicable to the Debtors' position.

HSG further argues that WorldCom has deprived HSG of any meaningful discovery concerning the issues raised in the Debtors' motion for summary judgment. The Court disagrees.

Rule 56(f) of the Federal Rules of Civil Procedure, incorporated in its entirety into the Federal Bankruptcy Rules through Rule 7056, provides

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance.

In particular, HSG contends that the Debtors redacted information related to other agents beside HSG and that the information was relevant to support HSG's argument that the Debtors made a conscious decision not to terminate its residual commission obligations for the purpose of misleading agents. Further, HSG argues that because of its inability to proceed with particular depositions, and the Debtors refusal to provide complete interrogatory responses, HSG has been deprived of the opportunity to take discovery that is central to the arguments it raises.

WorldCom argues that the discovery sought by HSG with respect to the acts of solicitation and the termination of the residual commission obligation is irrelevant.

An affidavit in opposition to motion for summary judgment, which seeks further discovery, should explain

> (1) what facts are sought and how they are to be obtained,
> (2) how those facts are reasonably expected to create a genuine issue of material fact,
> (3) what effort affiant has made to obtain them, and

(4) why the affiant was unsuccessful in those efforts.

*Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995).

A decision on whether to afford more time for discovery pursuant to Federal Rule of Civil Procedure 56(f) is within a court's discretion. *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994). Summary judgment may be granted where plaintiff gives "no basis to conclude that further discovery would yield proof" of the evidence it requires. *Meloff*, 51 F.3d at 375.

A party must already have a claim for which it seeks additional discovery, as discovery is not meant to allow a party "to find out if it has a claim." *Paddington*, 34 F.3d at 1138. The mere expectation of potentially developing further evidence is not sufficient. *Id*. Rather, the evidence sought must be to fill in evidentiary gaps. *Paddington*, 34 F.3d at 1138 (citations omitted).

A party may not defeat a motion for summary judgment by merely restating conclusory allegations and amplifying them only with speculation about what discovery might uncover. *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 107 (2d Cir. 1981). An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion. *Id*.

Thus, a properly and timely made Rule 56(f) request for discovery may nevertheless be denied if a court determines that the request is based on "speculation as to what potentially could be discovered." *Paddington*, 34 F.3d at 1138. A party seeking Rule 56(f) relief must show that the material sought is related to the defense, and that it is not cumulative or speculative. *Id*. A bare assertion that the evidence supporting a

24

plaintiff's allegation is in the hands of the defendant is not sufficient to justify a denial of

a motion for summary judgment under Rule 56(f). *Id.*

The Court finds that in order to prevail on the theory of inadequate discovery as

an affirmative defense, HSG must specify what facts it wished to discover and how such

facts were reasonably expected to create a genuine issue of material fact for trial. *Cubby,*

*Inc. v. CompuServ, Inc.,* 776 F.Supp. 135 (N.Y. 1991). HSG has failed to show that said

redactions and depositions have any bearing on the Debtors' objection to the claims

before the Court.

The Court finds that HSG has failed to sustain the burden to prevail under a Rule

56(f) defense to a motion for summary judgment because it did not specifically request

what facts it wished to discover and how such facts were reasonably expected to create a

genuine issue of material fact for trial. Therefore, the Court finds that HSG has not been

deprived of any meaningful discovery concerning the issues raised in the Debtors'

motion.

### 4. Enforceability

The Debtors argue that HSG has waived its defense of unenforceability because it

failed to raise the defense in its answer or any other response pleading.

Federal Rule of Civil Procedure 12(b), as incorporated by Federal Rule of

Bankruptcy Procedure 7012, states that "[e]very defense, in law or fact, to a claim for

relief in any pleading shall be asserted in the responsive pleading thereto" and Federal

Rule of Civil Procedure Rule 8(c), as incorporated by Federal Rule of Bankruptcy

Procedure 7008, further states

> In pleading to a preceding pleading, a party shall set forth affirmatively accord
> and satisfaction, arbitration and award, assumption of risk, contributory

25

negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

Generally, if an affirmative defense is not pleaded, it is waived and excluded from the case. *See Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1278 (3d ed. 1998). The Debtors argue that HSG failed to do raise the unenforceability of section 8.3 of the Representation Agreement as an affirmative defense to the Debtors' objection to claims numbered 38580 and 38583.

HSG argues that section 8.3 of the Representation Agreement is unenforceable on the grounds that it violates public policy and that it is unconscionable rather than an enforceable condition subsequent or liquidated damages provision. Those arguments are not affirmative claims. Instead, they constitute affirmative defenses to the enforceability of the Representation Agreement that should have been asserted in either an answer or other responsive pleadings.

Therefore, the Court finds that HSG has waived any affirmative defenses regarding enforceability on the basis of unconscionability or violation of public policy due to its failure to raise the defense in its Answer or any other responsive pleading.

However, even if HSG affirmative defense of enforceability was not waived, WorldCom argues that the Representation Agreement is enforceable as written, with respect to sections 8.1 and 8.3, because the provisions do not violate public policy and are not unconscionable. The Court agrees.

26

In *Shields v. Early*, 132 Miss. 282, 296 (Miss. 1923), the Supreme Court of Mississippi noted that, "… a penalty imposed by the terms of a contract on the party committing a breach thereof is not enforceable either in equity or at law. A penalty is provided for, for the purpose of terrorizing a party to a contract into complying with its terms. The English courts and the courts of this country have generally held that such penalties are unenforceable."

"The essence of a penalty is a payment of money stipulated as in terrorem of the party breaching the contract; while the essence of liquidated damages 'is a genuine covenanted pre-estimate of damages.'" *Shields*, 132 Miss. at 296-297 (citations omitted).

Indeed, parties agree to the payment of liquidated damages where it is difficult to determine actual damages, resulting from a breach. *Brown v. Staple Cotton Co-Op Association*, 132 Miss. 859, 892 (1923)

"In Mississippi, where such damages for breach are both 'uncertain and difficult of estimation,' such a provision has regularly been construed as one for liquidated damages." *Dahlstrom Corp. v. State Highway Com.*, 590 F.2d 614, 616 (5th Cir. 1979) (citing *Wood Naval Stores Export Ass'n v. Latimer*, 220 Miss. 652, 668 (1954)).

In the instant matter, the Representation Agreement states that the damages for solicitation would be difficult to estimate, and because of such difficulty, the parties agreed that if HSG solicited Customers, HSG would forego Residual Commissions not yet earned.

HSG argues that section 8.3 of the Representation Agreement in unenforceable on several grounds. First, HSG argues that section 8.3 of the Representation Agreement

27

violates public policy because it constitutes a penalty that requires payments that are grossly disproportionate to the amount of actual damages.

"Whether a sum stipulated is a penalty or liquidated damages is a question of construction 'to be decided upon the terms and inherent circumstances of each particular contract, *judged as at the time of the making of the contract, not as at the time of the breach*.'" *Shields*, 132 Miss. at 297 (Citations omitted) (Emphasis added).

"To distinguish then liquidated damages from a penalty, courts must look to the parties' intentions." *Board of Trustees v. Johnson*, 507 So. 2d 887, 890 (Miss. 1987) (citing *Continental Turpentine & Rosin Co. v. Gulf Naval Stores Co.*, 244 Miss. 465, 485 (1962)). In *Board of Trustees v. Johnson*, the court found that because the loss arising from the failure to perform under the agreement was difficult to assess, "the parties rightly agreed to include a liquidated damages provision in their contract." *Id.* Further, the court found that "such damages [were] reasonable, since their amount varies with the time remaining under the contract, thereby more accurately reflecting the ... losses." *Id.*

Although HSG argues that the amount of damages, at the time of the November Letter, appears to be disproportionate to the actual damages sustained, the Court finds that at the time the Representation Agreement was originally agreed upon, and throughout the six amendments, both parties agreed that damages could not easily be estimated. HSG argues that "the forfeiture of "millions of dollars constitutes an unenforceable penalty," the Court finds that the damages were reasonable because the varying number of subscribers to the Debtors services, which directly affected the amount of Residual Commissions owed to HSG, varied over time. Therefore, the Court finds that even if the affirmative defense of unenforceability based on public policy were

properly before the Court, section 8.3 of the Representation Agreement did not constitute
a penalty, and thus, did not violate public policy.

HSG also asserts that section 8.3 of the Representation Agreement may be
unconscionable because HSG had no choice but to agree to the terms of the contract.

The Supreme Court of Mississippi has defined unconscionability as "'an absence
of meaningful choice on the part of one of the parties, together with contract terms which
are unreasonably favorable to the other party.'" *East Ford, Inc. v. Taylor*, 826 So.2d 709,
715 (Miss. 2002) (quoting *Bank of Ind., Nat'l Ass'n v. Holyfield*, 476 F. Supp. 104, 109
(S.D. Miss. 1979)).

The Mississippi courts have recognized "two types of unconscionability,
procedural and substantive." *Pridgen  v. Green Tree Fin. Servicing Corp.*, 88 F. Supp. 2d
655 (S.D. Miss. 2000) (quoting *York v. Georgia-Pac. Corp.*, 585 F. Supp. 1265, 1278
(N.D. Miss.1984)).

To demonstrate procedural unconscionability, the HSG must establish "a lack of
knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic
language, disparity in sophistication or bargaining power of the parties and/or a lack of
opportunity to study the contract and inquire about the contract terms." *Id.* This type of
unconscionability is most strongly shown in contracts of adhesion presented to a party on
a "take it or leave it basis." *York v. Georgia-Pacific Corp.*, 585 F. Supp. at 1278 (quoting
*Bank of Indiana v. Holyfield*, 476 F. Supp. at 104).

In the instant matter, the Representation Agreement constituted an arm's length
transaction between two sophisticated parties.  Although HSG seeks to assert that
unequal bargaining power existed between the two parties and that section 8.3 of the

Representation Agreement functioned as a means of ensuring that HSG remained an exclusive agent of MCI WorldCom, the record evidences that HSG entered into several amendments of the Representation Agreement and was fully aware of the consequences of section 8.3 of the Representation Agreement with respect to any acts of soliciting Customers. Therefore, the Court finds that the Representation Agreement with respect to section 8.3 of the Representation Agreement was not procedurally unconscionable.

"Substantive unconscionability is found (a) in contracts, the terms of which are of such an oppressive character as to be unconscionable or (b) where there exists a large disparity between the cost of an item and the price paid for it." *Bank of Indiana v. Holyfield,* 476 F. Supp. at 110.

Substantive unconscionability is present when, "there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach." *Id.*

Applying the Mississippi standard for substantive unconscionability, the Court finds that the Representation Agreement, section 8.3 in particular, was not a one-sided agreement depriving HSG of all the benefits of the Representation Agreement, and HSG was not left without a remedy for the Debtors' nonperformance or breach. Hence, the Court finds that the Representation Agreement was not substantively unconscionable.

Thus, the Court finds that even if the affirmative defense of unenforceability based on unconscionability were properly before the Court, section 8.3 of the Representation Agreement is not unconscionable under Mississippi law and, therefore, is enforceable.

### C. HSG's Motion for Summary Judgment

WorldCom seeks affirmative recovery on the alternative theories of (i) tortious interference with customer contracts, (ii) tortious interference business relationships, (iii) tortious interference agency contracts, (iv) violations of the automatic stay, and (v) postpetition payments should be turned over.

HSG requests the Court grant it summary judgment with respect to all of the Debtors' claims within the adversary proceeding. HSG argues that the Court should grant summary judgment on several grounds. First, HSG asserts that the Debtors are not entitled to bring claims based on the theory of tortious interference because those claims should be raised as breach of contract claims. Further, HSG argues that the Debtors are not entitled to money damages for violation of the automatic stay because the contracts with Customers are not property of the estate and WorldCom did not comply with the procedural requirements for bringing contempt proceedings against HSG. Furthermore, HSG argues that the Debtors are barred by the statute of limitations set forth in section 549(d)(1) from recovering postpetition payments made to HSG by the Debtors.

In response, the Debtors oppose HSG's motion for summary judgment on several grounds. First, the Debtors argue that they are entitled to bring claims under the theory of tortious interference because they have not previously brought claims under a breach of contract theory. Further, the Debtors argue that the claims for tortious interference are timely. In addition, the Debtors argue that they are entitled to damages for HSG's willful violation of the automatic stay. Finally, the Debtors argue that their claim under section 549 of the Bankruptcy Code is timely.

31

The Court agrees with HSG that tortious interference claims are duplicative of the Debtors' claims for breach of contract. However, the Court finds that the Debtors' claim against HSG to turn over the postpetition payments is not barred by the statute of limitations. Furthermore, the Court finds that the Debtors are not entitled to compensatory damages in the form of sanctions for alleged violations of the automatic stay.

Therefore, HSG's motion for summary judgment is granted, in part, and denied, in part, for the reasons set forth below.

### 1. Tortious Interference

HSG argues that the Debtors are not entitled to bring any claims based on tortious interference as they are duplicative of the Debtors' claims for breach of contract.

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract. *Clark-Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 389 (N.Y. 1987) (Citations omitted).

The Debtors argue that they are entitled to bring claims for tortious interference because they have yet to file claims for breach of contract against HSG. The Debtors assert that their objection to HSG's proofs of claims on the grounds that the terms of the Representation Agreement precluded HSG's proofs of claim does not constitute an affirmative breach of contract claim against HSG.

Further, the Debtors classify their tort claims as defenses to HSG's contract claims. Citing *U.S. Fidelity and Garu. Co. v. Delmar Development Partners, LLC,* 22

32

A.D. 3d 1017 (N.Y. App. 2005), the Debtors argue that courts refuse to dismiss tort claims as an improper recharacterization of breach of contract claims when the tort claims are viewed as defenses to the breach of contract claims. The Court finds that the Debtors' claims for tortious interference are not defenses to HSG's contractual claims. Instead, the Debtors' claims for tortious interference claims seek affirmative relief.[14]

Further, the Court finds that duty to refrain from soliciting Customers is contained in the surviving terms of the Representation Agreement. The act of solicitation by HSG constituted a breach of the remaining obligations under the Representation Agreement. HSG's duty to refrain from solicitation of Customers arose from the language of surviving provisions, and therefore, no legal duty, independent of the contract itself was violated. Therefore, the Court finds that the Debtors have no valid claim for tortious interference.

Further, the Court finds that even if claims for tortious interference were allowable, recovery for claims under the theory of tortious interference would be duplicative of damages already awarded for breach of contract. With regard to their claims for tortious interference with customer contracts, and tortious interference with business relationships, the Debtors seek any compensatory damages not remedied under Section 8.3 of the Representation Agreement. The Court finds that no separate damages based on the claims of tortious interference are proper beyond the remedies provided in

---

[14] The Court notes that in the Debtors' Memorandum of Law in Support of the Debtors' Motion for Summary Judgment, the Debtors seek to enforce the provision of the Representation Agreement based upon HSG's solicitation of WorldCom customers under a breach of contract theory. (Memorandum of Law in Support of Motion for Summary Judgment, p.6). However, in their couterclaims, the Debtors argue that they have not sought any relief for breach of contract and only seek damages on theories of tortious interference.

section 8.3 of the Representation Agreement because the Debtors have already recovered damages under a separate theory of liability.

Accordingly, HSG's motion for summary judgment, with respect to the claims for tortious interference with customer contracts, tortious interference with business relationships, and tortious interference with agency contracts, is granted.

Because the Court grants HSG's motion for summary judgment with respect to the Debtors' claims under the theory of tortious interference, the Court does not reach the issue of whether the claims for tortious interference were timely.

### 2. Violations of the Automatic Stay

HSG argues the Debtors are not entitled to compensatory damages in the form of sanctions for alleged violations of the automatic stay in accordance with the equitable powers of the Court under section 105 of the Bankruptcy Code because the Debtors have not followed the proper procedure for bringing contempt proceedings before the Court. In addition, HSG argues that the customer contracts at issue were not "property of the estate" within the meaning of section 541 of the Bankruptcy Code and therefore, no violations of the automatic stay occurred.

The Debtors seek compensatory damages in the form of sanctions for alleged violations of the automatic stay, to the extent that section 8.3 of the Representation Agreement proves to be an insufficient remedy. As set forth above, the Court has granted relief to the Debtors in accordance with section 8.3 of the Representation Agreement. To the extent the Debtors were seeking additional relief under section 105 of the Bankruptcy Code, the Court finds that the Debtors did not provide HSG with adequate notice of their intent to seek relief in the form of sanctions.

34

For non-individual debtors, "contempt proceedings are the proper means of compensation and punishment for willful violations of the stay." *In re Chateaugay Corp.*, 920 F.2d 183, 186 (citing *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1104 (2nd Cir. 1990)).

The Court has, "the power, under 11 U.S.C. § 105 and Bankruptcy Rule 9020, to hear and determine a request for contempt emanating from the violation of one of its orders in a core proceeding." *In re Hulon*, 92 B.R. 670, 675 (Bankr. D. Tex. 1988).

Federal Rule of Bankruptcy Procedure 9020 provides that, "Rule 9014 governs a motion for an order of contempt made by the United States trustee or a party in interest."[15] In the instant matter, a motion for civil contempt under Rule 9020 is not before the Court.

"Due process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions." *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997) (citing *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 70 (2d Cir. 1996)). Although the Debtors seek the imposition of sanctions under the courts equitable powers, the Court notes that the Debtors first provided HSG with notice of their intent to seek relief in the form of sanctions for alleged violations of the automatic stay in their memorandum in opposition to HSG's motion for summary judgment. Therefore, the Court finds that the Debtors did not provide HSG with adequate notice of their intent to seek relief in the

---

[15] Rule 9014 provides

>   (a) In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought. No response is required under this rule unless the court directs otherwise.
>
>   (b) The motion shall be served in the manner provided for service of a summons and complaint by Rule 7004. Any paper served after the motion shall be served in the manner provided by Rule 5(b) F. R. Civ. P.

form of sanctions for alleged violations of the automatic stay as required when requesting the Court impose sanctions under section 105(a) of the Bankruptcy Code.

In addition, the Court notes that the issue of ownership with respect to any customer lists created during the Representation Agreement is still in dispute. However, because the Court grants HSG's motion for summary judgment with respect to the portion of the Debtors' complaint seeking sanctions against HSG for alleged violations of the automatic stay on other grounds, the Court does not need to reach the issue of ownership in this opinion.

Therefore, to the extent the Debtors were seeking relief in addition to section 8.3 of the Representation Agreement, the Court grants HSG's motion for summary judgment on procedural grounds, dismissing without prejudice that portion of the Debtors' complaint seeking compensatory damages in the form of sanctions under section 105 of the Bankruptcy Code for alleged violations of the automatic stay.

### 3. Postpetition Payments

HSG argues that section 549(d)(1) of the Bankruptcy Code precludes the Debtors' cause of action to recover three payments made by the Debtors following their petition for bankruptcy. Although the Court agrees that the statute of limitations of section 549(d) of the Bankruptcy Code is applicable here, the Court finds that the Debtors' adversary proceeding is not barred by the statute of limitations because the Debtors' cause of action was timely.[16]

---

[16] Section 549 provides in relevant part

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--
   (1) that occurs after the commencement of the case; and
   (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or
       (B) that is not authorized under this title or by the court.

36

Federal Rule of Bankruptcy Procedure 3007 states, "if an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding."

Federal Rule of Bankruptcy Procedure 7001(1), in relevant part, provides

> An adversary proceeding is governed by the rules of this Part VII. It is a proceeding (1) to recover money or property, except a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under section 554(b) or section 725 of the Code, Rule 2017, or Rule 6002

The Court in *In re Danbury Square Assocs., Ltd. Partnership*, 153 B.R. 657, 661 (Bankr. S.D.N.Y. 1993), held that it may be necessary to initiate an adversary proceeding by filing a complaint, even though the objection to the claim was procedurally sound and became an adversary proceeding when the objection was coupled with a demand for relief.

In the instant matter, three postpetition payments were made.[17] The Debtors filed their objection to the claim on May 9, 2003, combined with its request for return of the postpetition payments. The Court directed the Debtors to file an adversary proceeding, and the Debtors filed its adversary proceeding on November 11, 2005.

Although the filing date of the adversary proceeding was November 11, 2005, the Court does not find that date to be controlling for the statute of limitations analysis.

---

(d) An action or proceeding under this section may not be commenced after the earlier of--
  (1) two years after the date of the transfer sought to be avoided; or
  (2) the time the case is closed or dismissed.

[17] The three payments totaling $435,211.33, were made as follows

September 12, 2002 to HSG for $28,345.19

October 16, 2002 to HSG for $185,658.90

November 12, 2002 to HSG for $221,207.24

The United States Bankruptcy Court for the Western District of Missouri in *In re Farmland Industries,* 305 B.R. 490, 496 (Bankr. D. Mo. 2003), held that, "an action under Part VII of the Bankruptcy Rules is not proscribed by [section] 546(a) because the *de jure* adversary proceeding is not started anew; rather, it is a mere continuation of the claims procedure with the application of a new set of rules."

The Court finds that the holding of *Farmland Industries* is also applicable to the statute of limitations provision for postpetition payments contained in section 549(d) of the Bankruptcy Code. Applying the holdings of *Danbury Square* and *Farmland Associates,* the Court finds that through the operation of Federal Rule of Bankruptcy Procedure 3007, the claims procedure became an adversary proceeding on the date the Debtors substantively objected to HSG's proof of claim and asserted their right to recover money postpetition payments under section 549 of the Bankruptcy Code. This date constitutes the date on which the adversary proceeding was initiated. Further, this date gave HSG notice of the Debtors' intent to recover payments under the 549(a) of the Bankruptcy Code.

In addition, HSG argues that the Debtors' delay in filing of the adversary proceeding has prejudiced HSG. While the Court notes the delay of the Debtors to bring the adversary proceeding, the Court finds no evidence that HSG was actually prejudiced by the delay. Further, the Court notes that the sole purpose of requiring the Debtors to initiate a separate adversary proceedings was HSG's failure to file a response to the initial request for relief under section 549 of the Bankruptcy Code.

38

Therefore, the Court denies HSG's motion for summary judgment with respect to the claim that section 549(d)(1) bars the Debtors' request for the return of the Postpetition Payments, and finds no evidence of actual prejudice has been provided.

The Court notes that it is unclear as to what other issues are still in dispute with respect to the adversary proceeding as it pertains to the Debtors' claim for the return of postpetition payments. Therefore, the action remains pending and the Court will set a date for a pre-trial conference in the order issued regarding this opinion.

### V. Conclusion

Based on the foregoing, the Debtors' motion for summary judgment with respect to the objection to claim numbers 38580 and 38583 is granted, and HSG's motion for summary judgment in the adversary proceeding is granted, in part, and denied, in part. With respect to the Debtors' claims against HSG for tortious interference and alleged violations of the automatic stay, HSG's motion for summary judgment is granted. With respect to the Debtors' claim under section 549 of the Bankruptcy Code, HSG's motion for summary judgment is denied.

The Debtors are to settle an order consistent with this opinion. The order shall calculate HSG's general unsecured claims based on any Residual Commissions earned by HSG prior to the termination of the Residual Commissions Obligation.

Dated: New York, New York
       February 14, 2007

                           **s/Arthur J. Gonzalez**
                           UNITED STATES BANKRUPTCY JUDGE